JUDGE SWAIN

12 CIV 3868

# UNITED STATES DISTRICT COURT

## for the

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WOORI BANK, | Civil Action No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| CITIGROUP, INC.; CITIGROUP GLOBAL MARKETS, INC.; IVY LANE CDO LTD.; IVY LANE CDO CORP.; TIERRA ALTA FUNDING I LTD.; TIERRA ALTA FUNDING I CORP.; RIDGEWAY COURT FUNDING I, LTD.; RIDGEWAY COURT FUNDING I CORP.; FAB US 2006-1 PLC; FAB US 2006-1 CORP.; ARMITAGE ABS CDO, LTD.; and ARMITAGE ABS CDO, INC., | |
| Defendants. | |

RECEIVED MAY 15 2012 U.S.D.C. S.D.N.Y. CASHIERS

1.      Plaintiff Woori Bank, a corporation duly organized under the laws of the Republic of Korea with a principal place of business at 203, Hoehyeon-dong, 1-ga, Chung-gu, Seoul, Korea 100-792 ("Plaintiff" or "Woori"), for its complaint against Defendants Citigroup, Inc.; Citigroup Global Markets Inc. ("CGMI");[1] and Ivy Lane CDO Ltd.; Ivy Lane CDO Corp.; Tierra Alta Funding I Ltd.; Tierra Alta Funding I Corp.; Ridgeway Court Funding I, Ltd.; Ridgeway Court Funding I Corp.; FAB US 2006-1 plc; FAB US 2006-1 Corp.; Armitage ABS CDO, Ltd.; and Armitage ABS CDO, Inc.(collectively "Defendants") respectfully alleges on knowledge as to itself and its own actions, and on information and belief as to all other matters, as follows.

---

[1] Citigroup, Inc. and CGMI shall be collectively referred to as "Citigroup."

## I.    SUMMARY OF THE ACTION

2.      This action arises out of Defendants' false and misleading misrepresentations and omissions in arranging, marketing, and inducing Plaintiff to invest $95 million in a series of fraudulently created and marketed collateralized debt obligations and related products ("CDOs"). Each of these CDOs—Armitage ABS CDO Ltd. (ISIN USG04842AF09 MTGE)("Armitage"), FAB US 2006-1 PLC (ISIN USG3329PAF20 MTGE)("FAB"), Ridgeway Court Funding I, Ltd. (ISIN USG7570TAF15 MTGE) ("Ridgeway"), Ivy Lane CDO Ltd. (ISIN USG4988QAE38 MTGE )("Ivy Lane"), and Tierra Alta Funding I, Ltd. (ISIN USG88641AE89 MTGE )("Tierra Alta")—was in reality a fraudulent investment vehicle created and exploited by Defendants to move toxic mortgages off of their balance sheet and onto those of Plaintiff.

3.      From 2000 to 2006, Citigroup earned increasingly large returns from originating subprime mortgages, securitizing them into residential mortgage-backed securities ("RMBS"), arranging CDOs, and underwriting other structured finance transactions derived from subprime mortgages. When the overheated housing market began to cool in 2006, the market for subprime-based financial products began to decline. Yet Citigroup was accustomed to these profits. In now infamous words, the former CEO of Citigroup, Charles Prince, said in July of 2007, literally days before the subprime market collapse, "[a]s long as the music is playing, you've got to get up and dance," and added, "We're still dancing."[2]

4.      Commencing in early 2006, Defendants knew that CDOs were far more risky than their ratings suggested. Defendants' superior knowledge was based on information on individual loan performance that was available only to financial institutions that, like Citigroup, were securitizing mortgages into RMBS on a massive scale, and therefore had inside information that others did not about the quality and stability of these inherently opaque

---

[2]*See* Michiyo Nakamoto & David Wighton, C*itigroup Chief Stays Bullish on Buy-Outs* (Fin. Times July 9, 2007) available at  http://www.ft.com/cms/s/0/80e2987a-2e50-11dc-821c-0000779fd2ac.html#axzz1jdQ16vwk.

financial products. As a result of their insider knowledge, Defendants knew that the RMBS that they and other major banks were packaging into CDOs included a significant percentage of mortgages that violated basic underwriting standards and were likely to default—making the RMBS assets and the CDOs that securitized them far less secure than portrayed by their ratings that Citigroup was able to persuade Standard & Poor's ("S&P") and Moody's to give them. Rather than disclosing these material facts to investors in the deals it arranged, Defendants concealed them so that Citigroup could off-load some of the massive exposure to subprime RMBS that it carried on its own balance sheet to unsuspecting investors—while at the same time continuing to earn lucrative fees from generating CDOs.

5.      Although this was obviously material information, Defendants never disclosed to Plaintiff—and indeed affirmatively misrepresented and/or concealed—the fact that the ratings on the CDOs purchased by Plaintiff falsely portrayed the riskiness of the investments. If Plaintiff had known the truth, it would not have purchased $95 million in Citigroup CDOs.

## II.     THE PARTIES

### A.      The Plaintiff

6.      Plaintiff Woori is a corporation duly organized under the laws of the Republic of Korea with a principal place of business at 203, Hoehyeon-dong, 1-ga, Chung-gu, Seoul, Korea 100-792. Woori operates in locations throughout the world, including the United States, where it operates through its subsidiary, Woori America Bank, which has offices in New York City and in five other states.

7.      During 2006-07, Plaintiff purchased interests in the following CDOs from Citigroup, interests that it had to sell at a loss once their worthless nature became known. On all of these deals, Citigroup acquired and supplied the assets underlying the CDOs, established the issuers, arranged for the Moody's and S&P to supply ratings for the CDOs, and then marketed and sold the CDOs to Woori and other investors.

8.    On March 30, 2006, Woori purchased a $20 million interest in Tierra Alta. The CDO tranche Woori purchased was rated as A- by S&P at that time. Woori sold this interest on January 30, 2009 at 0.375% of what it paid.

9.    On May 18, 2006, Woori purchased a $15 million interest in Ivy Lane. The CDO tranche Woori purchased was rated as A by S&P at that time. Woori sold this interest on January 30, 2009 for a dollar.

10.    On July 27, 2006, Woori purchased a $15 million interest in Ridgeway. The CDO tranche that Woori purchased was rated as A- by S&P at that time. Woori sold this interest on January 30, 2009 for a dollar.

11.    On November 30, 2006, Woori purchased a $15 million interest in FAB. The CDO tranche that Woori purchased was rated as A- by S&P at that time. Woori sold this interest on January 30, 2009 for a dollar.

12.    On March 29, 2007, Woori purchased a $25 million interest in Armitage. The CDO tranche that Woori purchased was rated as A by S&P at that time. By December 4, 2007—eight months later—the CDO was in default. Woori sold this interest on August 14, 2008.

**B.    The Defendants**

13.    Defendant Citigroup, Inc. is a diversified global financial services holding company organized under the laws of the State of Delaware. It is headquartered at 399 Park Avenue, New York, New York.

14.    Defendant CGMI is a New York corporation located at 390 Greenwich Street, New York, New York 10013. CGMI is a registered broker-dealer and serves as a brokerage and securities arm of Citigroup Inc.

15.    As noted previously, Citigroup, Inc. and CGMI are collectively referred to herein as "Citigroup." Citigroup was the arranger, underwriter, "Placement Agent," and direct seller of the CDOs in which Plaintiff invested. Citigroup was responsible for preparing and

disseminating the Offering Circulars for Ivy Lane, Tierra Alta, Ridgeway, FAB, and Armitage discussed in more detail below, and for making other statements and disclosures to Plaintiff, on behalf of Citigroup and the other Defendants.

16.     On information and belief, Defendant Ivy Lane CDO Ltd. is a corporation formed under the laws of the Cayman Islands. Ivy Lane CDO Ltd. was formed by Citigroup or its affiliates to issue Ivy Lane CDO Ltd. securities. Ivy Lane CDO Ltd. is located at Walkers SPV Limited, Walker House, P.O. Box 908GT, Mary Street, George Town, Grand Cayman, Cayman Islands. Ivy Lane CDO Ltd. was incorporated on February 7, 2006 and the Closing Date on the Offering Circular was May 18, 2006. Ivy Lane CDO Ltd. has never had any employees, was nominally capitalized, and has no prior operating history.

17.     On information and belief, Defendant Ivy Lane CDO Corp. is a corporation organized under the laws of Delaware. Ivy Lane CDO Corp. was formed by Citigroup or its affiliates to issue Ivy Lane CDO Corp. securities. Ivy Lane CDO Corp. is located at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711. Ivy Lane CDO Corp. was incorporated on March 1, 2006 and the Execution Date on the Offering Circular was May 18, 2006. Ivy Lane CDO Corp. has never had any employees, was nominally capitalized, and has no prior operating history.

18.     On information and belief, Defendant Tierra Alta Funding I, Ltd. is a corporation formed under the laws of the Cayman Islands. Tierra Alta Funding I, Ltd. was formed by Citigroup or its affiliates to issue Tierra Alta Funding I, Ltd. securities. Tierra Alta Funding I, Ltd. is located at P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands. Tierra Alta Funding I, Ltd. was incorporated on January 1, 2006 and the Execution Date on the Offering Circular was March 23, 2006. Tierra Alta Funding I, Ltd. has never had any employees, was nominally capitalized, and has no prior operating history.

19.     On information and belief, Defendant Tierra Alta Funding I Corp. is a corporation organized under the laws of Delaware. Tierra Alta Funding I Corp. was formed by

Citigroup or its affiliates to issue Tierra Alta Funding I Corp. securities. Tierra Alta Funding I Corp. is located at 1209 Orange Street, Wilmington, Delaware 19801. Tierra Alta Funding I Corp. was incorporated on January 31, 2006 and the Execution Date on the Offering Circular was March 23, 2006. Tierra Alta Funding I Corp. has never had any employees, was nominally capitalized, and has no prior operating history.

20.     On information and belief, Defendant Ridgeway Court Funding I, Ltd. is a corporation formed under the laws of the Cayman Islands. Ridgeway Court Funding I, Ltd. was formed by Citigroup or its affiliates to issue Ridgeway Court Funding I, Ltd. securities. Ridgeway Court Funding I, Ltd. is located at P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands. Ridgeway Court Funding I, Ltd. was incorporated on May 17, 2006 and the Closing Date on the Offering Circular was July 27, 2006. Ridgeway Court Funding I, Ltd. has never had any employees, was nominally capitalized, and has no prior operating history.

21.     On information and belief, Defendant Ridgeway Court Funding I, Corp. is a corporation organized under the laws of Delaware. Ridgeway Court Funding I, Corp. was formed by Citigroup or its affiliates to issue Ridgeway Court Funding I, Corp. securities. Ridgeway Court Funding I, Corp. is located at 1209 Orange Street, Wilmington, Delaware 19801. Ridgeway Court Funding I, Corp. was incorporated on June 6, 2006 and the Closing Date on the Offering Circular was July 27, 2006. Ridgeway Court Funding I, Corp. has never had any employees, was nominally capitalized, and has no prior operating history.

22.     On information and belief, Defendant FAB US 2006-1 PLC is a corporation formed under the laws of Ireland. FAB US 2006-1 PLC was formed by Citigroup or its affiliates to issue FAB US 2006-1 PLC securities. FAB US 2006-1 PLC is located at J.P. Morgan Bank (Ireland) plc, J.P.Morgan House, IFSC, Dublin 1, Ireland. FAB US 2006-1 PLC was incorporated on September 6, 2006 and the Closing Date on the Offering Circular was November 30, 2006. FAB US 2006-1 PLC has never had any employees, was nominally capitalized, and has no prior operating history.

6

23.     On information and belief, Defendant FAB US 2006-1 Corp. is a corporation organized under the laws of Delaware. FAB US 2006-1 Corp. was formed by Citigroup or its affiliates to issue FAB US 2006-1 Corp. securities. FAB US 2006-1 Corp. is located at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711. FAB US 2006-1 Corp. was incorporated on just prior to the Closing Date, and the Closing Date on the Offering Circular was November 30, 2006. FAB US 2006-1 Corp. has never had any employees, was nominally capitalized, and has no prior operating history.

24.     On information and belief, Defendant Armitage ABS CDO, Ltd. is a corporation formed under the laws of the Cayman Islands. Armitage ABS CDO, Ltd. was formed by Citigroup or its affiliates to issue Armitage ABS CDO, Ltd. securities. Armitage ABS CDO, Ltd. is located at Walker House,87 Mary Street, George Town, Grand Cayman KY1-9002, Cayman Islands. Armitage ABS CDO, Ltd. was incorporated on March 7, 2007 and the Closing Date on the Offering Circular was March 29, 2007. Armitage ABS CDO, Ltd. has never had any employees, was nominally capitalized, and has no prior operating history.

25.     On information and belief, Defendant Armitage ABS CDO, Inc. is a corporation organized under the laws of Delaware. Armitage ABS CDO, Inc. was formed by Citigroup or its affiliates to issue Armitage ABS CDO, Inc. securities. Armitage ABS CDO, Inc. is located at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711. Armitage ABS CDO, Inc. was incorporated on March 19, 2007 and the Closing Date on the Offering Circular was March 29, 2007. Armitage ABS CDO, Inc. has never had any employees, was nominally capitalized, and has no prior operating history.

## III.   JURISDICTION AND VENUE

26.     This Court has diversity jurisdiction pursuant to 28 U.S.C §1332(a)(2) because Woori is the subject of a foreign state. The amount in controversy exceeds $75,000 exclusive of interest and costs. The over-the-counter CDO purchases described above were ones in which irrevocable liability occurred in the United States and pursuant to New York law.

27.     Venue is proper in this district pursuant to 28 U.S.C §1391(b)(2) because both Defendants reside here and because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district.

28.     The Tierra Alta, Ridgeway, Ivy Lane, FAB, and Armitage Offering Circulars all contain governing law provisions that state: "[t]he Notes and the Transaction Documents . . . will be governed by, and construed in accordance with, the laws of the State of New York" or words to that effect.

29.     The Ivy Lane Offering Circular additionally establishes jurisdiction and venue in New York state or federal court: "the Co-Issuers irrevocably submit to the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes, the Indenture or the Account Control Agreement, and the Co-Issuers irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court."

## IV.   FACTUAL ALLEGATIONS

### A.   Plaintiff's Decision To Invest In CDOs

30.     A CDO is an investment vehicle that typically includes the formation of a special purpose entity, commonly referred to as the "issuer," that raises money by issuing securities to investors. Generally, an arranging bank creates the issuer in order to acquire a portfolio of investment assets whose cash flow is the expected source of income for various classes, or "tranches," of debt securities that are marketed and sold to investors.

31.     The assets in a CDO's portfolio can be comprised of cash assets (such as RMBS), synthetic assets, or both. Synthetic assets include CDS contracts, transactions

resembling an insurance contract whereby a "protection buyer" pays a "protection seller" periodic "premiums" (similar to insurance premiums) in return for the protection seller's promise to pay the protection buyer should certain "credit events" occur, such as events of payment default, loss, write-down, or a deterioration in ratings. A CDO containing both cash and synthetic assets is referred to as a "hybrid" CDO.

32.     The investors in a CDO, which include noteholders and equity investors, are paid from the proceeds generated by the collateral. Amounts are paid out to investors according to a defined priority (the "waterfall" referenced in one of the following graphics). The most senior tranches of notes, which have the lowest risk of loss and highest credit rating, typically receive principal and interest first. The junior tranches have the highest risk of loss and lowest credit rating (with the exception of the equity tranche, which typically is not rated). The following charts issued by the Financial Crisis Inquiry Commission ("FCIC") (available at http://fcic.law.stanford.edu/resource/graphics) illustrate the process for both RMBS and CDOs:

# Residential Mortgage-Backed Securities

*Financial institutions packaged subprime, Alt-A and other mortgages into securities. As long as the housing market continued to boom, these securities would perform. But when the economy faltered and the mortgages defaulted, lower-rated tranches were left worthless.*



## 1. Originate

Lenders extend mortgages, including subprime and Alt-A loans.

## 2. Pool

Securities firms purchase these loans and pool them.

## 3. Tranche

Residential mortgage-backed securities are sold to investors, giving them the right to the principal and interest from the mortgages. These securities are sold in tranches, or slices. The flow of cash determines the rating of the securities, with AAA tranches getting the first cut of principal and interest payments, then AA, then A, and so on.

**Pool of Mortgages**

**RMBS**
TRANCHES
Low risk, low yield

**AAA**

*First claim to cash flow from principal & interest payments...*

*next claim...*

**AA**

*next... etc.*

**A**
**BBB**
**BB**
**EQUITY TRANCHES**

High risk, high yield

**SENIOR TRANCHES**

**MEZZANINE TRANCHES**
*These tranches were often purchased by CDOs.*

**Collateralized Debt Obligation**

# Collateralized Debt Obligations

*Collateralized debt obligations (CDOs) are structured financial instruments that purchase and pool financial assets such as the riskier tranches of various mortgage-backed securities.*

### 3. CDO tranches

Similar to mortgage-backed securities, the CDO issues securities in tranches that vary based on their place in the cash flow waterfall.

### 1. Purchase

The CDO manager and securities firm select and purchase assets, such as some of the lower-rated tranches of mortgage-backed securities.



### 2. Pool

The CDO manager and securities firm pool various assets in an attempt to get diversification benefits.

33.    Banks that arrange CDOs typically perform multiple roles, including:

(a) structuring and modeling the CDOs; (b) marketing and selling them to investors; (c)

interfacing with ratings agencies to achieve the targeted ratings for the CDOs' tranches; (d)

financing and facilitating the purchases of the cash collateral and holding that collateral on their

own books prior to closing; and (e) facilitating hybrid structures by acting as the initial

protection buyer for CDS included in the synthetic collateral pool. Moreover, because the

special purpose vehicle that serves as the deals issuer does not have any employees of its own,

the arranging banks usually act for the issuer and serve as the "initial purchaser" for some

portion of the CDO's tranches and the marketing agent for the remaining tranches. For

performing these functions, arranging banks typically receive millions of dollars in fees at

closing.

34.    For the purposes of this complaint, and unless stated otherwise, any reference to

a particular rating refers to the S&P ratings categories.

35.    Like many other CDO investors, Plaintiff focused on highly-rated "non-

speculative" tranches (primarily "A" or "A-" rated tranches). "A" or "A-" rated securities are

contrasted with speculative grade securities that promised higher rates of return in exchange for

a higher risk profile. S&P has explained that "[o]bligations rated 'BB', 'B', 'CCC', 'CC', and

'C' are regarded as having significant speculative characteristics. 'BB' indicates the least

degree of speculation and 'C' the highest. While such obligations will likely have some quality

and protective characteristics, these may be outweighed by large uncertainties or major

exposures to adverse conditions." *See* Standard & Poor's, *Global Credit Protal:*

*RatingsDirect*® (June 3, 2009), available at

http://www.standardandpoors.com/spf/ratings/Understanding_SandP_RatingDefinitions.pdf.

Conversely, an "A" rating indicates that the "obligor's capacity to meet its financial

commitment on the obligation is still strong." *Id.*

36.     Plaintiff's investment decisions in the Citigroup CDOs at issue were informed by the Offering Circulars for each of those CDOs (including the ratings contained in them), oral presentations made by salespeople for Citigroup in connection with those CDOs, and other marketing materials presented to Plaintiff by those salespeople.

37.     Citigroup represented to Plaintiff that independent and experienced collateral managers would select and manage the collateral portfolios for the CDOs for the benefit of long investors such as Plaintiff, whose profits are dependent on the success of the CDO. The long investors typically pay the collateral manager a percentage of the notional value of the transaction (*i.e.*, the total deal issuance) as a fee. The collateral manager's role is material to a long investor's investment decision because the collateral manager is supposed to be responsible for the CDOs' risk profile and performance through its selection of collateral.

38.     Plaintiff's investment decisions were also based on the ratings assigned to prospective CDO investments. Woori considered the objectives of safety, liquidity and profitability in making investments in CDOs and based on the written and oral presentations made by Citigroup, believed that its investments in the aforementioned CDOs satisfied those criteria.

**B.     Plaintiff's Reliance On Citigroup And Lack Of Knowledge Of Fraud**

39.     Citigroup promoted itself to Plaintiff and the world as a leader in structured finance CDOs, listing its track record with billions of dollars in structured credit transactions that either had already closed or were in the pipeline. Plaintiff relied on the reputation and track record of Citigroup in making its investments in the aforementioned CDOs. Plaintiff would not have purchased the CDOs in question had it been aware of the true facts described below.

40.     Plaintiff relied on the credit ratings given to the aforementioned CDOs in which it invested. Had it known that these credit ratings were false or had been manipulated, as described below, it would not have made these investments. Plaintiff generally sought to invest in CDOs that had an "A" or "A-" credit rating.

41.     Woori was not a 'sophisticated investor' with respect to CDOs backed by RMBS. It never issued or underwrote any CDOs. It relied on Citigroup and the other Defendants to explain to it fully and truthfully the risks associated with them. It had no expertise or involvement with issuing or underwriting RMBS. Again, Woori relied on Citigroup to explain to it fully and truthfully the risks associated with them. Nor did Woori have any understanding that securities ratings issued by entities like S&P should be taken at anything other than face value. It had no independent understanding of how S&P set such ratings for RMBS.

42.     To the extent that Plaintiff is deemed to be a "sophisticated investor", it acted like the investor in *Dordona I, LLC v. Goldman Sachs & Co.*, No. 10 Civ. 7497 (VM), 2012 935815 at *12 (S.D.N.Y. March 21, 2012): "when investors, sophisticated or not, purchase securities they do so in reliance on the reputation for integrity and good faith of the issuers and dealers, placing trust in their agents' implied representations that they would not engage in conduct which would place their own interests ahead of those of their customers." As in that case, the public information available to Plaintiff "would require much more than 'minimal diligence' to analyze—even for a sophisticated investor. Defendants have proffered nothing to suggest that investors were placed on guard about anything approximating the alleged fraud, that they were practically faced with the facts, or that they had access to truth-revealing information." *Id.* at *19 (internal quotations omitted).

43.     No public information was available to Plaintiff in 2006-07 that would have disclosed to it Citigroup's fraudulent activities with respect to the solicitation of investments in the CDOs in which Plaintiff invested that are described above. It had no access to Citigroup's internal analyses of the subprime market and the prognoses for the RMBS on which those CDOs were based. Likewise, Plaintiff had no access to internal concerns raised by Citigroup's managers in 2006-07 concerning the CDOs that it was marketing. Nor Could Plaintiff know that the initial S&P ratings of the RMBS for the aforementioned CDOs were false.

44.     It was only upon the publication by the FCIC in January of 2011 of its "Financial Crisis Inquiry Report" ("FCIC Report") (available at http://fcic.law.stanford.edu/report) that Plaintiff discovered the fraudulent activities of Citigroup in marketing the CDOs at issue.

### C.     Citigroup's Access To Specialized Information, Unavailable To Plaintiff, Concerning Subprime Mortgages, RMBS, And CDOs

45.     Citigroup was a major player at multiple levels of the subprime capital market. It acted as a mortgage originator, an underwriter and arranger of subprime RMBS, and an underwriter and arranger of structured finance products, like CDOs, that invested in RMBS. Because of these multiple roles, Citigroup gained a unique perspective and obtained peculiar knowledge—unavailable to Plaintiff—concerning the deteriorating condition and imminent collapse of the subprime market and the quality of the CDOs it was promoting.

46.     For example, in its consumer lending business unit, Citigroup held prime and subprime mortgages that it had originated itself or purchased from third parties through the Citigroup mortgage lending subsidiary, CitiFinancial Mortgage ("CitiFinancial"). Citigroup securitized these mortgages into RMBS, which it either sold to institutional investors directly or placed into CDOs and other structured finance products that it arranged.

47.     Within the investment banking business unit, Citigroup held subprime mortgages for securitization and trading, subprime RMBS that Citigroup warehoused, and tranches of CDOs that Citigroup had previously arranged but had not sold. *See* Hearing Before the FCIC on "Subprime Lending and Securitization and Government Sponsored Enterprises" at 127:16-25 to 128:1-17 (Apr. 7, 2010) (4/7/10 Tr.")(testimony of Susan Mills ("Mills"), Managing Director of Mortgage Finance, Citi Markets & Banking, Global Securitized Markets), available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0407-Transcript.pdf.

48.     From 2005 to 2007, Citigroup arranged nearly $110 billion of CDOs. During that period, Citigroup rose from the world's fourth-largest arranger of mortgage-backed CDOs to the largest—and received hundreds of millions of dollars in associated fees. Citigroup reaped over $347 million in fees from CDO transactions in 2007 alone.

49.     As the FCIC Report noted,

> "We had sales representatives in all those [global] locations, and their jobs were to sell structured products, "Nestor Dominguez [Dominguez], the co-head of Citigroup's CDO desk, told the FCIC. "We spent a lot of effort to have people in place to educate, to pitch structured products. So, it was a lot of effort, about 100 people. And I presume our competitors did the same."

FCIC Report at 131 (footnotes omitted).

50.     The incentives given to traders to market aggressively Citigroup's CDOs themselves created conflicts of interest, as the FCIC Report noted:

> An undated and unattributed internal document (believed to have been drafted in 2006) also questioned one of the practices of Citigroup's investment bank, which paid traders on its CDO desk for generating the deals without regard to later losses: **"There is a potential conflict of interest in pricing the liquidity put cheep [*sic*] so that more CDO equities can be sold and more structuring fee to be generated."** The result would be losses so severe that they would help bring the huge financial conglomerate to the brink of failure, as we will see.

*Id.* at 139 (emphases added).

51.     Dominguez also testified that although Citigroup sold the equity, mezzanine, and some of the senior tranches of these CDOs, Citigroup retained other senior tranches, typically known as "super-senior" tranches, which were considered extremely safe and secure: "[o]ur CDO business model called for distributing all the securities that resulted from our CDO structuring activities except the most senior tranches of specific transactions that were structured to be held on Citi's balance sheet. These retained positions were referred to in the market as super senior . . . ." 4/7/10 Tr. at261:18-24.

52.     As recounted in the FCIC Report, there were at least two additional reasons for retaining these tranches. *First*, the favorable capital treatment of AAA rated securities required banks to hold relatively less capital against them. FCIC Report at 196. *Second*, the super-senior and triple-A tranches were reported "at values for which they could not be sold" and as a consequence the "finances for creating the deal" improved. *Id.* In essence,"[i]t was a hidden subsidy of the CDO business by mispricing." *Id.*

53.     In a continuously rising housing market and healthy economy, Citigroup's subprime-related businesses appeared to investors to be nearly risk-free. Citigroup could make increasingly aggressive mortgages to subprime borrowers, but see default rates remain manageable. It could then package those mortgages into RMBS, and quickly sell those RMBS to third parties without taking any risk of decline. And Citigroup could also package the RMBS into CDOs and sell those CDOs to investors. At each step in the chain, Citigroup could pocket additional fees while minimizing the exposure to risks from subprime RMBS on its own balance sheet.

**D.    Citigroup's Inside Knowledge Of The Deterioration And Imminent Collapse Of The Subprime Capital Markets**

54.    In 2005-07, Citigroup became aware that the economic foundation of its subprime CDO and RMBS businesses were beginning to crack. Because of its insider's perspective, Citigroup became aware that subprime borrowers were missing increasing numbers of payments, causing higher delinquency and default rates. In some instances, those missed payments occurred within the first three months of the mortgage loan being made, suggesting that increasing numbers of mortgages were the product of fraudulent loan applications or otherwise had not met lenders' original underwriting guidelines. The escalating incidence of non-conforming loans also led to heightened requests by securities issuers and intermediaries that the loan originators take back mortgages that did not conform to underwriting criteria specified in the loan purchase agreement (known as "put backs"). These factors raised the specter of meaningful losses not just on the mortgages themselves, but on all products composed of them. The markets for subprime RMBS and CDOs began to deteriorate.

55.    Citigroup was keenly aware of the risks that these developments posed to its balance sheet. As a mortgage originator and RMBS securitizer, Citigroup knew that the subprime mortgage industry had become a house of cards teetering on the brink of collapse.

56.    For example, on April 11, 2007, Citigroup prepared an internal report entitled "ABS CDOs In a Mezz" that reflected earlier research showing CDO loss estimates based on various subprime scenarios. The report demonstrated that losses on Mezzanine CDOs were predicted to climb by 35% if housing prices remained flat, which would virtually render valueless all tranches rated lower than "AAA". If housing prices declined by 2% or more annually, all CDO tranches below the super senior level would be rendered worthless. A chart depicting this decline that was part of that report and that, on information and belief, was

18

prepared prior to April 11, 2007 is displayed below.

## Sub-Prime: An Example



CDO Losses Under Different Model Scenarios in Sub-Prime

Source: Citigroup "See "ABS CDOs in a Mezz", April 11, 2007

citi

57.     Indeed, by early 2006, Citigroup knew that substantial volumes of the subprime (and even prime) loans that it was purchasing from mortgage originators for securitization did not conform to applicable underwriting standards. This information was disclosed by Richard M. Bowen III ("Bowen"), the former Business Chief Underwriter for Citigroup's Consumer

Lending Group, who testified before the FCIC. He stated that through extensive due diligence

of the mortgages Citigroup acquired—information that was not available to investors like

Plaintiff—he discovered that significant portions of these mortgages were defective and failed

to meet Citigroup's underwriting and quality assurance standards.

58.     Bowen observed that, by mid-2006, more than 60% of the prime mortgages

Citigroup purchased from originators failed to comply with Citigroup's guidelines, and that the

number of defective mortgages increased to over 80% during 2007. 4/7/10 Tr. at 134:24-25 to

135:1-19. Despite knowing these mortgages were toxic, Citigroup securitized approximately

80% of them into RMBS and CDOs and sold them to investors without disclosure of these

material facts. *See Hearing on Subprime Lending and Securitization And Government*

*Sponsored Enterprises: Hearing Before the Fin. Crisis Inquiry Comm'n* (2010) (testimony of

Richard M. Bowen, III ), available at http://fcic-static.law.stanford.edu/ cdn_media/fcic-

docs/2010-04-07%20Richard%20Bowen%20Written%20Testimony.pdf ("Bowen Statement").

59.     The situation Bowen observed with respect to the subprime loans Citigroup was

acquiring and securitizing was equally egregious. Citigroup's policy dictated that pools of

subprime mortgages could only be purchased if underwriters applying Citigroup's policy

guidelines for subprime mortgages approved a minimum of 90% of loans in the pool (or, if the

pool was extremely large, in a statistically significant sample of the pool). *See id.* at 9. Bowen

testified that in the third quarter of 2006, the subprime loan Chief Risk Officer was changing

underwriters' recommendations from "turn down" to "approve" in order to ensure that the loan

pool would pass the 90% approval threshold. *See id.* Bowen further testified that, on other

occasions, Citigroup purchased subprime loan pools where only 70% of the constituent loans

met Citigroup's underwriting guidelines. *See* Bowen Statement at 10. Still on other occasions,

the Chief Risk Officer instructed underwriters to assess loan pools using the originators' more lenient underwriting guidelines rather than Citigroup's more stringent standards. *See id.*

60.    Bowen repeatedly raised these concerns with his superiors, including Robert Rubin (Chairman of Citigroup's Executive Committee), David Bushnell (its Senior Risk Officer), Gary Crittenden (its Chief Financial Officer), and Bonnie Howard (its Chief Auditor). *See id.* at 2, 7, 13-14; 4/7/10 Tr.133:14-25,134:1-7, 135:9-19, 136:19-21, 154:16-19, 155:1-3, 175:3:18.

61.    His concerns and the history of his repeated warnings extending back to 2006 were laid out in the following November 3, 2007 e-mail to these people which was attached as an exhibit to the Bowen Statement.

## Bowen, Dick [GCG-REO]

From:      Bowen, Dick [GCG-REO]
Sent:      Saturday, November 03, 2007 4:47 PM
To:        Rubin, Robert E [CCC]; Bushnell, David C [CCC]; Crittenden, Gary [CCC]; Howard, Bonnie [CCC]
Cc:        Bowen, Dick [GCG-REO]
Subject:   URGENT -- READ IMMEDIATELY -- FINANCIAL ISSUES

TO:  Robert Rubin, Chairman of Executive Committee
     David Bushnell, Senior Risk Officer
     Gary Crittenden, Chief Financial Officer
     Bonnie Howard, Chief Auditor

Gentlemen:

I am currently (since early 2006) the Business Chief Underwriter for the Real Estate Lending Correspondent channel, which is within the Consumer Lending Group. From 2002 to 2006 I was SVP and Chief Underwriter for the Correspondent and Acquisitions channel within Citifinancial Mortgage. I am also licensed as a Certified Public Accountant in the State of Texas.

The reason for this urgent email concerns breakdowns of internal controls and resulting significant but possibly unrecognized financial losses existing within our organization.

Since mid-2006, I have continually identified these breakdowns in processes and internal controls. The REL Chief Underwriter (my 2006 manager) and I have widely communicated these breakdowns, with possible ramifications, in weekly reports, emails, and discussions (which included the CLG Chief Risk Officer). There have also been two special investigations by CLG Business Risk and Control (the first initiated by me), with the findings confirming these breakdowns.

However, to my knowledge, these breakdowns have not been communicated to or recognized by either Audit or Finance.

I have been agonizing for some time over these issues, and in all good conscience feel I must now communicate these concerns outside of the Consumer Lending Group. I sincerely regret the delay.

## CONCERN #1 -- CORRESPONDENT FUNDINGS THROUGH DELEGATED AUTHORITY

- We currently purchase from mortgage companies and sell to third party investors approximately $50 billion annually ($42 billion YTD 2007) of mortgage loans which have not been underwritten by us but which we rep and warrant to the investors (primarily Fannie/Freddie) that these files are complete and have been underwritten to our policy criteria.
- Our internal Quality Assurance function, which underwrites a small sample of these files post-purchase, has reflected since 2006 (when this function started reporting to me) that 40-60% of these files are either outside of policy criteria or have documentation missing from the files. QA for recent months indicate 80% of the files fall into this category.
- If any of the mortgages in this category default, the investor may require that Citi repurchase the defaulted files based upon our reps and warrants. Under seller reps and warrants Citi may then force the selling mortgage company to repurchase the files, if the seller mortgage company remains financially viable at that time. (As one example, QA results indicate that Citi may be responsible for in excess of 50% of the losses associated with files purchased from the failed Aegis Mortgage -- $2.5 billion purchased since Jan '06).
- A CLG BRC investigation, requested by me, confirmed the breakdowns associated with the QA process and the fact that the QA findings were significantly out of compliance with QA Risk Policy. The Chief Underwriter responsible for this function was terminated and a new QA Risk Policy was approved in 2006.

22

We continue to be significantly out of compliance with the new QA Risk Policy.
- I do not believe that our company has recognized the material financial losses inevitably associated with the above Citi liability.

CONCERN #2 – CORRESPONDENT FUNDINGS THROUGH WALL STREET BULK PURCHASES

- During 2006-7 there were pools of mortgage loans aggregating $10 billion which were purchased from large mortgage companies with significant numbers of files identified as "exceptions" (higher risk and substantially outside of our credit policy criteria). These exceptions were approved by the Wall Street Channel Chief Risk Officer, many times over underwriting objections and with the files having been turned down by underwriting. These pools involved files aggregated and originated by Merrill Lynch, Residential Funding Corp, New Century, First NLC and others.
- The purchase decisions on many of these pools were approved even though the execution rates and other criteria established by the CLG Bulk Acquisition Policy were not met.
- Because of the initial high losses associated with many of these pools, CLG BRC investigated and reviewed correspondence which documented underwriting objections to purchasing identified pools.
- BRC conducted an investigation of one Merrill Lynch pool, identifying generic breakdowns of process required by policy and recommended needed changes.
- Changes were made in the bulk purchase process, but I do not know if the expected material financial losses from these pools has been recognized.

I know that this will prompt an investigation of the above circumstances which will hopefully be conducted by officers of the company outside of the Consumer Lending Group, and I pledge my full cooperation.

As a professional, as well as a shareholder of this company, I am deeply distressed with having to report the above.

I will be in the office Monday, and can be available by cell phone, if needed, this weekend.


Dick Bowen
469-220-1151 office
214-497-     call

62.   The FCIC Report had this to say on Bowen:

At Citigroup, meanwhile, Richard Bowen, a veteran banker in the consumer lending group, received a promotion in early 2006 when he was named business chief under-writer. He would go on to oversee loan quality for over $90 billion a year of mortgages underwritten and purchased by CitiFinancial. These mortgages were sold to Fannie Mae, Freddie Mac, and others. In June 2006, Bowen discovered that as much as 60% of the loans that Citi was buying were defective. They did not meet Citigroup's loan guidelines and thus endangered the company—if the borrowers were to default on their loans, the investors could force Citi to buy them back. **Bowen told the Commission that he tried to alert top managers at the firm by "email, weekly reports, committee**

presentations, and discussions"; but though they expressed concern, it "never translated into any action." Instead, he said, "there was a considerable push to build volumes, to increase market share."

Indeed, Bowen recalled, Citi began to loosen its own standards during these years up to 2005: specifically, it started to purchase stated-income loans. "So we joined the other lemmings headed for the cliff," he said in an interview with the FCIC.

He finally took his warnings to the highest level he could reach— Robert Rubin, the chairman of the Executive Committee of the Board of Directors and a former U.S. treasury secretary in the Clinton administration, and three other bank officials. He sent Rubin and the others a memo with the words "URGENT—READ IMMEDIATELY" in the subject line. Sharing his concerns, he stressed to top managers that Citi faced billions of dollars in losses if investors were to demand that Citi repurchase the defective loans.

Rubin told the Commission in a public hearing in April 2010 that Citibank handled the Bowen matter promptly and effectively. "I do recollect this and that either I or somebody else, and I truly do not remember who, but either I or somebody else sent it to the appropriate people, and I do know factually that that was acted on promptly and actions were taken in response to it." According to Citigroup, the bank undertook an investigation in response to Bowen's claims and the system of underwriting reviews was revised.

**Bowen told the Commission that after he alerted management by sending emails, he went from supervising 220 people to supervising only 2, his bonus was reduced, and he was downgraded in his performance review.**

FCIC Report at 19 (footnotes omitted) (emphases added).

63.     Bowen was not the only one at Citigroup to be aware at an early stage of the

problems with Citigroup's RMBS. The FCIC Report had this to say about Mills:

**Also, in early 2006, Susan Mills, a managing director in the securitization unit—which bought mortgages from other companies and bundled them for sale to investors—took note of rising delinquencies in the subprime market and created a surveillance group to track loans that her unit purchased. By**

> **mid-2006, her group saw a deterioration in loan quality and an increase in early payment defaults—that is, more borrowers were defaulting within a few months of getting a loan. From 2005 to 2007, Mills recalled before the FCIC, the early payment default rates nearly tripled from 2% to 5% or 6%.**

*Id.* at 260-61 (footnotes omitted; emphases added).

64.     Thomas Maheras, the former Co-CEO of Citi Markets & Banking, told the FCIC at the April 7, 2010 hearing that Citigroup was in fact "**negative on subprime**" and that by the latter part of 2006, was actively "**in most of our business areas, reducing our risk around subprime.**" 4/7/10 Tr. at 292:4 to 292:8.8 (emphases added). This internal recognition was not communicated to Plaintiff or other investors to whom Citigroup in the latter part of 2006 and in 2007 was still marketing CDOs that securitized subprime mortgages with false "investment grade" ratings.

65.     In addition to concealing these internal policies of, and warnings from executives within, Citigroup—warnings that were never disclosed to investors like Plaintiff—Citigroup also engaged in manipulation of the value of CDOs with third party due diligence consultants and rating agencies.

66.     Banks like Citigroup constitute a primary market for the sale of mortgage loans and they are expected to play a significant role in dictating and enforcing underwriting standards on mortgage lending. The Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Company, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision expressed this view in "interagency guidance" issued on March 1, 1999 (available at http://www.federalreserve.gov/boarddocs/srletters/1999/sr9906a1.pdf):

> Institutions should not accept loans from originators that do not meet their underwriting criteria, and should regularly review loans offered to ensure that loans purchased continue to meet those criteria. Deterioration in the quality of purchased loans or in the

portfolio's actual performance versus expectations requires a thorough reevaluation of the lenders or dealers who originated or sold the loans, as well as a reevaluation of the institution's criteria for underwriting loans and selecting dealers and lenders. Any such deterioration may also highlight the need to modify or terminate the correspondent relationship or make adjustments to underwriting and dealer/lender selection criteria.

The guidance further notes that:

Institutions should have information systems in place to segment and stratify their portfolio (*e.g.*, by originator, loan-to-value, debt-to-income ratios, credit scores) and produce reports for management to evaluate the performance of subprime loans. The review process should focus on whether performance meets expectations. Institutions then need to consider the source and characteristics of loans that do not meet expectations and make changes in their underwriting policies and loan administration procedures to restore performance to acceptable levels.

67.     Citigroup paid no heed to these warnings, despite receiving further early alarms from Clayton Holdings ("Clayton"), the due diligence consultant Citigroup retained to examine samples of the mortgage pools that Citigroup was purchasing in order to determine whether the sampled mortgages conformed to applicable underwriting standards.

68.     Starting in late 2005 or early 2006, Clayton reported to Citigroup that a large percentage of the loans Citigroup had acquired for securitization were non-conforming. *See* Letter from Paul T. Bossidy, Chief Executive Officer of, Clayton, to Phil Angelides, Chairman of the FCIC at 3 (Sept. 30, 2010), available at http://graphics8.nytimes.com/packages/pdf/opinion/Clayton-FCIC.pdf ("Clayton rolled out this system and its Exception Reports to our clients beginning in late 2005 and continuing throughout 2006.").

69.     Of the 6,205 loans it reviewed for Citigroup from 2006 to the first half of 2007, Clayton flagged 42% as failing to conform to underwriting standards. *See* FCIC Report at 167; "All Clayton Trending Reports: 1st Quarter 2006 – 2nd Quarter 2007" (Sept. 23, 2010),

26

available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf. The FCIC generated a chart depicting waivers for Citigroup and other major financial institutions (available at http://fcic.law.stanford.edu/img/resource-graphics/thumb/fig9.1_clayton.jpg):

### Rejected Loans Waived in by Selected Banks

*From January 2006 through June 2007, Clayton rejected 28% of the mortgages it reviewed. Of these, 39% were waived in anyway.*

| Financial Institution | A ACCEPTED LOANS (Event 1 & 2)/ Total pool of loans | B REJECTED LOANS (Event 3)/ Total pool of loans | C REJECTED LOANS WAIVED IN BY FINANCIAL INSTITUTIONS | D REJECTED LOANS AFTER WAIVERS (B–C) | E FINANCIAL INSTITUTION WAIVER RATE (C/B) |
|---|---|---|---|---|---|
| Citigroup | 58% | 42% | 13% | 29% | 31% |
| Credit Suisse | 68 | 32 | 11 | 21 | 33 |
| Deutsche | 65 | 35 | 17 | 17 | 50 |
| Goldman | 77 | 23 | 7 | 16 | 29 |
| JP Morgan | 73 | 27 | 14 | 13 | 51 |
| Lehman | 74 | 26 | 10 | 16 | 37 |
| Merrill | 77 | 23 | 7 | 16 | 32 |
| UBS | 80 | 20 | 6 | 13 | 33 |
| WaMu | 73 | 27 | 8 | 19 | 29 |
| **Total Bank Sample** | **72%** | **28%** | **11%** | **17%** | **39%** |

NOTES: From Clayton Trending Reports. Numbers may not add due to rounding.
SOURCE: Clayton Holdings

70.     Given that **at least two out of every five loans in the sample reviewed by Clayton were defective**, Citigroup should have examined the entire loan pool to identify and remove all of the other defective loans. Indeed, Citigroup had a contractual right to "put back" these non-conforming loans to the originator, requiring the original lender to repurchase such loans from Citigroup. Citigroup should have also disclosed—both to the ratings agencies and to potential investors like Plaintiff—that the CDOs (and RMBS underlying them) that it was marketing were substantially tainted with non-conforming and highly risky loans.

71.     Instead of taking steps to protect investors, or at least disclose these key material facts to them, Citigroup acted for its own benefit. Rather than use the Clayton Report to

improve the quality of the CDOs it was marketing, Citigroup instead used it to negotiate lower prices from the originators of these bad loans and pocketed the discount for itself.

72.     To make matters worse, Citigroup ignored Clayton's recommendations that the bank should reject these non-conforming loans. Citigroup allowed 31% of the defective loans Clayton found in its sample back into the loan pools, meaning that one out of every three of these bad loans made their way into RMBS that was then placed into Citigroup CDOs. More importantly, Citigroup made no effort to examine any of the loans that Clayton did not review (in other words, the vast majority of loans in the pool), meaning that all of the bad loans buried in the unreviewed majority of the pool—100% of them—made their way into RMBS and, inevitably, into CDOs of RMBS. According to testimony provided to the FCIC by Vicki Beal ("Beal"), a Senior Vice-President of Clayton, the size of the loan samples was a **subject of contention between Clayton and the banks for whom it was performing due diligence, with the banks constantly pushing for smaller sample sizes**. The typical sample size banks allowed Clayton to review was 10%, dipping as low as 5% during the height of the subprime mortgage boom. *See* FCIC Hearing on "Financial Crisis at the Community Level—Sacramento, CA" at 156:7-9, 177:15-23 (Sept. 23, 2010) (9/23/10 Tr.), available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-transcript.pdf).

73.     Defendants knew but never disclosed to Plaintiff or the ratings agencies that a substantial proportion of the loans underlying the RMBS assets of the CDOs it was arranging were non-conforming and that Citigroup had negotiated a discount from the loans' originators based on this defect and pocketed the reduction as profit. *Id.* at 155:24-25 to 156:1-4 (Beal testifying that "our clients use Clayton's due diligence to identify issues with loans, negotiate better prices on pools of loans they are considering for purchase, and negotiate expanded

representations and warranties in purchase and sale agreements from sellers); Jonathan R.

Laing, *Banks Face Another Mortgage Crisis* (Barron's, Nov. 20, 2010), available at

http://online.barrons.com/article/SB50001424052970203676504575618621671054514.html#art

icleTabs_panel_article%3D1 ("Apparently the Clayton data were merely employed by the

securitizers to negotiate lower prices on the mortgages from the originators without passing any

price discount or higher yield on to the investors.") (last accessed May 11, 2012)

74.     The systematic nondisclosure of these "waivers" to both investors and ratings

agencies was an integral part of Defendants' deception. At the FCIC hearing in Sacramento,

California, the following exchange occurred between Keith Johnson ("Johnson"), Clayton's

CEO, and FCIC Chairman Phil Angelides:

> [CHAIRMAN ANGELIDES] One is, **from what I can tell, it
> doesn't look like your information ever migrated to disclosure.
> I know you didn't prepare it for that purpose, but this wasn't
> disclosed. What you read in the disclosure is some of these
> loans, a significant amount, may be exceptions but there is
> compensating factors. What's not revealed is the actual data,
> so it appears not to have been available to investors. Is that --
> would that be your --**
>
> MR. JOHNSON: **We are not aware of -- and we looked at a [lot
> of] prospectuses -- of any of our information --**
>
> CHAIRMAN ANGELIDES: **-- ever popping through.**
>
> MR. JOHNSON: **-- going through the prospectus.**

9/23/10 Tr. at 176:18-177:6 (emphases added)

75.     Johnson made a similar point with respect to the rating agencies' knowledge of

Clayton's work in a taped interview. Fin. Crisis Inquiry Comm'n, FCIC Staff Audiotape of

Interview with D. Keith Johnson, Clayton Holdings LLC, available at

http://fcic.law.stanford.edu/interviews/view/220. Johnson stated that "**[t]o our knowledge, our**

**reports were never provided to the rating agencies.**" (Emphases added). Johnson was asked by the FCIC: "the size and number of waived loans to your—is it your belief that they were disclosed or not disclosed?" His response was; **"[t]hey were not disclosed."** (Emphases added).

76.     The fact that the ratings agencies were not told about Defendants' decision to waive defective loans into the CDO securitization pools led to inflated ratings. As Johnson further stated in the same taped interview: "[w]hat I'm saying is that if [the ratings agencies] knew that the factory that engineered the loans that I'm trying to do [or sell via] securitizations had high exception rates, then in their models they should have factored the sloppiness of that and asked for higher subordination levels."

77.     In the same interview, Johnson further explained that: "I think in September of '07—you know, we had a very—a good meeting with Ray McDaniel ["McDaniel"], Moody's Chief Executive Officer, and many of his top executives at Moody's and we went there, you know, with the intent to try to inform them what we do, show them what exceptions—kind of show them what we have," among other things. Johnson could not recall the exact date in September 2007 when he met with McDaniel and other top executives from Moody's, but he explained that the "gist of my meetings"—with Moody's as well as S&P and Fitch—"was to, you know, reinforce that look, this is what we're seeing in our reviews, we think this information is valuable for you to consider in your ratings and we think that your models could perhaps benefit from that" information.

78.     To better understand what precise information Johnson "quoted" to the rating agencies, the government asked him, "[w]hen you said 'this is what we are seeing', what is the 'this' you were talking about? And tell me what you told them about that 'this' was." Johnson explained: **"[w]ell, in 2007 I know we quoted them saying—you know, we used this report**

saying for every 100 loans that, you know, we saw exceptions with, you know, forty percent of them were being wa[i]ved in ... we were seeing huge amounts of exceptions and that we thought that, again part of the rating of a bond" should reflect that data. (Emphases added).

79.     Johnson further testified about how the rating agencies reacted during his meetings with them. "We had—I want to say all of them acknowledged that what we had was great data, that they were very impressed," according to Mr. Johnson. But he continued to say that "[m]aybe initially they were shocked at some of the numbers that we were quoting."

80.     On September 10, 2007, there occurred a Moody's "Managing Director's Town Hall Meeting" ("Town Hall Meeting"). The confidential transcript of that meeting is now available. Moody's Town Hall Transcript (Sept. 2007), available at http://oversight-archive.waxman.house.gov/documents/20081022112343.pdf; *see also* FCIC Report at 209 & nn. 131-32.

81.     At the Town Hall Meeting, McDaniel stated to his subordinates: "[w]e've got to doubt what we're hearing more aggressively than we might be inclined to, but it is difficult to try to calibrate how much information is good information and how much is bad, especially if people—I mean it's one thing to say, they're only giving us the positive story." Then he said, "**but if they're breaking the law, which they are doing, I mean they are violating reps and warrantees [sic]**" that is a different matter because there "**is a body of thought that lying to a rating agency in contemplation of a security ... is a violation of federal securities law.**" (Emphases added). "**People are doing that,**" McDaniel stated, "**and so it is going to be a challenge.**" (Emphases added). McDaniel went on to note that **"[w]hat we're really being asked to do is figure out how much lying is going on and bake it into the credit.**"

31

(Emphases added). He referenced a question about "talking to the bankers" and said "**I don't know if you mean something different like asking them how much they've been lying to us or something like that**" and noted "**we have been doing some of that**." (Emphases added).

82.      One managing director at the Town Hall Meeting noted that "[i]t seems to me that this problem is the incentive structure where people are incentivized to lie." Brian Clarkson ("Clarkson"), Moody's former President, responded "**[w]e think we can make a business of measuring how much people lie for the incentives**." (Emphases added).

83.      Clarkson continued: "[t]he first thing I talked about w[as] [a] change in methodology, and that's what we're doing," noting "**We're on notice that a lot of things we relied on before just weren't true**." (Emphases added). Clarkson provided the following explanation as to why Moody's ratings were false and misleading:

> **At the end of the day, we relied on reps and warrantees that no loans were originated in violation of any state or federal law. We know that's a lie. If none were originated in violation of any predatory lending law, we know that's a lie. So what are you going to do about it? We can't rely on what people tell us anymore, and so we've got to figure out, do we rely on third party oversight? We have to have post-closing audits. We've got to be very public about things we actually see.**

(emphases added).

84.      In fact, Moody's ratings were based on fraudulent information, according to Clarkson, who said "[t]here's a lot of fraud that's involved there, things that we didn't see." He told Moody's employees that the company would change its ratings methodologies "to make sure that we capture a lot the things that we relied on in the past that we can't rely on, on a going forward basis."

85.    In the following months, the ratings agencies reacted by engaging in wide-spread write downs of CDOs, including the CDOs at issue here, as the following *Bloomberg* ratings history demonstrates:













86.     These downgrades exposed the corrupt system of CDO ratings. The point was

illustrated by an FCIC interview with Ilya Kochinsky ("Kochinsky"), a lawyer and former Vice-

President Senior Credit Officer at Moody's. Interview by the Fin. Crisis Inquiry Comm'n, of

Ilya Kolchinsky in New York, NY (Apr. 27, 2010), available at http://fcic-

static.law.stanford.edu/cdn_media/fcic-docs/2010-04-27%20Transcript%20of%20Interview

%20with%20Eric%20Kolchinsky.pdf. In September of 2007, he learned that Moody's was

going to downgrade ratings for all RMBS issuances in 2006. He said he was panicked at the

news because "I still had [CDO] deals that used those {RMBS} ratings as the basis for my

[CDO] ratings." Kochinsky said "**well, if I know those ratings are wrong, I can't assign new**

**[CDO] ratings based on those ratings**" because that is like a "**definition of securities fraud**." (Emphases added).[3]

### E.   Citigroup's Inside Knowledge That The Collateral in CDOs It Was Arranging Were Toxic

87.     Citigroup knew but never disclosed that the RMBS underlying its CDOs were composed largely of toxic mortgages that were likely to default and were not worthy of the credit ratings given to them by the ratings agencies.

88.     Indeed, in testimony given before the House Committee on Oversight & Government Reform on October 22, 2008 (available at http://oversight-archive.waxman.house.gov/story.asp?ID=2250), Deven Sharma, President of S&P testified "that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work." The testimony of Frank Raiter (available at the same website), former head of RMBS ratings for S&P, indicated that S&P had in existence better tools for modeling the risks of the mortgages that supported RMBS, but did not deploy them.

---

[3] In a related context, the Federal Housing Finance Agency ( "FHFA") sued Citigroup in connection with its subprime RMBS operations in a complaint recently filed in the Southern District of New York. The FHFA is a federal agency that was created pursuant to the Housing and Economic Recovery Act of 2008 ("HERA") to oversee the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Federal Home Loan Banks. On September 6, 2008, FHFA was appointed conservator of Fannie Mae and Freddie Mac and in that capacity is authorized under HERA to bring suits on behalf of those entities. *See* 12 U.S.C. § 4617(b)(2). *See* "Complaint", *Federal Housing Fin. Agency v. Citigroup, Inc.*, No. 11-Civ-6196, 2011 WL3873301 (S.D.N.Y. Sept. 2, 2011). The FHFA alleged that Citigroup falsely represented the quality and nature of the loans underlying over $3.5 billion worth of RMBS that Citigroup securitized and sold to Fannie Mae and Freddie Mac. After those securities began to fail at an alarming rate, Fannie Mae and Freddie Mac discovered massive discrepancies between the actual owner occupancy rates and loan-to-value ratios and what was represented by the loan originators in prospectus supplements and other marketing and registration materials.

89.     One reason it did not do so was because of interference by banks like Citigroup. The report by Senate Permanent Subcommittee on Investigations of the Senate Committee on Homeland Security and Governmental Affairs, 112th Cong., entitled *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* at 279 & n.1079 (Apr. 13, 2011) (available at http://levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf) gives this example:

> **Some investment banks applied various types of pressure to maintain the status quo, despite the fact that the newer models were considered more accurate. In a February 2006 email to an S&P analyst, for example, an investment banker from Citigroup wrote:**
>
> **"I am VERY concerned about this E3 [new CDO rating model]. If our current struc[ture], which we have been marketing to investors ... doesn't work under the new assumptions, this will not be good. Happy to comply, if we pass, but will ask for an exception if we fail."**

*See also id.* at 282 & n.1087 (June 2007 e-mail from Moody's to Citigroup agreeing to grant an exception) (emphasis added).

90.     Of equal importance, based on its communications with Clayton, with originators, and with other market participants, Citigroup knew or had reason to suspect that the RMBS securitized by other underwriters that it was packing into its CDOs were similarly flawed. Indeed, as Citigroup's former CEO, Charles Prince, explained in testimony before the FCIC, within the major investment banks—including Citigroup itself—the securitization of subprime RMBS had become "**a factory line.... As more and more of these subprime mortgages were created as raw materials for the securitization process ... more and more of it was of lower and lower quality. And at the end of the process, the raw material [*i.e.,* the mortgages themselves]going into it was actually bad quality, it was toxic quality, and**

that is what ended up coming out the other end of the pipeline." FCIC Report at 102-03

(footnotes omitted; emphases added).

91.     And other top executives within Citigroup also were aware of the problems with

Citigroup's securitization of mortgage-related securities, as reflected in the Bowen e-mail

reproduced above.

92.     In contrast to a multifaceted market participant such as Citigroup, Plaintiff

lacked access to the above-described information. It did not know and could not have known

the truth about the non-conforming mortgages and other issues underlying the RMBS in the

collateral portfolios of the CDOs Citigroup was arranging.

93.     Indeed, according to the FCIC Report, "Citigroup's Bowen criticized the extent

of information provided on loan pools: 'There was no disclosure made to the investors with

regard to the quality of the files they were purchasing.'" The FCIC ultimately concluded that

any

> **disclosures were insufficient for investors to know what**
> **criteria the mortgages they were buying actually did meet.**
> **Only a small portion—as little as 2% to 3%—of the loans in**
> **any deal were sampled, and evidence from Clayton shows that**
> **a significant number did not meet stated guidelines or have**
> **compensating factors. On the loans in the remainder of the**
> **mortgage pool that were not sampled (as much as 97%),**
> **Clayton and the securitizers had no information, but one could**
> **reasonably expect them to have many of the same deficiencies,**
> **and at the same rate, as the sampled loans. Prospectuses for**
> **the ultimate investors in the mortgage-backed securities did**
> **not contain this information, or information on how few loans**
> **were reviewed, raising the question of whether the disclosures**
> **were materially misleading, in violation of the securities laws.**

*Id.* at 169-70 (footnotes omitted) (emphases added).

94.     **Citigroup also lied to investors about how assets were selected as the basis**

**for CDOs.** One prominent example involved its dealings with a Chicago-based hedge fund

called Magnetar Capital LLC ("Magnetar") that was the subject of an extensive investigative

report issued by *ProPublica* on April 9, 2010 (available at

http://www.propublica.org/article/the-magnetar-trade-how-one-hedge-fund-helped-keep-the-

housing-bubble-going). In 2006-07, certain banks (including Citigroup) allowed "short sellers"

to participate in selecting the assets included in CDOs, unbeknownst to investors. This omission

was material because such "short" investors had an incentive to include the worst assets they

could find, so that they would profit if the assets failed. Magnetar was one of these "short"

investors. Based on the data made available by *ProPublica*, at least $264 million of toxic

Magnetar CDOs were included in the asset portfolios of the CDOs sold by Citigroup to Woori.

In June of 2011, the United States Securities & Exchange Commission ("SEC") fined J.P.

Morgan Securities LLC $153.6 million for similar misconduct involving Magnetar. *See*

http://www.sec.gov/news/press/2011/2011-131.htm.

95.     Magnetar was not the only example of Citigroup's duplicitous practices in this

regard. The CDOs that Woori purchased from Citigroup contained $54 million in CDOs chosen

by Goldman Sachs & Co. ("Goldman") under the Abacus name.[4] The SEC sued Goldman,

which defended itself by calling this a common industry practice. Goldman ultimately entered

into a $550 million dollar consent decree with the SEC in July of 2010 and conceded that not

telling investors about its practices was a "mistake." *See* http://www.sec.gov/news/press/2010/

2010-123.htm.

96.     Citigroup did not merely engage in these types of misconduct with third parties

like Magnetar and Goldman. **Beginning in October of 2006, it devised a scheme to itself**

---

[4] A CDO that contains portions of other CDOs is called a "CDO Squared."

**place a massive short bet against A-rated tranches of specific CDOs that it believed were
at heightened risk of defaulting, again without telling investors of this tactic.**

97.     The reasons for doing so were clear. Citigroup's exposure to the toxic mortgage
securities on its books was massive. Citigroup had over $20 billion in super-senior exposure
from the CDOs that it arranged between 2004 and 2007. To make matters worse, Citigroup had
issued "liquidity puts" on an additional $25 billion in super-senior tranches of other CDOs,
thereby incurring the risk of losses on them as well. *See* Written Testimony of Dominguez
presented to the FCIC (Apr. 7, 2010), available at http://www.fcic.gov/hearings/pdfs/2010-
0407-Dominguez.pdf (noting that Citigroup's put options were "a fall-back source of financing,
in case of either a significant widening of credit spreads or a temporary inability to issue
commercial paper); *see also* 4/7/10 Tr. at 262:25 to 263:1-3.

98.     At the same time, beginning in or around 2006, Citigroup was finding it
progressively more difficult to drum up investors for the senior and junior tranches of its CDOs,
and was increasingly being forced to hold these positions on its own books—and thus bear the
risk—after the deals closed. To minimize its own exposure (while keeping its CDO machine
running), Citigroup decided to manufacture the appearance of a market for these otherwise
unsellable tranches by placing them into new Citigroup-arranged CDOs that it controlled.

99.     As reported in August of 2010 by the independent, non-profit newsroom
*ProPublica*, "[b]y 2007, 67 percent of [CDO securities] were purchased by other CDOs" and
"[t]he banks often orchestrated these purchases." *ProPublica* found "85 instances during 2006
and 2007 where two CDOs bought pieces of each other's unsold inventory." The arranging
banks induced collateral managers to go along by threatening to cut them off from future CDO
management business if they did not agree to purchase CDO notes for the CDOs they were

managing. *See* Jake Bernstein and & Jesse Eisinger, "Banks' Self-Dealing Super Charged Financial Crisis," *ProPublica* (Aug. 26, 2010), available at http://www.propublica.org/article/banks-self-dealing-supercharged-financial-crisis.

100.    According to one analysis, Citigroup placed over 30% of the tranches of the CDOs it arranged into other Citigroup-arranged CDOs, making Citigroup's CDOs their own largest customers. Not surprisingly, Citigroup-arranged CDOs that cross-invested in other Citigroup-arranged CDOs performed particularly poorly, demonstrating that Citigroup included the worst of its own CDO tranches in subsequent CDOs.

101.    Recognizing this pattern, in October of 2011, the United States Securities and Exchange Commission ("SEC") sued Citigroup. The SEC alleged that in or about October of 2006, Citigroup's CDO trading desk and its CDO structuring desk devised a plan to allow the bank to place a massive short bet against A-rated tranches of specific CDOs that they believed were at a high risk of default. To carry out this plan, Citigroup arranged Class V Funding III ("Class V Funding"), a hybrid "CDO-squared" (so-called because its collateral consisted of tranches of other CDOs) with a notional portfolio valued at $1 billion.

102.    Unknown to investors, beginning in October of 2006, Citigroup planned for and then commenced using Class V Funding to take a $500 million naked short position on specific CDO tranches that Citigroup clandestinely selected for Class V Funding's synthetic portfolio.[5] Citigroup hid its involvement in portfolio selection from potential investors by falsely representing in the deal's marketing materials that Credit Suisse Alternative Capital, Inc. ("CSAC"), the deal's putative collateral manager, would independently select Class V

---

[5] A "naked short" position is one that is not being used to hedge or offset a long position.

Funding's portfolio. Ultimately, Citigroup selected nearly 60% of Class V Funding's reference assets, which it shorted through credit default swap ("CDS") contracts. The SEC's complaint (available at http://www.sec.gov/litigation/complaints/2011/comp-pr2011-214.pdf) accused Citigroup of engaging in "misleading and inaccurate disclosures" to investors.

103.    In addition to concealing its involvement in selecting collateral for Class V Funding, Citigroup also misrepresented that its true economic interests in this CDO were directly opposed to those of the long investors to whom Citigroup was marketing the deal. From the outset, Citigroup had intended to use Class V Funding as a vehicle for making a proprietary short trade (*i.e.*, one made for the bank's own benefit and not on behalf of a client) on $500 million—fully half—of the deal's portfolio. Citigroup did not disclose this material fact in its marketing materials.

104.    Citigroup's undisclosed short-trading scheme soon paid off. Less than nine months after the deal closed, all of Class V Funding's tranches were downgraded; 12 days later, the CDO experienced an event of default. Class V Funding's long investors suffered catastrophic losses on their investments, yet Citigroup pocketed approximately $160 million of net profit on its venture, including $34 million in fees for structuring the deal.

105.    The Class V Funding CDO was included in the assets of one or more of the CDOs that Citigroup sold to Woori.

106.    Citigroup reached a settlement with the SEC on October 19, 2011, pursuant to which it agreed, without admitting or denying liability, to disgorge its entire $160 million profit from Class V Funding plus an additional $125 million in penalties and prejudgment interest. The judge, however, refused to approve the proposed settlement, stating that Citigroup was a "recidivist" and should not be permitted to escape liability for relative "pocket change" and

without admitting wrongdoing. The settlement was rejected by the District Court, and is currently on appeal. *See United States SEC v. Citigroup Global Markets Inc.*, 11 Civ. 7387 (JSR), 2011 U.S. Dist. LEXIS 135914 at*14-*15 (S.D.N.Y. Nov. 28, 2011). On March 15, 2012, the United States Court of Appeals for the Second Circuit stayed the effect of the district court's decision. "Order" (March 15, 2012) in *United States SEC v. Citigroup Global Markets Inc.*, Dkt. Nos. 11-5227cv, 11-5375cv. & 11-5242-cv (2d Cir.).

107.    As the FCIC Report noted: "John Reed, former co-CEO of Citigroup, attributed the firm's failures in part to a culture change that occurred when the bank took on Salomon Brothers as part of the 1998 Travelers merger. He said that Salomon executives 'were used to taking big risks" and "had a history . . . [of] making a lot of money . . . but then getting into trouble.'" FCIC Report at 265.

**F.     Defendants' Material Misrepresentations And Omissions**

108.    As detailed below, Defendants falsely marketed these deals to Plaintiff as safe long-term investment opportunities built on high-quality collateral portfolios.

109.    The Offering Circulars and associated materials for the CDOs at issue contained material omissions and false or misleading statements. There were references in one or more of them to "high grade" securities, to securities of "investment quality" and to ratings given by S&P that the CDO tranches purchased by Plaintiff were rated A or A- by S&P. Nowhere did any of the documents reflect such matters as the facts that Citigroup's own contemporaneous estimate of these CDOs was that they were based in part on "bad quality" or "toxic quality" residential loans, that Citigroup "waived in" a significant number of defective loans, that the credit ratings given to the CDOs and the instruments underpinning them were known to be false when made, that Citigroup was improperly influencing the assets that underpinned the CDOs,

or that Citigroup (or entities with which it was dealing and who selected assets for the CDOs, like Magnetar or Goldman) was systematically shorting some of the RMBS tranches in its own CDOs.

110.    As noted above, the inadequacy of Citigroup's disclosures has been remarked upon by both Bowen and the FCIC.

### i.    The Tierra Alta CDO

111.    The Offering Circular concerning the Tierra Alta CDO was prepared by Citigroup on its own behalf, and on behalf of Tierra Alta Funding I, Ltd. and Tierra Alta Funding I Corp.

112.    The "Notice To Purchasers" provides in all capitals as follows:"TO THE BEST KNOWLEDGE AND BELIEF OF THE CO-ISSUERS, HAVING TAKEN ALL RESPONSIBLE CARE THAT SUCH IS THE CASE, THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR IS IN ACCORDANCE WITH THE FACTS AND DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION."

113.    Accordingly, Defendants assumed a duty to disclose the material facts pled in detail above and known to them not later than 2005. Defendants failed to make such disclosures.

114.    Furthermore, the Offering Circular concerning the Tierra Alta CDO states on page 3 of the Summary of Terms that the Class B1A Notes that Plaintiff purchased were to be rated by Moody's as "A3" and by S&P as "A-"—ratings that are non-speculative and consistent with the safe, quality investment that Plaintiff intended to purchase. Additional disclosures were made in the Summary of Terms, and relied upon by Plaintiff, that the interest and principal coverage ratios exceeded 101% for the Class B1A Notes, which means that the notes were over-

collateralized and which, therefore, a suggested that the notes were designed conservatively and to protect the principal underlying them and the income streams from them.

115.   Page 27 of the Offering Circular, which was relied upon by Plaintiff, states that, "[t]he CDO Collateral . . . may consist of loans, asset backed securities . . .(which will initially be rated investment grade)", among other things.

116.   Pages 79 and 80 of the Offering Circular, which were relied upon by Plaintiff, state that the selection of the CDO's underlying assets was performed with "reasonable care, using a degree of skill and attention no less than that which the Servicer exercises with respect to comparable assets that it manages for others having similar objectives and restrictions, and in a manner consistent with practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Collateral for clients having similar objectives and restrictions . . . ."

117.   These statements were false and misleading. Defendants knew that the ratings provided by S&P and Moody's were false and inaccurate, and by marketing the CDOs with artificially high ratings and by providing false assurances of safety by virtue of their claims of over-collateralization, Defendants misled and deceived Plaintiff into purchasing an asset that was not "investment grade" and that it would never have purchased had its true "speculative" grade characteristics been properly disclosed.

118.   Defendants' statement that the underlying asset backed securities—the RMBS in the CDO's collateral portfolio—was "investment grade" was similarly false and misleading. Defendants were aware, but did not disclose, that the quality control process for securitizing RMBS had broken down and that they were waiving in substantial numbers of defective mortgages into their CDOs. Defective mortgages are not investment grade.

119.   Additionally, Defendants' assertion that "reasonable care", "skill" and "attention" were used to select the collateral underlying the CDO was similarly false and misleading, and Defendants were aware of this. These statements provided a false sense of security to Plaintiff that the CDO's ratings provided by Moody's and S&P were reliable and that Plaintiff was making a substantial investment in a safe and reliable long-term investment.

120.   Taken together, Defendants' conduct was not consistent with its disclosures and caused a false and misguided impression that Plaintiff was investing millions of dollars in a safe and secure investment vehicle. Plaintiff would never have made this investment had Defendants made a full and complete disclosure of the true facts then known to them.

### ii.   The Ridgeway CDO

121.   The Offering Circular concerning the Ridgeway CDO was prepared by Citigroup on its own behalf, and on behalf of Ridgeway Court Funding I, Ltd. and Ridgeway Court Funding I, Corp.

122.   The "Notice To Purchasers" provides in all capitals as follows: "TO THE BEST KNOWLEDGE AND BELIEF OF THE CO-ISSUERS, HAVING TAKEN ALL RESPONSIBLE CARE THAT SUCH IS THE CASE, THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR IS IN ACCORDANCE WITH THE FACTS AND DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION."

123.   Accordingly, Defendants assumed a duty to disclose the material facts pled in detail above and known to them not later than 2005. Defendants failed to make such disclosures.

124.   Furthermore, the Offering Circular concerning the Ridgeway CDO states on page 4 of the "Summary of Terms" that the Class B Notes that Plaintiff purchased were to be

rated by Moody's as "A3" and by S&P as "A-"—ratings that are non-speculative and consistent with the safe, quality investment that Plaintiff intended to purchase. Additional disclosures were made in the Summary of Terms, and relied upon by Plaintiff, that the interest and principal coverage ratios exceeded 100% for the Class B Notes, which means that the notes were over-collateralized and which, therefore, a suggested that the notes were designed conservatively and to protect the principal underlying them and the income streams from them.

125.    Page 75 of the Offering Circular, which was relied upon by Plaintiff, states that the selection of the CDO's underlying assets was performed with "reasonable care, using a degree of skill and attention no less than that which the Manager exercises with respect to comparable assets that it manages for others having similar objectives and restrictions, and in a manner consistent with practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Collateral for clients having similar objectives and restrictions . . . ."

126.    These statements were false and misleading. Defendants knew that the ratings provided by S&P and Moody's were false and inaccurate, and by marketing the CDOs with artificially high ratings and by providing false assurances of safety by virtue of their claims of over-collateralization, Defendants misled and deceived Plaintiff into purchasing an asset that was not "investment grade" and that it would never have purchased had its true "speculative" grade characteristics been properly disclosed.

127.    Additionally, Defendants' assertion that "reasonable care", "skill" and "attention" were used to select the collateral underlying the CDO was similarly false and misleading, and Defendants were aware of this. These statements provided a false sense of

security to Plaintiff that the CDO's ratings provided by Moody's and S&P were reliable and that Plaintiff was making a substantial investment in a safe and reliable long-term investment.

128.   Taken together, Defendants' conduct was not consistent with its disclosures and caused a false and misguided impression that Plaintiff was investing millions of dollars in a safe and secure investment vehicle. Plaintiff would never have made this investment had Defendants made a full and complete disclosure of the true facts then known to them.

### iii.   The Ivy Lane CDO

129.   The Offering Circular concerning the Ivy Lane CDO was prepared by Citigroup on its own behalf, and on behalf of Ivy Lane CDO Ltd. and Ivy Lane CDO Corp.

130.   The "Notice To Purchasers" provides in all capitals as follows: "TO THE BEST KNOWLEDGE AND BELIEF OF THE CO-ISSUERS, HAVING TAKEN ALL RESPONSIBLE CARE THAT SUCH IS THE CASE, THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR IS IN ACCORDANCE WITH THE FACTS AND DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION."

131.   Accordingly, Defendants assumed a duty to disclose the material facts pled in detail above and known to them not later than 2005. Defendants failed to make such disclosures.

132.   Furthermore, the Offering Circular states on page 2 of the "Summary of Terms" that the Class B Notes that Plaintiff purchased were to be rated by Moody's as "A2" and by S&P as "A"—ratings that are non-speculative and consistent with the safe, quality investment that Plaintiff intended to purchase.

133.   Page 70 of the Offering Circular, which was relied upon by Plaintiff, states that the selection of the CDO's underlying assets was performed in "good faith and . . .reasonable

care," using "a degree of skill and attention that is (i) generally comparable to that which the Collateral Manager exercises with respect to comparable assets that it manages for itself and for others in accordance with its existing practices and procedures relating to assets of the nature and character of the Collateral and (ii) no less than that which is customarily employed by institutional portfolio managers of nationally recognized standing which manage assets similar to the Collateral . . . ."

134.    These statements were false and misleading. Defendants knew that the ratings provided by S&P and Moody's were false and inaccurate, and by marketing the CDOs with artificially high ratings, Defendants misled and deceived Plaintiff into purchasing an asset that it would never have purchased had its true "speculative" grade characteristics been properly disclosed.

135.    Additionally, Defendants' assertion that "good faith", "reasonable care", "skill" and "attention" were used to select the collateral underlying the CDO was similarly false and misleading, and Defendants were aware of this. These statements provided a false sense of security to Plaintiff that the CDO's ratings provided by Moody's and S&P were reliable and that Plaintiff was making a substantial investment in a safe and reliable long-term investment.

136.    Taken together, Defendants' conduct was not consistent with its disclosures and caused a false and misguided impression that Plaintiff was investing millions of dollars in a safe and secure investment vehicle. Plaintiff would never have made this investment had Defendants made a full and complete disclosure of the true facts then known to them.

### iv.    The FAB CDO

137.    The Offering Circular concerning the FAB CDO was prepared by Citigroup on its own behalf, and on behalf of FAB US 2006-1 PLC and FAB US 2006-1 Corp.

138.    The "Notice To Purchasers" provides in all capitals as follows: "TO THE BEST KNOWLEDGE AND BELIEF OF THE CO-ISSUERS, HAVING TAKEN ALL RESPONSIBLE CARE THAT SUCH IS THE CASE, THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR IS IN ACCORDANCE WITH THE FACTS AND DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION."

139.    Accordingly, Defendants assumed a duty to disclose the material facts pled in detail above and known to them not later than 2005. Defendants failed to make such disclosures.

140.    Furthermore, the Offering Circular concerning the FAB CDO states on page 4 of the Summary of Terms that the Class B Notes that Plaintiff purchased were to be rated by Moody's as "A3" and by S&P as "A-"—ratings that are non-speculative and consistent with the safe, quality investment that Plaintiff intended to purchase. Additional disclosures were made in the Summary of Terms, and relied upon by Plaintiff, that the interest and principal coverage ratios exceeded 100% for the Class B Notes, which means that the notes were over-collateralized and, therefore, a safer investment.

141.    Page 79 of the Offering Circular, which was relied upon by Plaintiff, states that the selection of the CDO's underlying assets was performed in a "prudent manner with reasonable care and in good faith using a degree of skill and attention no less than that which the Manager (i) exercises with respect to comparable assets that it manages for itself and its Affiliates and (ii) exercises with respect to comparable assets that it manages for others, and in carrying out its obligations under the Management Agreement and the Indenture, to act in a manner consistent with practices and procedures followed by prudent institutional managers of international standing relating to assets of the nature and character of the Collateral . . . ."

142.    These statements were false and misleading. Defendants knew that the ratings provided by S&P and Moody's were false and inaccurate, and by marketing the CDOs with artificially high ratings and by providing false assurances of safety by virtue of their claims of over-collateralization, Defendants misled and deceived Plaintiff into purchasing an asset that was not "investment grade" and that it would never have purchased had its true "speculative" grade characteristics been properly disclosed.

143.    Defendants were aware, but did not disclose, that the quality control process for securitizing RMBS had broken down and that they waiving in substantial numbers of defective mortgages into their CDOs. Defective mortgages are not investment grade.

144.    Additionally, Defendants' assertion that "reasonable care", "skill" and "attention" were used to select the collateral underlying the CDO was similarly false and misleading, and Defendants were aware of this. These statements provided a false sense of security to Plaintiff that the CDO's ratings provided by Moody's and S&P were reliable and that Plaintiff was making a substantial investment in a safe and reliable long-term investment.

145.    Taken together, Defendants' conduct was not consistent with its disclosures and caused a false and misguided impression that Plaintiff was investing millions of dollars in a safe and secure investment vehicle. Plaintiff would never have made this investment had Defendants made a full and complete disclosure of the true facts then known to them.

v.    **The Armitage CDO**

146.    The Offering Circular concerning the Armitage CDO was prepared by Citigroup on its own behalf, and on behalf of Armitage ABS CDO, Ltd. and Armitage ABS CDO, Inc.

147.    The Offering Circular concerning the Armitage CDO states on page 4 of the Summary of Terms that the Class B Notes that Plaintiff purchased were to be rated by Moody's

52

as "A2" and by S&P as "A"—ratings that are non-speculative and consistent with the safe, quality investment that Plaintiff intended to purchase. Additional disclosures were made in the Summary of Terms, and relied upon by Plaintiff, that the interest and principal coverage ratios exceeded 100% for the Class B Notes, which means that the notes were over-collateralized and which, therefore, a suggested that the notes were designed conservatively and to protect the principal underlying them and the income streams from them.

148.   Page 118 of the Offering Circular, which was relied upon by Plaintiff, states that the selection of the CDO's underlying assets was performed "with reasonable care (i) using a degree of skill and attention no less than that which the Collateral Servicer exercises with respect to comparable assets that it manages for itself and (ii) without limiting the foregoing, in a manner consistent with the customary standards, policies and procedures followed by institutional servicers of national standing relating to assets of the nature and character of the Collateral. . . ."

149.   These statements were false and misleading. Defendants knew that the ratings provided by S&P and Moody's were false and inaccurate, and by marketing the CDOs with artificially high ratings and by providing false assurances of safety by virtue of their claims of over-collateralization, Defendants misled and deceived Plaintiff into purchasing an asset that was not "investment grade" and that it would never have purchased had its true "speculative" grade characteristics been properly disclosed.

150.   Defendants were aware, but did not disclose, that the quality control process for securitizing RMBS had broken down and that they waiving in substantial numbers of defective mortgages into their CDOs. Defective mortgages are not investment grade.

likelihood that impending changes in rating methodologies, and resulting downgrades, would result in the collapse of CDOs investing in subprime RMBS.

156.    Citigroup's representations were materially false and misleading when made. These representations were made intentionally or with reckless disregard for the truth.

157.    Citigroup made these misrepresentations and omissions to Plaintiff with the knowledge that Plaintiff would rely on them.

158.    Citigroup made these misrepresentations and omissions to the ratings agencies with the knowledge that the ratings agencies would rely on them and give the CDOs inflated ratings, and with the intention and expectation that Plaintiff would rely upon these ratings in purchasing notes.

159.    Citigroup had an affirmative duty to provide complete and accurate disclosures of the material facts about the CDOs that lay peculiarly within its knowledge. Citigroup intentionally or recklessly failed to provide full, complete, and accurate disclosures of these material facts.

160.    By orchestrating the sale of notes of Citigroup-arranged CDOs to other Citigroup arranged CDOs, Citigroup created and perpetuated the false impression that the market for Citigroup-arranged CDOs was robust, and that the prices the CDOs were paying for the referenced CDOs were fair prices.

161.    Plaintiff reasonably and justifiably relied to their detriment on Citigroup's above-described misrepresentations and omissions, including Citigroup's affirmative duty to provide full, complete, and accurate disclosures to Plaintiff.

162.    Plaintiff reasonably and justifiably relied to their detriment on the ratings of the CDOs.

163.    Citigroup's misrepresentations and omissions induced Plaintiff to purchase the above-described CDOs.

164.    As a direct and proximate result of Citigroup's fraud, Plaintiff has suffered damages, and Citigroup and the other Defendants are liable to Plaintiff in an amount set forth above plus interest.

165.    Plaintiff also is entitled to punitive damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Negligent Misrepresentation)**

166.    Plaintiff repeats and re-alleges all of the foregoing paragraphs as if fully set forth herein.

167.    Defendants had a duty to Plaintiff, which they acknowledged, to exercise reasonable care in providing information about the CDOs at issue here (to the extent they were involved in the issuance, underwriting, and/or marketing of each of these CDOs) and Plaintiff's reliance on that information in making its decisions to invest in those CDOs was foreseeable. Defendants involved in each of these CDOs had knowledge or its equivalent that Plaintiff desired such information for the serious purpose of enabling it to decide whether or not to invest in each of these CDOs, that the Plaintiff intended to rely or act on this information and that the Plaintiff would suffer injury if the information was false or erroneous.

168.    Defendants possessed unique or specialized expertise in each of the CDOs in which they were involved, and occupied a special position of confidence and trust with respect to the Plaintiff for each such CDO. Plaintiff did, in fact, repose confidence and trust in the Defendants with respect to each of the CDOs in which they were involved and in which it invested.

169.    Plaintiffs' reliance on each of Defendants' negligent misrepresentations was justified because each Defendant making the representation held or appeared to hold unique or special expertise; a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.

170.    As a direct, proximate and foreseeable result of Defendants' negligent misrepresentations, Plaintiff was injured in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment)

171.    Plaintiff repeats and re-alleges all of the foregoing paragraphs as if fully set forth herein.

172.    As a result of their wrongful conduct detailed above, Defendants have been unjustly enriched at Plaintiff's expense, and Plaintiff is entitled to judgment ordering Defendants disgorge all amounts they received as a result of their involvement in connection with the CDOs, including without limitation: (i) the proceeds of the sales of the notes; (ii) amounts received by Citigroup as counterparties on credit default swaps created by it; (iii) distributions of any type from the CDOs at issue; (iv) commissions or sales fees; and (v) amounts received from the CDOs at issue in transactions involving the purchase of collateral.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands entry of judgment in their favor and against Defendants as follows:

A.    Awarding Plaintiff: (i) damages from Defendants in an amount to be determined at trial, but in no event less than the $95 million paid by Plaintiff for the notes they

purchased; and (ii) other damages sustained by Plaintiff as a result of Defendants' conduct, as described above, in an amount to be determined at trial;

B.      Ordering disgorgement of Defendants' ill-gotten gains and unjustly obtained fees and profits, and ordering restitution of such gains to Plaintiff as appropriate;

C.      Awarding Plaintiff punitive damages as a result of Defendants' intentional, deliberate, malicious, willful, and wanton conduct, as detailed above;

D.      Awarding Plaintiff pre-judgment and post-judgment interest;

E.      Awarding Plaintiff their costs and fees, including, to the extent applicable, attorneys' fees and other costs incurred by Plaintiff in bringing this action; and

F.      Awarding Plaintiff such other relief as this Court may deem just and appropriate.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial on all matters so triable.

Dated: May 15, 2012                        Respectfully submitted,

                                           HAUSFELD LLP

                           By:     _____
                                           Seth R. Gassman (SG-8116)
                                           Michael D. Hausfeld (N.Y. Bar No. 4722963)
                                           William P. Butterfield
                                           Nathaniel C. Giddings
                                           HAUSFELD LLP
                                           1700 K St. NW, Suite 650
                                           Washington, D.C. 20006
                                           Telephone: (202) 540-7200
                                           Facsimile: (202) 540-7201

                                           Michael P. Lehmann

58

Christopher L. Lebsock
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980

Hojin Seo (N.Y. Bar No. 3016136)
Seokyoung Shin (N.Y. Bar No. 4869772)
DERYOOK & AJU LAW FIRM, PC
1114 Avenue of Americas, 35F.
New York, NY 10036

*Attorneys for Plaintiff*