COPY_

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WOORI BANK, | Civil Action No. 12 CIV 3868 (LTS) |
| Plaintiff, | **AMENDED COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| CITIGROUP GLOBAL MARKETS, INC., | |
| Defendant. | |



1.      Plaintiff Woori Bank, a corporation duly organized under the laws of the Republic of Korea with a principal place of business at 203, Hoehyeon-dong, 1-ga, Chung-gu, Seoul, Korea 100-792 ("Plaintiff" or "Woori"), for its complaint against Defendant Citigroup Global Markets Inc. ("CGMI" or "Defendant") respectfully alleges on knowledge as to itself and its own actions, and on information and belief as to all other matters, as follows.

## I.      SUMMARY OF THE ACTION

2.      This action arises out of Defendant's false and misleading misrepresentations and omissions in arranging, marketing, and inducing Plaintiff to invest $25 million in Armitage ABS CDO Ltd. (ISIN USG04842AF09 MTGE)("Armitage")—was in reality a fraudulent investment vehicle created and exploited by CGMI to move toxic mortgages off of their balance sheet and onto those of Plaintiff.

3.     From 2000 to 2006, CGMI earned increasingly large returns from originating subprime mortgages, securitizing them into residential mortgage-backed securities ("RMBS"), arranging CDOs, and underwriting other structured finance transactions derived from subprime mortgages. When the overheated housing market began to cool in 2006, the market for subprime-based financial products began to decline. Yet CGMI was accustomed to these profits. In now infamous words, the former CEO of Citigroup, Charles Prince, said in July of 2007, literally days before the subprime market collapse, "[a]s long as the music is playing, you've got to get up and dance," and added, "We're still dancing."[1]

4.     Commencing in early 2006, Defendant knew that CDOs were far more risky than their ratings suggested. Defendant's superior knowledge was based on information on individual loan performance that was available only to financial institutions that, like CGMI, were securitizing mortgages into RMBS on a massive scale (which, in turn, served as collateral for CDOs that it was creating and marketing, including the ones at issue here).  CGMI, therefore, had inside information that Woori did not about the quality and stability of these inherently opaque financial products. As a result of their insider knowledge, Defendant knew that the RMBS that it was packaging into CDOs included a significant percentage of mortgages that violated basic underwriting standards and were likely to default—making the RMBS assets and the CDOs that securitized them far less secure than portrayed by the ratings that CGMI was able to persuade Standard & Poor's ("S&P") and Moody's to give them.  In addition, CGMI, as the CDO underwriter, created and circulated marketing materials/pitch books to clients like Woori that contained "break even default" tables—tables identifying the percentage of collateral that could default before a particular investment would be impacted—that were premised on historical mortgage default rates and historical rates of recovery that were

---

[1] *See* Michiyo Nakamoto & David Wighton, C*itigroup Chief Stays Bullish on Buy-Outs* (Fin. Times July 9, 2007) available at  http://www.ft.com/cms/s/0/80e2987a-2e50-11dc-821c-0000779fd2ac.html#axzz1jdQ16vwk.

unrealistic in light of the lax mortgage underwriting standards that occurred starting in and after 2005.[2]  Rather than disclosing these material facts to investors in the deals it arranged, Defendant concealed them so that CGMI could off-load some of the massive exposure to RMBS that it carried on its own balance sheet to unsuspecting investors—while at the same time continuing to earn lucrative fees from generating CDOs.

5.      Although this was obviously material information, Defendant never disclosed to Plaintiff—and indeed affirmatively misrepresented and/or concealed—the fact that the ratings on the CDOs purchased by Plaintiff falsely portrayed the riskiness of the investments, and that the break even default analysis that it provided to Plaintiff were unrealistic in light of the degradation of mortgage underwriting standards. If Plaintiff had known the truth, it would not have purchased $25 million in the Armitage CDO.

## II.      THE PARTIES

### A.      The Plaintiff

6.      Plaintiff Woori is a corporation duly organized under the laws of the Republic of Korea with a principal place of business at 203, Hoehyeon-dong, 1-ga, Chung-gu, Seoul, Korea 100-792. Woori operates in locations throughout the world, including the United States, where

---

[2] The ultimate mortgage collateral of a CDO is opaque to the CDO investor, who would rely instead on statistical probabilities of failure based on the assets considered in the aggregate to make investment decisions.  Thousands of mortgages are bundled together in RMBS.  And it was this diversification, and the aggregated risk profile of the RMBS that provided investors with confidence to invest in these types of securities.  Tranches of RMBS were then securitized into CDOs.  Underwriters like CGMI purported to examine the creditworthiness of the RMBS and CDO collateral in two ways.  With respect to RMBS that it was securitizing, CGMI and other banks used internal and third-party due diligence providers like Clayton Holdings to examine portions of the mortgage loan pools in order to determine if the pool conformed with the representations and warranties of the lender and complied with underwriting standards.  Second, CGMI and other banks used statistical models to estimate the losses that the RMBS collateral and the CDO could withstand (at various tranches in the repayment waterfall—from junior positions to mezzanine positions, and up to the senior and super-senior tranches.  The result of this modeling was reported in the pitch books as the break-even default scenarios for the CDO. The break even scenarios were premised on historical rates of default for residential mortgages and the historical rates of recovery when defaults did occur.

it operates through its subsidiary, Woori America Bank, which has offices in New York City and in five other states.

7.      On March 29, 2007, Woori purchased a $25 million interest in Armitage. The CDO tranche that Woori purchased was rated as A by S&P at that time. By December 4, 2007—eight months later—the CDO was in default. Woori sold this interest on August 14, 2008.

**B.      The Defendant And Affiliated Parties**

8.      Defendant CGMI is a New York corporation located at 390 Greenwich Street, New York, New York 10013. CGMI is a registered broker-dealer and serves as a brokerage and securities arm of Citigroup, Inc.

9.      CGMI was the arranger, underwriter, "Placement Agent," and direct seller of the Armitage CDO in which Plaintiff invested. CGMI was responsible for preparing and disseminating the Offering Circulars and pitch book for the Armitage CDO discussed in more detail below.

10.      On information and belief, Armitage ABS CDO, Ltd. is a corporation formed under the laws of the Cayman Islands. Armitage ABS CDO, Ltd. was formed by Citigroup or its affiliates to issue Armitage ABS CDO, Ltd. securities. Armitage ABS CDO, Ltd. is located at Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9002, Cayman Islands. Armitage ABS CDO, Ltd. was incorporated on March 7, 2007 and the Closing Date on the Offering Circular was March 29, 2007. Armitage ABS CDO, Ltd. has never had any employees, was nominally capitalized, and has no prior operating history.

11.      On information and belief, Armitage ABS CDO, Inc. is a corporation organized under the laws of Delaware. Armitage ABS CDO, Inc. was formed by Citigroup or its affiliates to issue Armitage ABS CDO, Inc. securities. Armitage ABS CDO, Inc. is located at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711. Armitage ABS CDO, Inc. was incorporated on March 19, 2007 and the Closing Date on the Offering Circular was

March 29, 2007. Armitage ABS CDO, Inc. has never had any employees, was nominally capitalized, and has no prior operating history.

## III.   JURISDICTION AND VENUE

12.     This Court has diversity jurisdiction pursuant to 28 U.S.C §1332(a)(2) because Woori is the subject of a foreign state. The amount in controversy exceeds $75,000 exclusive of interest and costs. The over-the-counter CDO purchases described above were ones in which irrevocable liability occurred in the United States and pursuant to New York law.

13.     Venue is proper in this district pursuant to 28 U.S.C §1391(b)(2) because Defendant resides here and because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district.

14.     The Armitage CDO Offering Circular contains a governing law provision that states: "[t]he Notes and the Transaction Documents . . . will be governed by, and construed in accordance with, the laws of the State of New York" or words to that effect.

## IV.   FACTUAL ALLEGATIONS

### A.   Plaintiff's Decision To Invest In CDOs

15.     A CDO is an investment vehicle that typically includes the formation of a special purpose entity, commonly referred to as the "issuer," that raises money by issuing securities to investors. Generally, an arranging bank creates the issuer in order to acquire a portfolio of investment assets whose cash flow is the expected source of income for various classes, or "tranches," of debt securities that are marketed and sold to investors.

16.     The assets in a CDO's portfolio can be comprised of cash assets (such as RMBS), synthetic assets, or both. Synthetic assets include CDS contracts, transactions resembling an insurance contract whereby a "protection buyer" pays a "protection seller"

periodic "premiums" (similar to insurance premiums) in return for the protection seller's promise to pay the protection buyer should certain "credit events" occur, such as events of payment default, loss, write-down, or a deterioration in ratings. A CDO containing both cash and synthetic assets is referred to as a "hybrid" CDO.

17.     The investors in a CDO, which include noteholders and equity investors, are paid from the proceeds generated by the collateral. Amounts are paid out to investors according to a defined priority (the "waterfall" referenced in one of the following graphics). The most senior tranches of notes, which have the lowest risk of loss and highest credit rating, typically receive principal and interest first. The junior tranches have the highest risk of loss and lowest credit rating (with the exception of the equity tranche, which typically is not rated). The following charts issued by the Financial Crisis Inquiry Commission ("FCIC") (available at http://fcic.law.stanford.edu/resource/graphics) illustrate the process for both RMBS and CDOs:

# Residential Mortgage-Backed Securities

*Financial institutions packaged subprime, Alt-A and other mortgages into securities. As long as the housing market continued to boom, these securities would perform. But when the economy faltered and the mortgages defaulted, lower-rated tranches were left worthless.*



**1. Originate**

Lenders extend mortgages, including subprime and Alt-A loans.

**2. Pool**

Securities firms purchase these loans and pool them.

**3. Tranche**

Residential mortgage-backed securities are sold to investors, giving them the right to the principal and interest from the mortgages. These securities are sold in tranches, or slices. The flow of cash determines the rating of the securities, with AAA tranches getting the first cut of principal and interest payments, then AA, then A, and so on.

**Pool of Mortgages**

**RMBS**
TRANCHES
Low risk, low yield

**AAA**

First claim to cash flow from principal & interest payments...

**SENIOR TRANCHES**

next claim...

**AA**

next... etc.

**MEZZANINE TRANCHES**

*These tranches were often purchased by CDOs.*

A
BBB
BB
**EQUITY TRANCHES**

High risk, high yield

**Collateralized Debt Obligation**

# Collateralized Debt Obligations

*Collateralized debt obligations (CDOs) are structured financial instruments that purchase and pool financial assets such as the riskier tranches of various mortgage-backed securities.*

## 3. CDO tranches

Similar to mortgage-backed securities, the CDO issues securities in tranches that vary based on their place in the cash flow waterfall.

## 1. Purchase

The CDO manager and securities firm select and purchase assets, such as some of the lower-rated tranches of mortgage-backed securities.

Low risk, low yield

*First claim to cash flow from principal & interest payments...*

New pool of RMBS and other securities

AAA

AAA

*next claim...*

## 2. Pool

The CDO manager and securities firm pool various assets in an attempt to get diversification benefits.

AA

*next... etc.*

AA

A
BBB
BB
EQUITY

AA

A
BBB
BB

High risk, high yield

18.    Banks that arrange CDOs typically perform multiple roles, including:

(a)structuring and modeling the CDOs; (b) marketing and selling them to investors; (c)

interfacing with ratings agencies to achieve the targeted ratings for the CDOs' tranches; (d) financing and facilitating the purchases of the cash collateral and holding that collateral on their own books prior to closing; and (e) facilitating hybrid structures by acting as the initial protection buyer for CDS included in the synthetic collateral pool. Moreover, because the special purpose vehicle that serves as the deals issuer does not have any employees of its own, the arranging banks usually act for the issuer and serve as the "initial purchaser" for some portion of the CDO's tranches and the marketing agent for the remaining tranches. For performing these functions, arranging banks typically receive millions of dollars in fees at closing.

19.     For the purposes of this complaint, and unless stated otherwise, any reference to a particular rating refers to the S&P ratings categories.

20.     Like many other CDO investors, Plaintiff focused on highly-rated "non-speculative" tranches (primarily "A" or "A-" rated tranches). "A" or "A-" rated securities are contrasted with speculative grade securities that promised higher rates of return in exchange for a higher risk profile. S&P has explained that "[o]bligations rated 'BB', 'B', 'CCC', 'CC', and 'C' are regarded as having significant speculative characteristics. 'BB' indicates the least degree of speculation and 'C' the highest. While such obligations will likely have some quality and protective characteristics, these may be outweighed by large uncertainties or major exposures to adverse conditions." *See* Standard & Poor's, *Global Credit Protal: RatingsDirect*® (June 3, 2009), available at http://www.standardandpoors.com/spf/ratings/Understanding_SandP _RatingDefinitions.pdf. Conversely, an "A" rating indicates that the "obligor's capacity to meet its financial commitment on the obligation is still strong." *Id*.

21.     The United States Office of the Comptroller of the Currency ("OCC") noted the

importance of the ratings in the growth of securitized products well before the credit crisis:

> Securitized assets [such as CDOs] offer a combination of attractive yields
> (compared with other instruments of similar quality), increasing secondary market
> liquidity, and generally more protection by way of collateral overages and/or
> guarantees by entities with high and stable credit ratings. They also offer a
> measure of flexibility because their payment streams can be structured to meet
> investors' particular requirements. *Most important, structural credit
> enhancements and diversified asset pools free investors of the need to obtain a
> detailed understanding of the underlying loans.* This has been the single largest
> factor in the growth of the structured finance market.

22.     The OCC continued:

> The rating agencies perform a critical role in structured finance — evaluating the
> credit quality of the transactions. Such agencies are considered credible because
> they possess the expertise to evaluate various underlying asset types, and because
> they do not have a financial interest in a security's cost or yield. *Ratings are
> important because investors generally accept ratings by the major public rating
> agencies in lieu of conducting a due diligence investigation of the underlying
> assets and the servicer.*

*See* Comptroller's Handbook "Asset Securitization" published November 1997 (emphasis

added).

23.     Plaintiff's investment decision in the CGMI CDO at issue was informed by the

Offering Circular (including the ratings contained in them), oral presentations made by

salespeople for CGMI in connection with those CDOs, and other marketing materials (pitch

books) presented to Plaintiff by CGMI's salespeople.

24.     CGMI represented to Plaintiff that independent and experienced collateral

managers would select and manage the collateral portfolios for the CDOs for the benefit of long

investors such as Plaintiff, whose profits are dependent on the success of the CDO. The long

investors typically pay the collateral manager a percentage of the notional value of the

transaction (*i.e.*, the total deal issuance) as a fee. The collateral manager's role is material to a

long investor's investment decision because the collateral manager is supposed to be responsible for the CDOs' risk profile and performance through its selection of collateral.

25.      Plaintiff's investment decision was also based on the ratings assigned to prospective CDO investment. Woori considered the objectives of safety, liquidity and profitability in making investments in the Armitage CDO and based on the written and oral presentations made by CGMI believed that its investment in the aforementioned CDO satisfied those criteria.

26.      Plaintiff had no meaningful access to information about the CDO at issue and the collateral underlying it other than what was provided to it by CGMI and its representatives. As stated at pages 8-9 of a Preliminary Staff Report of the FCIC dated June 2, 2010 ( available at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/2010-0602-Credit-Ratings.pdf ):

> Ratings also figure into the decisions of private and public entities to extend credit or purchase securities. Many institutional investors, such as pension funds or university endowments, do not have the resources to evaluate all of the securities they purchase, which in any case would be duplicative of the agencies' work. In addition, these investors do not have access to the same information that the ratings agencies do. **Consequently, they use credit ratings as a substitute for the more granular information they would otherwise have to gather. As former Moody's Managing Director Jerome Fons has acknowledged, "subprime RMBS and their offshoots offer little transparency around the composition and characteristics of the loan collateral. … Loan-by-loan data, the highest level of detail, is generally not available to investors." Methods of credit analysis, he added, "are quite technical, often relying on advanced statistical techniques" and therefore "beyond the grasp of many investors."** (Emphases added.)

**B.      Plaintiff's Reliance On CGMI And Lack Of Knowledge Of Fraud**

27.      CGMI promoted itself to Plaintiff and the world as a leader in structured finance CDOs, listing its track record with billions of dollars in structured credit transactions that either had already closed or were in the pipeline. Plaintiff relied on the reputation and track record of

CGMI in making its investment in the aforementioned CDO.  Plaintiff would not have

purchased the CDO in question had it been aware of the true facts described below.

28.    Plaintiff relied on the credit ratings given to the aforementioned CDO.  Had it

known that these credit ratings were false or had been manipulated, as described below, it

would not have made this investment.  Plaintiff generally sought to make investments that had

an "A" or "A-" credit rating.

29.    Woori was not a 'sophisticated investor" with respect to CDOs backed by

RMBS.  It never issued or underwrote any CDOs.  It relied on CGMI to explain to it fully and

truthfully the risks associated with the Armitage CDO.  It had no expertise or involvement with

issuing or underwriting RMBS. Again, Woori relied on CCGMI to explain to it fully and

truthfully the risks associated with them.  Nor did Woori have any understanding that securities

ratings issued by entities like S&P should be taken at anything other than face value.  It had no

independent understanding of how S&P and Moody's set such ratings for RMBS.

30.    To the extent that Plaintiff is deemed to be a "sophisticated investor", it acted

like the investor in *Dordona I, LLC v. Goldman Sachs & Co.*, No. 10 Civ. 7497 (VM), 2012

935815 at *12 (S.D.N.Y. March 21, 2012): "when investors, sophisticated or not, purchase

securities they do so in reliance on the reputation for integrity and good faith of the issuers and

dealers, placing trust in their agents' implied representations that they would not engage in

conduct which would place their own interests ahead of those of their customers." As in that

case, the public information available to Plaintiff "would require much more than 'minimal

diligence' to analyze—even for a sophisticated investor. Defendants have proffered nothing to

suggest that investors were placed on guard about anything approximating the alleged fraud,

that they were practically faced with the facts, or that they had access to truth-revealing information." *Id.* at *19 (internal quotations omitted).

31.     Indeed, Janet Tavakoli ("Tavakoli"), President of Tavakoli Structrured Finance, Inc., with more than 20 years of experience in investment banking, trading, structuring and marketing of structured financial products, said the following about the marketing of CDOs in a July 26, 2011 report entitled "Tavakoli Structured Finance Revokes the Credit Rating Agencies' NRSRO Designation: Issues and Solutions for Restoring Credibility to the Credit Rating Agencies and Rehabilitating the Alternative Banking System" ("Tavakoli Report")(available at http://www.tavakolistructuredfinance.com/NRSRO) at page 20: "CDOs were often offloaded on naïve investors. Funds in Europe and the United States—including local government run funds—often find they did not understand the risks of complex structured financial products they own, because they relied on the 'AAA' ratings for guidance."  She continued: "There is often a difference between an investor with a lot of money to manage and a sophisticated investor." *Id.*  Tavakoli speaks with deep knowledge of the derivatives market. She is a former adjunct associate professor of derivatives at the University of Chicago's Graduate School of Business and an author of several books on derivatives and collateralized debt obligations.

32.     No public information was available to Plaintiff in 2006-07 that would have disclosed to it CGMI's fraudulent activities with respect to the solicitation of investments in the CDOs in which Plaintiff invested that are described above.  It had no access to CGMI's internal analyses of the market and the prognoses for the RMBS on which CDOs were based.  Likewise, Plaintiff had no access to internal concerns raised by CGMI's managers in 2006-07 concerning the CDOs that it was marketing. Nor Could Plaintiff know that the initial S&P and Moody's

ratings of the RMBS underlying CDOs were false and misleading starting not later than late 2005.

33.     It was only upon the publication by the FCIC in January of 2011 of its "Financial Crisis Inquiry Report" ("FCIC Report") (available at http://fcic.law.stanford.edu/report) that Plaintiff discovered the fraudulent activities of CGMI in marketing the CDO at issue.

### C.     CGMI Heavily Invests in RMBS and CDOs

34.     CGMI acted as  a buyer of mortgage pools, an underwriter, securitizer, and arranger of RMBS, and an underwriter, structure, and arranger of CDOs, that invested in RMBS. Because of these multiple roles, CGMI gained a unique perspective and obtained peculiar knowledge—unavailable to Plaintiff—concerning the deteriorating condition and imminent collapse of the market and the quality of the CDOs it was promoting, and the quality of the collateral underlying them.

35.     In addition, CitiFinancial Mortgage ("CitiFinancial"), a Citigroup consumer lending business unit (and an affiliate company of CGMI) held prime and subprime mortgages that it had originated itself or purchased from third parties. CGMI securitized a portion of these mortgages into RMBS, which it either sold to institutional investors directly or placed into CDOs and other structured finance products that it arranged.

36.     CGMI held mortgages for securitization and trading, RMBS, and tranches of CDOs that CGMI had previously arranged but had not sold. *See* Hearing Before the FCIC on "Subprime Lending and Securitization and Government Sponsored Enterprises" at 127:16-25 to 128:1-17 (Apr. 7, 2010) (4/7/10 Tr.")(testimony of Susan Mills ("Mills"), Managing Director of Mortgage Finance, Citi Markets & Banking, Global Securitized Markets), available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0407-Transcript.pdf; *see generally* http://www.citi.com/investorinfo/cgmi_sfc.pdf

37.     From 2005 to 2007, CGMI arranged nearly $110 billion of CDOs. During that period, CGMI rose from the world's fourth-largest arranger of mortgage-backed CDOs to the largest—and received hundreds of millions of dollars in associated fees. CGMI reaped over $347 million in fees from CDO transactions in 2007 alone.

38.     As the FCIC Report noted,

> "We had sales representatives in all those [global] locations, and their jobs were to sell structured products, "Nestor Dominguez [Dominguez], the co-head of Citigroup's CDO desk, told the FCIC. "We spent a lot of effort to have people in place to educate, to pitch structured products. So, it was a lot of effort, about 100 people. And I presume our competitors did the same."

FCIC Report at 131 (footnotes omitted). [3]

### D.     CGMI's Inside Knowledge Of The Deterioration And Imminent Collapse Of The CDO, RMBS, And Mortgage Lending Market

39.     In 2005-07, CGMI became aware that the economic foundation of its CDO and RMBS businesses were beginning to crack. Because of its insider's perspective, CGMI became aware that mortgage holders were missing increasing numbers of payments, causing higher delinquency and default rates. In some instances, those missed payments occurred within the first three months of the mortgage loan being made, suggesting that increasing numbers of mortgages were the product of fraudulent loan applications or otherwise had not met lenders' original underwriting guidelines. The escalating incidence of non-conforming loans also led to heightened requests by securities issuers and intermediaries that the loan originators take back mortgages that did not conform to underwriting criteria specified in the loan purchase agreement (known as "put backs"). These factors raised the specter of meaningful losses not

---

[3] For clarity, CGMI operates as Citigroup Inc.'s investment bank.

just on the mortgages themselves, but on all products composed of them. The markets for subprime RMBS and CDOs began to deteriorate.

40.     CGMI was keenly aware of the risks that these developments posed to its balance sheet. As a mortgage originator and RMBS securitizer, CGMI knew that the consumer mortgage lending industry had become a house of cards teetering on the brink of collapse.

41.     For example, on April 11, 2007—just days after Plaintiff invested in the Armitage CDO, CGMI prepared an internal report entitled "ABS CDOs In a Mezz" that summarized pre-existing data showing CDO loss estimates based on various subprime scenarios. The report demonstrated that losses on Mezzanine CDOs were predicted to climb by 35% if housing prices remained flat, which would virtually render valueless all tranches rated lower than "AAA".  If housing prices declined by 2% or more annually, all CDO tranches below the super senior level would be rendered worthless. A chart depicting this decline that was part of that report and that, on information and belief, was prepared prior to April 11, 2007 is displayed below.

## Sub-Prime: An Example





42.     This is particularly important information because the riskiness of a CDO is analyzed based on statistical probabilities and assumptions about the quality of the collateral in the market—not the specific collateral underlying any specific CDO.

43.     Indeed, by early 2006, CGMI's colleagues at Citi Financial knew that substantial volumes of loans that Citi Financial was purchasing from mortgage originators for

securitization did not conform to applicable underwriting standards. This information was disclosed by Richard M. Bowen III ("Bowen"), the former Business Chief Underwriter for Citigroup's Consumer Lending Group, who testified before the FCIC. He stated that through extensive due diligence of the mortgages Citi Financial acquired—information that was not available to investors like Plaintiff—he discovered that significant portions of these mortgages were defective and failed to meet Citi Financial's underwriting and quality assurance standards.

44.      Bowen observed that, by mid-2006, more than 60% of the prime mortgages Citi Financial purchased from originators failed to comply with company guidelines, and that the number of defective mortgages increased to over 80% during 2007. 4/7/10 Tr. at 134:24-25 to 135:1-19. *See Hearing on Subprime Lending and Securitization And Government Sponsored Enterprises: Hearing Before the Fin. Crisis Inquiry Comm'n* (2010) (testimony of Richard M. Bowen, III ), available at http://fcic-static.law.stanford.edu/ cdn_media/fcic-docs/2010-04-07%20Richard%20Bowen%20Written%20Testimony.pdf ("Bowen Statement").

45.      CGMI was also aware of underwriting problems.  According to Bowen's testimony CGMI was sufficiently concerned as far back as 2005 about the quality of its due diligence underwriters that it consulted with Bowen about how to improve its processes. Bowen testified:

> The belief that full time employee underwriters make better quality decisions than contract underwriters was shared by other organizations within Citi. Citigroup Capital Markets was a company that exclusively utilized contract underwriters. The Chief Underwriter of Citigroup Capital Markets spent a day at Citifinancial Mortgage in 2005 discussing underwriting. He visited extensively with some of our underwriters and managers regarding procedures and quality controls.

> The Chief Underwriter was concerned about the quality of decisions made by their contract underwriters. We discussed the possibility that Citigroup Capital Markets might contract to utilize CFMC underwriters, under control of CFMC underwriting management. This would be for due diligence on some of the pools they were purchasing. Their Chief Underwriter felt this would give them a greater confidence in the quality of pools that they were considering purchasing.

> CFMC volumes then started increasing and there was no longer excess underwriting capacity to possibly outsource to Citigroup Capital Markets. The proposed outsourcing agreement was not pursued.

*See* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0407-Bowen.pdf.[4]

46.   CGMI utilized the services of Clayton Holdings ("Clayton") as one of its third-party due diligence providers instead.

47.   Susan Mills, the head of Mortgage Finance at CGMI was also aware of a deterioration in loan quality not later than mid-2006. The FCIC Report had this to say about Mills:

> **Also, in early 2006, Susan Mills, a managing director in the securitization unit—which bought mortgages from other companies and bundled them for sale to investors—took note of rising delinquencies in the subprime market and created a surveillance group to track loans that her unit purchased. By mid-2006, her group saw a deterioration in loan quality and an increase in early payment defaults—that is, more borrowers were defaulting within a few months of getting a loan. From 2005 to 2007, Mills recalled before the FCIC, the early payment default rates nearly tripled from 2% to 5% or 6%.**

*Id.* at 260-61 (footnotes omitted; emphases added).

48.   Thomas Maheras, the former Co-CEO of CGMI, told the FCIC that CGMI was in fact "**negative on subprime**" and that by the latter part of 2006, was actively "**in most of our business areas, reducing our risk around subprime**." 4/7/10 Tr. at 292:4 to 292:8.8 (emphases added). This internal recognition was not communicated to Plaintiff or other investors to whom CGMI in the latter part of 2006 and in 2007 was still marketing CDOs that securitized subprime mortgages with false "investment grade" ratings.

---

[4] Citigroup Capital Markets is another name for CGMI.

49.     CGMI constituted a primary market for the sale of mortgage loans and they were expected to play a significant role in dictating and enforcing underwriting standards on mortgage lending. The Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Company, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision expressed this view in "interagency guidance" issued on March 1, 1999 (available at http://www.federalreserve.gov/boarddocs/srletters/1999/sr9906a1.pdf):

> Institutions should not accept loans from originators that do not meet their underwriting criteria, and should regularly review loans offered to ensure that loans purchased continue to meet those criteria. Deterioration in the quality of purchased loans or in the portfolio's actual performance versus expectations requires a thorough reevaluation of the lenders or dealers who originated or sold the loans, as well as a reevaluation of the institution's criteria for underwriting loans and selecting dealers and lenders. Any such deterioration may also highlight the need to modify or terminate the correspondent relationship or make adjustments to underwriting and dealer/lender selection criteria.

The guidance further notes that:

> Institutions should have information systems in place to segment and stratify their portfolio (*e.g.*, by originator, loan-to-value, debt-to-income ratios, credit scores) and produce reports for management to evaluate the performance of subprime loans. The review process should focus on whether performance meets expectations. Institutions then need to consider the source and characteristics of loans that do not meet expectations and make changes in their underwriting policies and loan administration procedures to restore performance to acceptable levels.

50.     CGMI paid no heed to these warnings, despite receiving further early alarms from Clayton, its contracted, third-party due diligence consultant retained to examine samples of the mortgage pools that it was purchasing in order to determine whether the sampled mortgages conformed to applicable underwriting standards.

51.     Starting in late 2005 or early 2006, Clayton reported to CGMI that a large percentage of the loans CGMI had acquired for securitization were non-conforming. *See* Letter from Paul T. Bossidy, Chief Executive Officer of, Clayton, to Phil Angelides, Chairman of the FCIC at 3 (Sept. 30, 2010), available at http://graphics8.nytimes.com/packages/pdf/ opinion/Clayton-FCIC.pdf ("Clayton rolled out this system and its Exception Reports to our clients beginning in late 2005 and continuing throughout 2006.").

52.     Of the 6,205 loans it reviewed for CGMI and its affiliates from 2006 to the first half of 2007, Clayton flagged 42% as failing to conform to underwriting standards. *See* FCIC Report at 167; "All Clayton Trending Reports: 1st Quarter 2006 – 2nd Quarter 2007" (Sept. 23, 2010), available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf. The FCIC generated a chart depicting waivers for CGMI and other major financial institutions (available at http://fcic.law.stanford.edu/img/resource-graphics/ thumb/fig9.1_clayton.jpg):

## Rejected Loans Waived in by Selected Banks

*From January 2006 through June 2007, Clayton rejected 28% of the mortgages it reviewed. Of these, 39% were waived in anyway.*

| | A<br>ACCEPTED LOANS<br>*(Event 1 & 2)/*<br>*Total pool of loans* | B<br>REJECTED LOANS<br>*(Event 3)/*<br>*Total pool of loans* | C<br>REJECTED LOANS WAIVED IN BY FINANCIAL INSTITUTIONS | D<br>REJECTED LOANS AFTER WAIVERS<br>*(B–C)* | E<br>FINANCIAL INSTITUTION WAIVER RATE<br>*(C/B)* |
|---|---|---|---|---|---|
| **Financial Institution** | | | | | |
| Citigroup | 58% | 42% | 13% | 29% | 31% |
| Credit Suisse | 68 | 32 | 11 | 21 | 33 |
| Deutsche | 65 | 35 | 17 | 17 | 50 |
| Goldman | 77 | 23 | 7 | 16 | 29 |
| JP Morgan | 73 | 27 | 14 | 13 | 51 |
| Lehman | 74 | 26 | 10 | 16 | 37 |
| Merrill | 77 | 23 | 7 | 16 | 32 |
| UBS | 80 | 20 | 6 | 13 | 33 |
| WaMu | 73 | 27 | 8 | 19 | 29 |
| **Total Bank Sample** | **72%** | **28%** | **11%** | **17%** | **39%** |

NOTES:  From Clayton Trending Reports. Numbers may not add due to rounding.
SOURCE: Clayton Holdings

53.     Given that **at least two out of every five loans in the sample reviewed by Clayton were defective**, CGMI should have examined the entire loan pool to identify and remove all of the other defective loans. Indeed, CGMI had a contractual right to "put back" these non-conforming loans to the originator, requiring the original lender to repurchase such loans from CGMI. CGMI should have also disclosed—both to the ratings agencies and to potential investors like Plaintiff—that the CDOs (and RMBS underlying them) that it was marketing were substantially tainted with non-conforming and highly risky loans.[5]

54.     Instead of taking steps to protect investors, or at least disclose these key material facts to them, CGMI acted for its own benefit. Rather than use the Clayton Report to improve the quality of the CDOs it was marketing, CGMI instead used it to negotiate lower prices from the originators of these bad loans and pocketed the discount for itself.

55.     To make matters worse, CGMI ignored Clayton's recommendations that the bank should reject these non-conforming loans. CGMI allowed 31% of the defective loans Clayton found in its sample back into the loan pools, meaning that one out of every three of these bad loans made their way into RMBS that was then placed into CGMI CDOs. More importantly, Citigroup made no effort to examine any of the loans that Clayton did not review (in other words, the vast majority of loans in the pool), meaning that all of the bad loans buried in the unreviewed majority of the pool—100% of them—made their way into RMBS and,

_____

[5] As noted above, given that RMBS and CDOs are built upon thousands of mortgages and that CDO default probabilities are therefore determined statistically, it was material to an investor's decision to know what CGMI knew—that massive numbers of mortgages supporting CDOs created not later than 2006 were defective and did not conform to CGMI's own underwriting standards. This deterioration in lending standards made the historical default assumptions that underpinned the break-even default scenarios knowingly (or at least recklessly) invalid at the time they were made.  Plaintiff's subsequent experience with the CDOs it purchased vividly illustrates that CDO investments that were purportedly rated A became worthless when actual default rates exceeded those experienced historically.

inevitably, into CDOs of RMBS. According to testimony provided to the FCIC by Vicki Beal

("Beal"), a Senior Vice-President of Clayton, the size of the loan samples was a **subject of**

**contention between Clayton and the banks for whom it was performing due diligence,**

**with the banks constantly pushing for smaller sample sizes**. The typical sample size banks

allowed Clayton to review was 10%, dipping as low as 5% during the height of the subprime

mortgage boom. *See* FCIC Hearing on "Financial Crisis at the Community Level—Sacramento,

CA" at 156:7-9, 177:15-23 (Sept. 23, 2010) (9/23/10 Tr.), available at http://fcic-

static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-transcript.pdf).

56.     Defendant knew but never disclosed to Plaintiff or the ratings agencies that a

substantial proportion of the loans underlying the RMBS assets of the CDOs it was arranging

were non-conforming and that CGMI had negotiated a discount from the loans' originators

based on this defect and pocketed the reduction as profit. *Id*. at 155:24-25 to 156:1-4 (Beal

testifying that "our clients use Clayton's due diligence to identify issues with loans, negotiate

better prices on pools of loans they are considering for purchase, and negotiate expanded

representations and warranties in purchase and sale agreements from sellers); Jonathan R.

Laing, *Banks Face Another Mortgage Crisis* (Barron's, Nov. 20, 2010), available at

http://online.barrons.com/article/SB50001424052970203676504575618621671054514.html#art

icleTabs_panel_article%3D1 ("Apparently the Clayton data were merely employed by the

securitizers to negotiate lower prices on the mortgages from the originators without passing any

price discount or higher yield on to the investors.") (last accessed May 11, 2012)

57.     The systematic nondisclosure of these "waivers" to both investors and ratings

agencies was an integral part of Defendant's deception. At the FCIC hearing in Sacramento,

California, the following exchange occurred between Keith Johnson ("Johnson"), Clayton's

CEO, and FCIC Chairman Phil Angelides:

> [CHAIRMAN ANGELIDES] One is, **from what I can tell, it
> doesn't look like your information ever migrated to disclosure.
> I know you didn't prepare it for that purpose, but this wasn't
> disclosed. What you read in the disclosure is some of these
> loans, a significant amount, may be exceptions but there is
> compensating factors. What's not revealed is the actual data,
> so it appears not to have been available to investors. Is that --
> would that be your --**
>
> MR. JOHNSON: **We are not aware of -- and we looked at a [lot
> of] prospectuses -- of any of our information --**
>
>  CHAIRMAN ANGELIDES: **-- ever popping through.**
>
> MR. JOHNSON: **-- going through the prospectus.**

9/23/10 Tr. at 176:18-177:6 (emphases added)

     58.     Johnson made a similar point with respect to the rating agencies' knowledge of

Clayton's work in a taped interview. Fin. Crisis Inquiry Comm'n, FCIC Staff Audiotape of

Interview with D. Keith Johnson, Clayton Holdings LLC, available at

http://fcic.law.stanford.edu/interviews/view/220. Johnson stated that "**[t]o our knowledge, our**

**reports were never provided to the rating agencies.**" (Emphases added). Johnson was asked

by the FCIC: "the size and number of waived loans to your—is it your belief that they were

disclosed or not disclosed?" His response was; **"[t]hey were not disclosed."** (Emphases added).

     59.     The fact that the ratings agencies were not told about Defendant's decision to

waive defective loans into the CDO securitization pools led to inflated ratings. As Johnson

further stated in the same taped interview: "[w]hat I'm saying is that if [the ratings agencies]

knew that the factory that engineered the loans that I'm trying to do [or sell via] securitizations

had high exception rates, then in their models they should have factored the sloppiness of that and asked for higher subordination levels."

60.     In the same interview, Johnson further explained that: "I think in September of '07—you know, we had a very—a good meeting with Ray McDaniel ["McDaniel"], Moody's Chief Executive Officer, and many of his top executives at Moody's and we went there, you know, with the intent to try to inform them what we do, show them what exceptions—kind of show them what we have," among other things. Johnson could not recall the exact date in September 2007 when he met with McDaniel and other top executives from Moody's, but he explained that the "gist of my meetings"—with Moody's as well as S&P and Fitch—"was to, you know, reinforce that look, this is what we're seeing in our reviews, we think this information is valuable for you to consider in your ratings and we think that your models could perhaps benefit from that" information.

61.     To better understand what precise information Johnson "quoted" to the rating agencies, the government asked him, "[w]hen you said 'this is what we are seeing', what is the 'this' you were talking about? And tell me what you told them about that 'this' was." Johnson explained: **"[w]ell, in 2007 I know we quoted them saying—you know, we used this report saying for every 100 loans that, you know, we saw exceptions with, you know, forty percent of them were being wa[i]ved in** ... we were seeing huge amounts of exceptions and that we thought that, again part of the rating of a bond" should reflect that data. (Emphases added).

62.     Johnson further testified about how the rating agencies reacted during his meetings with them. "We had—I want to say all of them acknowledged that what we had was

great data, that they were very impressed," according to Mr. Johnson. But he continued to say

that "[m]aybe initially they were shocked at some of the numbers that we were quoting."

63.     On September 10, 2007, there occurred a Moody's "Managing Director's Town

Hall Meeting" ("Town Hall Meeting"). The confidential transcript of that meeting is now

available. Moody's Town Hall Transcript (Sept. 2007), available at http://oversight-

archive.waxman.house.gov/documents/20081022112343.pdf; *see also* FCIC Report at 209 &

nn. 131-32.

64.     At the Town Hall Meeting, McDaniel stated to his subordinates: "[w]e've got to

doubt what we're hearing more aggressively than we might be inclined to, but it is difficult to

try to calibrate how much information is good information and how much is bad, especially if

people—I mean it's one thing to say, they're only giving us the positive story." Then he said,

"**but if they're breaking the law, which they are doing, I mean they are violating reps and

warrantees** [sic]" that is a different matter because there "**is a body of thought that lying to a

rating agency in contemplation of a security ... is a violation of federal securities law**."

(Emphases added). "**People are doing that**," McDaniel stated, "**and so it is going to be a

challenge.**" (Emphases added). McDaniel went on to note that **"[w]hat we're really being

asked to do is figure out how much lying is going on and bake it into the credit**."

(Emphases added). He referenced a question about "talking to the bankers" and said "**I don't

know if you mean something different like asking them how much they've been lying to us

or something like that**" and noted "**we have been doing some of that**." (Emphases added).

65.     One managing director at the Town Hall Meeting noted that "[i]t seems to me

that this problem is the incentive structure where people are incentivized to lie." Brian Clarkson

("Clarkson"), Moody's former President, responded **"[w]e think we can make a business of measuring how much people lie for the incentives**." (Emphases added).

66.     Clarkson continued: "[t]he first thing I talked about w[as] [a] change in methodology, and that's what we're doing," noting "**We're on notice that a lot of things we relied on before just weren't true**." (Emphases added). Clarkson provided the following explanation as to why Moody's ratings were false and misleading:

> **At the end of the day, we relied on reps and warrantees that no loans were originated in violation of any state or federal law. We know that's a lie. If none were originated in violation of any predatory lending law, we know that's a lie. So what are you going to do about it? We can't rely on what people tell us anymore, and so we've got to figure out, do we rely on third party oversight? We have to have post-closing audits. We've got to be very public about things we actually see.**

(emphases added).

67.     In fact, Moody's ratings were based on fraudulent information, according to Clarkson, who said "[t]here's a lot of fraud that's involved there, things that we didn't see." He told Moody's employees that the company would change its ratings methodologies "to make sure that we capture a lot the things that we relied on in the past that we can't rely on, on a going forward basis."

68.     In the following months, the ratings agencies reacted by engaging in wide-spread write downs of CDOs, including the CDO at issue here, as the following *Bloomberg* ratings history demonstrates:

27



69.     These downgrades exposed the corrupt system of CDO ratings. The point was
illustrated by an FCIC interview with Ilya Kochinsky ("Kolchinsky"), a lawyer and former
Vice-President Senior Credit Officer at Moody's. Interview by the Fin. Crisis Inquiry Comm'n,
of Ilya Kolchinsky in New York, NY (Apr. 27, 2010), available at http://fcic-
static.law.stanford.edu/cdn_media/fcic-docs/2010-04-27%20Transcript%20of%20Interview
%20with%20Eric%20Kolchinsky.pdf. In September of 2007, he learned that Moody's was
going to downgrade ratings for all RMBS issuances in 2006. He said he was panicked at the
news because "I still had [CDO] deals that used those [RMBS] ratings as the basis for my
[CDO] ratings." Kolchinsky said "**well, if I know those ratings are wrong, I can't assign new**

**[CDO] ratings based on those ratings**" because that is like a "**definition of securities fraud**." (Emphases added).[6]

70.     CGMI knew but never disclosed that the RMBS underlying its CDOs were composed largely of toxic mortgages that were likely to default and were not worthy of the credit ratings given to them by the ratings agencies.

71.     Indeed, in testimony given before the House Committee on Oversight & Government Reform on October 22, 2008 (available at http://oversight-archive.waxman.house.gov/story.asp?ID=2250), Deven Sharma, President of S&P testified "that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work." The testimony of Frank Raiter (available at the same website), former head of RMBS ratings for S&P, indicated that S&P had in existence better tools for modeling the risks of the mortgages that supported RMBS, but did not deploy them.

72.     One reason it did not do so was because of interference by banks like CGMI. The report by Senate Permanent Subcommittee on Investigations of the Senate Committee on Homeland Security and Governmental Affairs, 112th Cong., entitled *Wall Street and the*

---

[6] In a related context, the Federal Housing Finance Agency ( "FHFA") sued CGMI in connection with its RMBS operations in a complaint recently filed in the Southern District of New York. The FHFA is a federal agency that was created pursuant to the Housing and Economic Recovery Act of 2008 ("HERA") to oversee the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Federal Home Loan Banks. On September 6, 2008, FHFA was appointed conservator of Fannie Mae and Freddie Mac and in that capacity is authorized under HERA to bring suits on behalf of those entities. *See* 12 U.S.C. § 4617(b)(2). *See* "Complaint", *Federal Housing Fin. Agency v. Citigroup, Inc.*, No. 11-Civ-6196, 2011 WL3873301 (S.D.N.Y. Sept. 2, 2011). The FHFA alleged that CGMI falsely represented the quality and nature of the loans underlying over $3.5 billion worth of RMBS that CGMI securitized and sold to Fannie Mae and Freddie Mac. After those securities began to fail at an alarming rate, Fannie Mae and Freddie Mac discovered massive discrepancies between the actual owner occupancy rates and loan-to-value ratios and what was represented by the loan originators in prospectus supplements and other marketing and registration materials.

*Financial Crisis: Anatomy of a Financial Collapse* at 279 & n.1079 (Apr. 13, 2011) (available

at http://levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf)

gives this example:

> **Some investment banks applied various types of pressure to maintain the status quo, despite the fact that the newer models were considered more accurate. In a February 2006 email to an S&P analyst, for example, an investment banker from Citigroup[7] wrote:**
>
> **"I am VERY concerned about this E3 [new CDO rating model]. If our current struc[ture], which we have been marketing to investors … doesn't work under the new assumptions, this will not be good. Happy to comply, if we pass, but will ask for an exception if we fail."**

*See also id*. at 282 & n.1087 (June 2007 e-mail from Moody's to CGMI agreeing to grant an

exception) (emphasis added).

73.     Of equal importance, based on its communications with Clayton, with

originators, and with other market participants, CGMI knew or had reason to suspect that the

RMBS securitized by other underwriters that it was packing into its CDOs were similarly

flawed. Indeed, as Citigroup, Inc.'s former CEO, Charles Prince, explained in testimony before

the FCIC, within the major investment banks—including CGMI itself—the securitization of

subprime RMBS had become "**a factory line…. As more and more of these subprime**

**mortgages were created as raw materials for the securitization process … more and more**

**of it was of lower and lower quality. And at the end of the process, the raw material [*i.e*.,**

**the mortgages themselves]going into it was actually bad quality, it was toxic quality, and**

**that is what ended up coming out the other end of the pipeline.**" FCIC Report at 102-03

(footnotes omitted; emphases added).

---

[7] CGMI is Citigroup, Inc.'s investment banking arm.

74.    In contrast to a multifaceted market participant such as CGMI, Plaintiff lacked access to the above-described information. It did not know and could not have known the truth about the non-conforming mortgages and other issues underlying the RMBS in the collateral portfolios of the CDOs CGMI was arranging.

75.    Indeed, according to the FCIC Report: 'There was no disclosure made to the investors with regard to the quality of the files they were purchasing.'" The FCIC ultimately concluded that any

> **disclosures were insufficient for investors to know what criteria the mortgages they were buying actually did meet. Only a small portion—as little as 2% to 3%—of the loans in any deal were sampled, and evidence from Clayton shows that a significant number did not meet stated guidelines or have compensating factors. On the loans in the remainder of the mortgage pool that were not sampled (as much as 97%), Clayton and the securitizers had no information, but one could reasonably expect them to have many of the same deficiencies, and at the same rate, as the sampled loans. Prospectuses for the ultimate investors in the mortgage-backed securities did not contain this information, or information on how few loans were reviewed, raising the question of whether the disclosures were materially misleading, in violation of the securities laws.**

*Id.* at 169-70 (footnotes omitted) (emphases added).

76.    This failure to disclose specific and known facts carried through to the pitch books and offering circulars provided with the CDOs (built on this RMBS) purchased from CGMI by Plaintiff.

77.    Unknown to Plaintiff, beginning in October of 2006, CGMI planned for and then commenced using Class V Funding III to take a $500 million naked short position on specific CDO tranches that CGMI clandestinely selected for Class V Funding III's synthetic portfolio. CGMI hid its involvement in portfolio selection from potential investors by falsely representing in the deal's marketing materials that Credit Suisse Alternative Capital, Inc. ("CSAC"), the

deal's putative collateral manager, would independently select Class V Funding III's portfolio. Ultimately, CGMI selected nearly 60% of Class V Funding's reference assets, which it shorted through credit default swap ("CDS") contracts. The SEC's complaint (available at http://www.sec.gov/litigation/complaints/2011/comp-pr2011-214.pdf) accused CGMI of engaging in "misleading and inaccurate disclosures" to investors.

78.     In addition to concealing its involvement in selecting collateral for Class V Funding III, CGMI also misrepresented that its true economic interests in this CDO were directly opposed to those of the long investors to whom CGMI was marketing the deal. From the outset, CGMI had intended to use Class V Funding III as a vehicle for making a proprietary short trade (*i.e.*, one made for the bank's own benefit and not on behalf of a client) on $500 million—fully half—of the deal's portfolio. CGMI did not disclose this material fact in its marketing materials.

79.     CGMI's undisclosed short-trading scheme soon paid off. Less than nine months after the deal closed, all of Class V Funding III's tranches were downgraded; 12 days later, on November 19, 2007, the CDO experienced an event of default. Class V Funding III's long investors suffered catastrophic losses on their investments, yet CGMI pocketed approximately $160 million of net profit on its venture, including $34 million in fees for structuring the deal.

80.     The Class V Funding III failure directly impacted the Armitage CDO purchased by Woori. Within days after the Class V Funding III CDO was issued, CGMI dumped twenty million dollars of its A3 tranche into the collateral supporting the Armitage CDO.  CGMI failed to disclose any of its activities in shorting Class V Funding III CDO to Woori.

81.     CGMI reached a settlement of the SEC's securities fraud allegations concerning Class V Funding III on October 19, 2011, pursuant to which it agreed, without admitting or

denying liability, to disgorge its entire $160 million profit from Class V Funding III plus an additional $125 million in penalties and prejudgment interest. The judge, however, refused to approve the proposed settlement, stating that CGMI was a "recidivist" and should not be permitted to escape liability for relative "pocket change" and without admitting wrongdoing. The settlement was rejected by the District Court, and is currently on appeal. *See United States SEC v. Citigroup Global Markets Inc.*, 11 Civ. 7387 (JSR), 2011 U.S. Dist. LEXIS 135914 at*14-*15 (S.D.N.Y. Nov. 28, 2011).

      **E.**    **Defendants' Material Misrepresentations And Omissions**

      82.    In connection with each CDO deal in which CGMI acted as an underwriter and marketer, CGMI took responsibility for creating a marketing/pitch book that described the key features and terms of the deal. Specific information about the collateral manager's history and business experience was prepared by the collateral manager, but otherwise the information provided was created by CGMI.  The Armitage CDO pitchbook is attached hereto as Exhibit 1.

      83.    The pitch book at issue in this case provided a break-even statistical default analysis, that as explained above, was the important metric for evaluating the aggregated risk of default of the thousands of mortgages and RMBS that served as the collateral for the CDOs. Plaintiff relied on the break-even default analysis to make its investment decision.

      84.    The Armitage CDO break-even default analysis is set forth below:

*Breakeven Default Rate Analysis*[1]



THE TABLE SHOWS THE ANNUAL AND CUMULATIVE BREAKEVEN DEFAULT RATES ON THE
UNDERLYING PORTFOLIO FOR EACH TRANCHE OF THE TRANSACTION.[2]

| | Class A1 | | Class A2 | | Class A3 | | Class A4 | | Class B | | Class C | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Default Rate | Annual | Cumul. | Annual | Cumul. | Annual | Cumul. | Annual | Cumul. | Annual | Cumul. | Annual | Cumul. |
| No Loss of Yield | 12.87% | 46.19% | 6.52% | 27.12% | 3.11% | 14.19% | 1.80% | 8.67% | 0.99% | 4.96% | 0.45% | 2.87% |
| No Loss of Principal | 40.52% | 85.25% | 10.57% | 39.94% | 6.05% | 25.42% | 3.85% | 17.26% | 1.89% | 8.95% | 1.09% | 5.44% |

1.   Assumes that defaults are applied monthly to the outstanding collateral balance (starting in period [4]) with immediate recoveries of [70]% upon default. Refer to Page 7 for certain
     additional modeling assumptions and Section 4 for certain risk factors.
2.   Cumulative default is the aggregate of all defaulted securities over the life of the transaction divided by the effective date portfolio balance.



corporate and
investment banking

6

85.    Plaintiff purchased the "Class B" (A-rated) tranche of the Armitage CDO, in

which no loss of principal was expected so long as annual collateral default rates were less than

1.89% and cumulatively stayed below 8.95%.

86.    In September 2006, prior to the Armitage deal, CGMI provided Plaintiff with an

historical default performance analysis that showed very low defaults historically, which

suggested that the default cushions provided in the Armitage CDO were far beyond what was

necessary to protect Woori's investment.

## Performance of ABS: Historical Defaults and Loss Rates

HISTORICALLY, RATES OF MATERIAL IMPAIRMENT AND CUMULATIVE LOSS RATES HAVE BEEN LOWER FOR VARIOUS ABS COLLATERAL THAN COMPARABLY RATED CORPORATE BONDS.[1]

| AVERAGE ONE-YEAR MATERIAL IMPAIRMENT RATES BY ORIGINAL RATING, 1993-2002 | | | | | |
|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba |
| Structured Finance Securities[2] | 0.00% | 0.08% | 0.04% | 0.05% | 0.25% |
| Corporate bonds[3] | 0.00% | 0.00% | 0.00% | 0.58% | 4.10% |

| CUMULATIVE LOSS RATES ON U.S. STRUCTURED SECURITIES BY ORIGINAL RATING, 1994-2003[2] | | | | | |
|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba |
| ABS, CMBS, RMBS | 0.00% | 0.00% | 0.01% | 0.05% | 0.00% |
| Corporate bonds | 0.00% | 0.00% | 0.01% | 0.13% | 0.77% |

► Note that the highest level of material impairments for the periods described above have been in the following asset classes, which will not be invested in the Transaction:
- healthcare securitizations
- franchise-loan backed securities
- manufactured housing securitizations ("MH")

NOTE: PAST PERFORMANCE IS NO ASSURANCE OF FUTURE RESULTS.

[1] Note: The timing of principal cash flows for certain ABS is subject to more variability than corporate bonds or loans. Cash flow timing is sensitive to many factors including changes in interest rates, banks' willingness to extend or renew credit, and strength of the real estate market.
[2] Source: Moody's, "Default & Loss Rates of Structured Finance Securities: 1993-2004", July 2005. Levels for corporate bonds based on data from 1982-2004. The modern day ABS market has been in existence for a far shorter period than the corporate bond/loan market. There is, therefore, less historical data showing the performance of these securities.
[3] Source: Moody's, "Payment Defaults and Material Impairments of U.S. Structured Finance Securities: 1993-2002", December 2003.

 33 

.

87.    With respect to recovery rates for CDO mortgage related collateral, CGMI represented to Plaintiff in September 2006 the following:



### Performance of ABS: Positive Recovery History of Real Estate Related Securities

DEFAULTED REAL ESTATE RELATED SECURITIES HAVE REALIZED RELATIVELY HIGH RECOVERY RATES AND LOW LOSS RATES.

Historically, real estate related securities have realized substantially higher recovery rates upon default compared with corporate bonds.

► FAB US is expected to consist of approximately [77]% residential real estate related securities.[3]

NOTE: PAST PERFORMANCE IS NO ASSURANCE OF FUTURE RESULTS.

[1] Source: Moody's, "Default and Loss Rates of Structured Finance Securities, 1993-2004", July 2005.
[2] RMBS and HEL percentages are based on cohort rating data between 1988 and April 2004 and corporate percentages are based on cohort rating data between 1983 and 2003. Securities with the same ratings at the beginning of each year are grouped into a cohort.
[3] Includes Res A, Res B/C and HEL.



34



88.     CGMI stated that the source of this data was: Moody's, "Default and Loss Rates of Structured Finance Securities, 1993-2004", July 2005.  Again, the material provided suggested that, statistically speaking (which is how risk in CDOs was evaluated), the assumptions underlying the Armitage break-even default analysis were sound based on historical experience.

89.     Also in September 2006, CGMI provided Plaintiff with the following additional historical data:

## Performance of ABS: Rating Stability

AVERAGE ONE-YEAR RATING TRANSITIONS: STRUCTURED FINANCE RELATED SECURITIES VS. CORPORATE BONDS[1]

| CMBS [2] 1985-2005 | AAA | AA | A | BBB | BB | B | CCC | CC or below | % Stable or Upgrade |
|---|---|---|---|---|---|---|---|---|---|
| AAA | 99.6% | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 99.6% |
| AA | 10.8% | 88.1% | 0.8% | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% | 98.9% |
| A | 3.2% | 6.6% | 87.9% | 2.0% | 0.2% | 0.0% | 0.0% | 0.0% | 97.7% |
| BBB | 1.0% | 2.7% | 5.4% | 88.0% | 2.1% | 0.6% | 0.1% | 0.2% | 97.1% |
| BB | 0.3% | 0.2% | 0.6% | 4.9% | 89.9% | 2.6% | 0.8% | 0.7% | 95.9% |

| RMBS [3] 1978-2005 | AAA | AA | A | BBB | BB | B | CCC | CC or below | % Stable or Upgrade |
|---|---|---|---|---|---|---|---|---|---|
| AAA | 99.9% | 0.1% | <0.1% | <0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 99.9% |
| AA | 8.0% | 90.8% | 1.0% | 0.1% | <0.1% | <0.1% | <0.1% | 0.0% | 98.8% |
| A | 2.6% | 6.9% | 89.6% | 0.6% | 0.1% | <0.1% | <0.1% | 0.1% | 99.1% |
| BBB | 0.5% | 3.0% | 4.3% | 90.7% | 0.5% | 0.6% | 0.2% | 0.1% | 98.5% |
| BB | 0.1% | 0.5% | 3.4% | 7.1% | 86.4% | 1.0% | 0.7% | 0.8% | 97.5% |

| ABS [4] [5] 1982-2004 | AAA | AA | A | BBB | BB | B | CCC | CC or below | % Stable or Upgrade |
|---|---|---|---|---|---|---|---|---|---|
| AAA | 99.3% | 0.4% | 0.2% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 99.3% |
| AA | 2.2% | 93.3% | 2.6% | 1.2% | 0.5% | 0.3% | 0.0% | 0.0% | 95.4% |
| A | 1.2% | 1.5% | 91.7% | 4.6% | 0.4% | 0.3% | 0.2% | 0.2% | 94.3% |
| BBB | 2.4% | 0.8% | 1.1% | 88.9% | 2.1% | 2.8% | 1.2% | 0.7% | 93.2% |
| BB | 0.4% | 0.7% | 0.8% | 2.4% | 78.4% | 5.9% | 7.6% | 3.9% | 82.6% |

| CORPORATE [4] 1981-2004 | AAA | AA | A | BBB | BB | B | CCC | CC or below | % Stable or Upgrade |
|---|---|---|---|---|---|---|---|---|---|
| AAA | 92.2% | 7.1% | 0.6 % | <0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 92.2% |
| AA | 0.6% | 90.8% | 7.6% | 0.7% | 0.1% | 0.1% | <0.1% | <0.1% | 91.4% |
| A | 0.1% | 1.9% | 91.2% | 6.0% | 0.5% | 0.2% | <0.1% | 0.1% | 93.2% |
| BBB | <0.1% | 0.2% | 4.0% | 89.8% | 4.8% | 0.8% | 0.1% | 0.3% | 94.0% |
| BB | 0.1% | 0.1% | 0.3% | 6.0% | 82.8% | 8.8% | 0.8% | 1.2% | 89.3% |

Historically, CMBS and RMBS exhibit fewer rating migrations than corporate bonds in all rating categories.

NOTE: PAST PERFORMANCE IS NO ASSURANCE OF FUTURE RESULTS

[1] To be read as, for example, 2.3% of CMBS rated BBB at the start of the year ended up as BB at the end of the year.
[2] Source: S&P, "Rating Transitions 2005: North American CMBS Upgrades outpace Downgrades 8 to 1", January 25, 2006.
[3] Source: S&P, "Rating Transitions 2005: U.S. RMBS Volume and Rating Activity Continue to Set Records" January 24, 2006.
[4] Source: S&P, "Rating Transitions 2005: U.S. ABS Hits Turning Point As Credit Quality Improves", January 18, 2006.
[5] Includes 12b-1, auto, credit cards, equipment loans, esoteric loans, franchise loans/small business loans, future flow, MH, and RV loans. Equipment loans, esoteric loans, franchise loans, future flow and RV loans are not expected to be included in FAB US 2006-1, PLC.



35



90.      Again, Woori's investment in the Armitage CDO seemed very safe in light of the default cushions built into the CDO relative to historical performance of what Woori believed was similar collateral.  In light of the historical data that CGMI supplied to Plaintiff, its investment in Armitage—given the break even default analysis that also was provided by CGMI—appeared reasonable in return for the small return on investment promised—LIBOR + 1.8% over the life of the security.

91.      Plaintiff would not have invested in the Armitage CDO had it known what CGMI knew at the time that CGMI was marketing the Armitage CDO:

A. That CGMI's statistical due diligence of mortgage pools from 2006 onward was allowing huge numbers of mortgages into CGMI RMBS securitizations that did not conform to underwriting guidelines (and thus making historical performance of

RMBS and mortgages utterly meaningless as a guide for investment decision-making). As Exhibit B demonstrates, over $474 million dollars of the RMBS and CDO collateral underpinning the Armitage CDO was initially securitized by CGMI, and CGMI thus had knowledge of and control over the quality of these assets based on the work performed on its behalf by Clayton Holdings and CGMI's due diligence team.

B. That CGMI had prepared and disseminated the Armitage pitchbook knowing that it touted Vanderbilt Capital Advisors as experienced collateral managers that would act independently to select Armitage CDO's collateral, and that CGMI prepared and disseminated the Armitage CDO Offering Circular which expressly represented that Vanderbilt Capital Advisors would select "all" of the collateral for the Armitage CDO, when, in fact, CGMI influenced Vanderbilt Capital Advisors to purchase nearly one-half of a billion dollars worth of collateral created by CGMI, a fact which was not disclosed until after Woori purchased its investment in the Armitage CDO. CGMI exercised substantial influence over Vanderbilt Capital Advisors, who ultimately included over $474 million of RMBS and CDOs securitized by CGMI as assets for the Armitage CDO.

C. That CGMI was aware of its naked short in Class V Funding III at the time it prepared and disseminated the pitch book for the Armitage CDO and the Offering Circular[8] for the Armitage CDO issuance, and that no disclosures were made about its naked short on collateral underlying the Armitage CDO.

_____

[8] The Armitage CDO Offering Circular states that it was prepared by the co-issuers, which are special purpose entities that had no employees and were created solely to issue the (footnote continued)

D.  That CGMI personnel were actively resisting changes to the ratings methodology for structured financial products that would have made the ratings a more reliable indicator of the expected performance of the CDOs, and that the quality of RMBS created by CGMI to serve as the Armitage CDO collateral did not justify the A rating assigned to it.

92.    Each of these matters were material and were known to CGMI at the time that it provided Plaintiff with the Armitage CDO pitch book and Offering Circular.  CGMI assumed a duty to disclose all of this material information to Plaintiff, but instead disclosed break-even default tables that provided a false and misleading impression of the safety of the aggregated collateral supporting the CDO.  CGMI's failure to fully and completely disclose the material information known to it was reckless and knowing because its internal processes were waiving defective mortgages into the securitization pools at the same time it was encouraging investors to rely on historical performance indicators that no longer had any bearing on collateral security.  Further, the failure of CGMI to disclose its bet against the success of Class V Funding III, which constituted $20 million of the Armitage CDO collateral, demonstrates a level of wrongdoing that was knowing and intentional.

---

Armitage CDO notes.  By contract, CGMI was the arranger, marketer, underwriter, and initial purchaser of the notes from the co-issuers.  CGMI, not the co-issuers, actually prepared the Offering Circular and the representation to the contrary in the Offering Circular is false, something that was noted by the United States Securities & Exchange Commission in the complaint it filed against CGMI in *United States SEC v. Citigroup Global Markets Inc*., 11 Civ. 7387 (JSR), 2011 U.S. Dist. LEXIS 135914 at*14-*15 (S.D.N.Y. Nov. 28, 2011), at ¶39.  Woori never had contact with the co-issuers and purchased its investment in the Armitage CDO directly from CGMI, which was the initial purchaser.  CGMI disseminated the Offering Circular and pitch book for the Armitage CDO directly to Woori.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Common Law Fraud and Fraud in the Inducement)

93.     Plaintiff repeats and re-alleges all of the foregoing paragraphs as if fully set forth herein.

94.     CGMI, as arranger and marketing agent for the Armitage CDO, made representations to Plaintiff and to the rating agencies concerning the RMBS and CDO collateral for the CDOs.

95.     These oral and written misrepresentations and omissions, all as described in the preceding allegations, included representations concerning the statistical information concerning the probability of default; the role of the collateral manager in selecting the collateral underlying the Armitage CDO and the influence that CGMI exercised on the collateral selected; the safety of Plaintiff's investment based on the rating provided by the ratings agencies; CGMI's naked short on collateral supporting the Armitage CDO; CGMI's wide-spread use of defective mortgages to create RMBS underlying the CDOs that it was underwriting; the influence that CGMI was exerting on the ratings agencies to maintain artificially high ratings on CDOs underwritten by it; and CGMI's intentional efforts to shift subprime assets off of its books not later than late-2006.

96.     CGMI's dissemination of materials concerning historical performance of CDO collateral and the statistical break-even default probabilities were materially false and misleading when sent. These representations were made intentionally or with reckless disregard for the truth.

97.     CGMI made these misrepresentations and omissions to Plaintiff with the knowledge that Plaintiff would rely on them.

98.     CGMI made misrepresentations and omissions to the ratings agencies with the knowledge that the ratings agencies would rely on them and give CDOs, including the Armitage CDO inflated ratings, and with the intention and expectation that Plaintiff would rely upon these ratings in purchasing notes.

99.     CGMI had an affirmative duty to provide complete and accurate disclosures of the material facts about the Armitage CDO that lay peculiarly within its knowledge. CGMI intentionally or recklessly failed to provide full, complete, and accurate disclosures of these material facts.

100.    By orchestrating the sale of notes of CGMI-arranged CDOs to other CGMI arranged CDOs, CGMI created and perpetuated the false impression that the market for CGMI-arranged CDOs was robust, and that the prices the CDOs were paying for the referenced CDOs were fair prices.

101.    Plaintiff reasonably and justifiably relied to their detriment on CGMI's above-described misrepresentations and omissions, including CGMI's affirmative duty to provide full, complete, and accurate disclosures to Plaintiff.

102.    Plaintiff reasonably and justifiably relied to their detriment on the ratings of the CDOs.

103.    CGMI's misrepresentations and omissions induced Plaintiff to purchase the above-described CDOs.

104.    As a direct and proximate result of CGMI's conduct, Plaintiff has suffered damages, and CGMI is liable to Plaintiff in an amount set forth above plus interest.

105.    Plaintiff also is entitled to punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation)

106.   Plaintiff repeats and re-alleges all of the foregoing paragraphs as if fully set forth herein.

107.   CGMI had a duty to Plaintiff to exercise reasonable care in providing information about the Armitage CDO at issue here (to the extent it prepared the material or disseminated it) and Plaintiff's reliance on that information in making its decisions to invest in the Armitage CDO was foreseeable. CGMI had knowledge or its equivalent that Plaintiff desired for the serious purpose of enabling it to decide whether or not to invest in the Armitage CDO, that the Plaintiff intended to rely or act on this information and that the Plaintiff would suffer injury if the information was false or erroneous.

108.   CGMI possessed unique or specialized expertise in the creation, structure, and marketing of CDOs, and occupied a special position of confidence and trust with respect to the Plaintiff.  Plaintiff did, in fact, repose confidence and trust in CGMI with respect to the Armitage CDO.

109.   Plaintiff's reliance CGMI's  negligent misrepresentations was justified because CGMI held or appeared to hold unique or special expertise; a special relationship of trust or confidence existed between the parties; and CGMI, as the speaker, was aware of the use to which the information would be put and supplied it for that purpose.

110.   As a direct, proximate and foreseeable result of CGMI's negligent misrepresentations, Plaintiff was injured in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment)

111.    Plaintiff repeats and re-alleges all of the foregoing paragraphs as if fully set forth herein.

112.    As a result of its wrongful conduct detailed above, CGMI has been unjustly enriched at Plaintiff's expense, and Plaintiff is entitled to judgment ordering CGMI to disgorge all amounts it received as a result of its involvement in connection with the Armitage CDO, including without limitation: (i) the proceeds of the sales of the notes; (ii) amounts received by CGMI and its affiliated companies as counterparties on credit default swaps created by it; (iii) distributions of any type from the CDO at issue; (iv) commissions or sales fees; and (v) amounts received from the CDO at issue in transactions involving the purchase of collateral.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands entry of judgment in their favor and against CGMI as follows:

A.    Awarding Plaintiff: (i) damages from CGMI in an amount to be determined at trial, but in no event less than the $25 million paid by Plaintiff for the note it purchased; and (ii) other damages sustained by Plaintiff as a result of CGMI's conduct, as described above, in an amount to be determined at trial;

B.    Ordering disgorgement of CGMI's ill-gotten gains and unjustly obtained fees and profits, and ordering restitution of such gains to Plaintiff as appropriate;

C.    Awarding Plaintiff punitive damages as a result of CGMI's intentional, deliberate, malicious, willful, and wanton conduct, as detailed above;

D.    Awarding Plaintiff pre-judgment and post-judgment interest;

E.          Awarding Plaintiff its costs and fees, including, to the extent applicable, attorneys' fees and other costs incurred by Plaintiff in bringing this action; and

F.          Awarding Plaintiff such other relief as this Court may deem just and appropriate.

### JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial on all matters so triable.

Dated: August 26, 2013                    Respectfully submitted,

                                          HAUSFELD LLP

By:   *Timothy S. K_____*
                                          Michael D. Hausfeld (N.Y. Bar No. 4722963)
                                          William P. Butterfield
                                          Timothy S. Kearns
                                          Nathaniel C. Giddings
                                          HAUSFELD LLP
                                          1700 K St. NW, Suite 650
                                          Washington, D.C. 20006
                                          Telephone: (202) 540-7200
                                          Facsimile: (202) 540-7201

                                          Michael P. Lehmann
                                          Christopher L. Lebsock
                                          HAUSFELD LLP
                                          44 Montgomery Street, Suite 3400
                                          San Francisco, CA 94104
                                          Telephone: (415) 633-1908
                                          Facsimile: (415) 358-4980

                                          Hojin Seo (N.Y. Bar No. 3016136)
                                          Seokyoung Shin (N.Y. Bar No. 4869772)
                                          DERYOOK & AJU LAW FIRM, PC
                                          1114 Avenue of Americas, 35F.
                                          New York, NY 10036

                                          *Attorneys for Plaintiff*

# EXHIBIT 1

*Confidential*

# Armitage ABS CDO, Ltd.

**February 2007**





## Important Notice

The information presented in this material (the "Information") is preliminary and is superseded by a preliminary and then a final offering circular (the "Offering Circular"). The Information is in condensed summary form and is not complete. The Information outlines the general structure, and summarizes certain but not all of the characteristics, of a collateralized debt obligation transaction of a portfolio of synthetic and cash securities. This material is furnished to you, and, if applicable, to your beneficial owners (collectively, "you") to determine your preliminary interest in investing in the securities described herein (the "Securities") and on the understanding that as a sophisticated investor, you understand and accept its inherent limitations. You should base your investment decision with respect to the Securities on the information contained in the Offering Circular. An Offering Circular may be obtained by contacting your representative at Citigroup Global Markets Inc. ("Citigroup").

An investment in the Securities is speculative, not suitable for all clients, and intended for experienced and sophisticated investors who are willing to bear the high economic risk of the investment, which may include:

- loss of all or a substantial portion of the investment in the Securities due to leveraging or other speculative investment practices;
- lack of liquidity in that there may be no secondary market for the Securities and none expected to develop;
- volatility of returns;
- restrictions on transferring interests in the Securities;
- potential lack of diversification and resulting higher risk due to concentration within a single industry;
- absence of information regarding valuations and pricing;
- delays in tax reporting;
- phantom tax issues;
- less regulation and higher fees than mutual funds.

See Risk Factors beginning on page 49 and the risk factors in the Offering Circular.

Neither Citigroup nor any of its affiliates is responsible for the tax treatment of the Securities, whether or not the Securities are purchased by a trust or company administered by Citigroup or an affiliate. Citigroup assumes that, before making a commitment to purchase the Securities, you have taken whatever tax, legal or other advice you consider necessary and have arranged to account for any tax lawfully due on the income or gains arising from the Securities. Additionally, certain retirement plans covered by ERISA (including KEOGHs and IRAs) are restricted from holding in total more than 25% of some classes of Securities (subject to certain calculation adjustments). Benefit plan investors subject to ERISA should confirm their status prior to making an investment.

IRS Circular 230 Disclosure: Citigroup and its affiliates do not provide tax or legal advice. Any discussion of tax matters in these materials (i) is not intended or written to be used, and cannot be used or relied upon, by you for the purpose of avoiding any tax penalties and (ii) may have been written in connection with the "promotion or marketing" of the transaction described herein. Accordingly, you should seek advice based on your particular circumstances from an independent tax advisor.

Neither Citigroup nor Vanderbilt Capital Advisors, LLC ("Vanderbilt") nor in its capacity as collateral manager, the "Collateral Manager") are acting as your advisor or agent. Therefore, prior to making any investment decision in the Securities, you should determine, without reliance upon Citigroup, Vanderbilt or any of their respective affiliates, the economic risks and merits, as well as the legal, tax and accounting characterizations and consequences of the transaction, and independently determine that you are able to assume these risks. In this regard, by acceptance of these materials, you acknowledge that you have been advised that (a) neither Citigroup nor Vanderbilt is in the business of providing legal, tax or accounting advice, (b) you understand that there may be legal, tax or accounting risks associated with the transaction, (c) you should receive legal, tax and accounting advice from advisors with appropriate expertise to assess relevant risks and (d) you should apprise senior management in your organization as to the legal, tax and accounting advice (and, if applicable, risks) associated with this transaction and Citigroup's and Vanderbilt's disclaimers as to these matters. By acceptance of these materials, you and Citigroup hereby agree that from the commencement of discussions with respect to any transaction, and notwithstanding any other provision in this material, we hereby confirm that no participant in any transaction shall be limited from disclosing the U.S. tax treatment or U.S. tax structure of such transaction.

Notwithstanding the foregoing and any other provision in this preliminary discussion material, effective from the date of commencement of discussions, you and Citigroup (and each employee, representative, or other agent) may disclose to any and all persons, with out limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to you relating to such tax treatment and tax structure, other than any information for which nondisclosure is reasonably necessary in order to comply with applicable securities laws.



## Important Notice

The Securities will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), and the issuer of the Securities will not be registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"). The Securities will not be recommended or approved by any United States federal or state securities commission or any other regulatory authority. Furthermore, the foregoing authorities have not confirmed or determined the adequacy of this material. Any representation to the contrary is a criminal offense. The Securities will be subject to certain restrictions on transfers as described in the Offering Circular and the indenture (the "Indenture") pursuant to which the Issuer will provide for the administration of its assets and liabilities.

By accepting this information, (A) you agree that you are (1)(a) a qualified institutional buyer (as defined in Rule 144A of the Securities Act), or (b) not a U.S. Person (as defined in Regulation S under the Securities Act) as defined in Regulation S and (2) are also a "qualified purchaser" for purposes of the Investment Company Act of 1940 and (B) you understand that the Securities have not been and will not be registered under the Securities Act or the securities laws of any state and may not be offered, sold or otherwise transferred unless an exemption from registration under the Securities Act and applicable state securities laws is available. You agree that you are not a Benefit Plan Investor. See Risk Factors attached hereto; specifically "Certain ERISA Considerations".

This material is not intended for distribution to, or to be used by, any person or entity in any jurisdiction or country in which distribution or use would be contrary to law or regulation.

Neither Citigroup, Vanderbilt, nor any of their affiliates make any representation or warranty, express or implied, as to the accuracy or completeness of the Information. In particular, the Information regarding the Collateral Manager has been provided by Vanderbilt and Citigroup has not independently verified the information provided by Vanderbilt and is not responsible for the content of such information. Information or data about past performance is no assurance of future results.

This material contains "forward-looking" information. Such information may include, among other things, projections, forecasts or estimates of cashflows, yields or return, scenario analyses and proposed or expected portfolio composition. The forward-looking information is based upon certain assumptions about future events or conditions and is intended only to illustrate hypothetical results under those assumptions (not all of which are specified herein). Actual events or conditions are unlikely to be consistent with, and may differ materially from, those assumed. In addition, not all relevant events or conditions may have been considered in developing such assumptions. Accordingly, actual results will vary and the variations may be material. You should understand such assumptions and evaluate whether they are appropriate for your purposes.

No representation is made that the Securities will actually perform as described in any of the illustrative calculations presented herein. Actual results, will differ, and may differ substantially, from those illustrated in the Information. Illustrative performance results are based on mathematical models that calculate those results by using inputs that are based on assumptions about a variety of future conditions and events.

As with all mathematical models, results may vary significantly depending upon the value of the inputs given, so that a relatively minor modification of an assumption may have a significant impact on the result. Future conditions and events are unlikely to match those assumed, both because it is impossible to predict the future and because the inherent limitations of the modeling process require the relevant conditions and events to be significantly simplified in order to generate inputs to the model. Among other things, the illustrative calculations do not take into account all aspects of the applicable security's characteristics under certain conditions, including characteristics that can have a significant impact on the results. For example, the illustrative calculations do not indicate the effects of redemption or call events and cash flow priorities at all prepayment levels and/or interest rates. Further, in evaluating the illustrative performance results, you should understand that not all of the hypothetical assumptions used in the model are described herein, and conditions and events that are not accounted for by the model may have a significant effect on the performance of the Securities.

Neither Citigroup, Vanderbilt nor any of their affiliates makes any representation or warranty, expressed or implied, as to the reasonableness of any assumptions used in calculating the illustrative performance information or the accuracy (mathematical or otherwise) or validity of such information. You should consider whether the behavior of the Securities should be tested based on different and/or additional assumptions from those included in the Information. In addition, the models used in any analysis may be proprietary, making the results difficult or impossible for any third party to reproduce. You may contact your Citigroup sales representative for detailed explanations of the same circumstances or changed interpretations of the same circumstances. CUSTOMIZED CALCULATIONS WITH ASSUMPTIONS SPECIFIED BY YOU CAN BE PERFORMED BY CITIGROUP AT YOUR REQUEST.

Citigroup is required to obtain, verify and record certain information that identifies each entity that enters into a formal business relationship with Citigroup. Citigroup will ask for an investor's complete name, street address, and taxpayer ID number. Citigroup may also request corporate formation documents, or other forms of identification, to verify information provided.


citigroup
corporate and
investment banking

## Important Notice

Although this material may contain publicly available information about Citigroup corporate bond research or economic and market analysis, Citigroup policy (i) prohibits employees from offering, directly or indirectly, a favorable or negative research opinion or offering to change an opinion as consideration or inducement for the receipt of business or for compensation; and (ii) prohibits analysts from being compensated for specific recommendations or views contained in research reports. So as to reduce the potential for conflicts of interest, as well as to reduce any appearance of conflicts of interest, Citigroup has enacted policies and procedures designed to limit communications between its investment banking and research personnel to specifically prescribed circumstances.

Except as otherwise permitted herein, distribution of this material to any person other than the person to whom this was originally delivered and to such person's advisors is unauthorized and any reproduction, in whole or in part, or the divulgence of its contents, without the prior consent of Citigroup in each such instance is prohibited.

For UK investors only: This document has been approved for distribution in the UK by Citigroup Global Markets Limited, which is regulated by the Financial Services Authority. The securities described herein are not available in the UK to private investors as defined by the Financial Services Authority.

For Hong Kong investors only: Citigroup represents and agrees that:

(a) it will not offer or sell in Hong Kong, by means of any document, any Notes other than (i) to persons whose ordinary business is to buy or sell shares or debentures (whether as principal or agent); or (ii) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made under that Ordinance; or (iii) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that Ordinance; and

(b) it has not issued or had in its possession for the purposes of issue, and will not issue or have in its possession for the purposes of issue, whether in Hong Kong or elsewhere, any advertisement, invitation or document relating to the Notes, which is directed at, or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to Notes which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance and any rules made under that Ordinance.

For China investors only:

These materials do not constitute an offer or a solicitation of an offer and they are for educational purposes only. These materials are for the intended recipient only and must not be copied and/or distributed within the PRC. If you are not the intended recipient of these materials please destroy them immediately and contact the sender. Vanderbilt has represented and agreed that neither it nor any of its affiliates has offered or sold or will offer or sell any of the Notes in the People's Republic of China (excluding Hong Kong, Macau and Taiwan) as part of the initial distribution of the Notes.

For Thailand investors only:

Citigroup has represented, warranted and agreed that it has not offered or sold and will not offer or sell any Notes and it has not distributed and will not distribute any other documents or material in connection with the Notes, either directly or indirectly, in Thailand or to any resident of Thailand.

For Korea investors only:

NO REPRESENTATION IS MADE WITH RESPECT TO THE ELIGIBILITY OF ANY RECIPIENTS OF THIS MARKETING MATERIAL TO ACQUIRE THE SECURITIES DESCRIBED HEREIN UNDER THE LAWS OF KOREA, INCLUDING BUT WITHOUT LIMITATION THE FOREIGN EXCHANGE TRANSACTION ACT AND REGULATIONS THEREUNDER. PROSPECTIVE INVESTORS WHO ARE KOREAN RESIDENTS SHOULD BE ADVISED OF THE INVESTMENT PROCEDURES UNDER THE LAWS OF KOREA, INCLUDING BUT WITHOUT LIMITATION, FILING REQUIREMENTS UNDER THE FOREIGN EXCHANGE TRANSACTION ACT AND REGULATIONS THEREUNDER.

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES AND EXCHANGE ACT OF KOREA OR THE INDIRECT INVESTMENT ASSET MANAGEMENT BUSINESS ACT OF KOREA, AND NONE OF THE SECURITIES MAY BE OFFERED, SOLD OR DELIVERED, DIRECTLY OR INDIRECTLY, IN KOREA OR TO ANY RESIDENT OF KOREA, OR TO ANY PERSON FOR RE-OFFERING OR RESALE, DIRECTLY OR INDIRECTLY, IN KOREA OR TO ANY RESIDENT OF KOREA, EXCEPT AS PERMITTED BY APPLICABLE LAWS AND REGULATIONS OF KOREA.


citigroup
corporate and
investment banking

## Important Notice

For Taiwan investors only:

Any offering or sales activities in connection with offshore securities in the territory of Taiwan are strictly regulated. Any offering or sales of the Notes in the territory of Taiwan or to Taiwanese investors must be subject to certain restrictions under the applicable laws and rules. Each subscriber or purchaser of the Notes must seek professional opinions on its eligibility in subscribing or purchasing the Notes and represents and warrants that it is duly qualified to subscribe or purchase the Notes under the applicable Taiwanese laws and rules. Any holder of the Notes might be restricted from reselling the Notes in Taiwan except as otherwise approved by the regulator in Taiwan or according to applicable Taiwanese laws or rules.

For Singapore investors only:

We acknowledge that this presentation has not been registered as a prospectus with the Monetary Authority of Singapore. Each dealer will represent, warrant and agree that it will not offer or sell such Notes or cause such Notes to be made the subject of an invitation for subscription or purchase, and has not circulated or distributed, nor will it circulate or distribute, this presentation or any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of such Notes, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where Notes are subscribed or purchased under Section 275 by a relevant person which is:

(a) a corporation (which is not an accredited investor) (as defined in Section 4A of the SFA) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within 6 months after that corporation or that trust has acquired the Notes pursuant to an offer made under Section 275 except:

(i) to an institutional investor (for corporations, under Section 274 of the SFA) or to a relevant person defined in Section 275(2) of the SFA, or to any person pursuant to an offer that is made on terms that such shares, debentures and units of shares and debentures of that corporation or such rights and interest in that trust are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in Section 275 of the SFA;

(ii) where no consideration is or will be given for the transfer; or

(iii) where the transfer is by operation of law.

For Philippines investors only:

In accordance with the requirements of the Securities Regulation Code ("SRC") and the Securities and Exchange Commission ("SEC"), we hereby disclose that: THE SECURITIES BEING OFFERED OR SOLD HAVE NOT BEEN REGISTERED WITH THE SEC UNDER THE SRC. ANY FUTURE OFFER OR SALE OF THE SECURITIES IS SUBJECT TO REGISTRATION REQUIREMENTS UNDER THE SRC UNLESS SUCH OFFER OR SALE QUALIFIES AS AN EXEMPT TRANSACTION.

The Securities are being offered to investors in the Philippines on the understanding that each such offeree is a "qualified buyer" as defined in the SRC/this is a private placement to fewer than twenty (20) investors in the Philippines within a twelve-month period. Consequently, the offer of the Securities to such offeree is exempt from registration with the SEC under Sections 10.1.(1)/10.1.(K) of the SRC. A confirmation of exception from the SEC that the offer and sale of the Securities in the Philippines so qualifies as an exempt transaction has not been obtained.

2007 Citigroup Global Markets Inc. Member SIPC. All rights reserved. CITIGROUP and the Umbrella Device are trademarks and service marks of Citigroup or its affiliates and are used and registered throughout the world.

2007 Citigroup Global Markets Limited. Authorized and regulated by the Financial Services Authority. All rights reserved. CITIGROUP and the Umbrella Device are trademarks and service marks of Citigroup or its affiliates and are used and registered throughout the world.


citigroup
corporate and
investment banking

# *Table of Contents*

1.  Transaction Overview

2.  The Collateral Manager

    A.  Introduction to Vanderbilt Capital Advisors

    B.  Vanderbilt's Research & Credit Process

    C.  Surveillance

    D.  Vanderbilt CDO Transactions Overview

    E.  Biographies of Key Investment Professionals

3.  Risk Factors



citigroup
corporate and
investment banking

# 1. Transaction Overview

*This document outlines a potential investment vehicle structure and makes certain assumptions about the modeling parameters and market environment, including projections about the underlying assets, a part or all of which have yet to be purchased. The structure and assumptions contained herein are subject to change at anytime due to market conditions and other factors. Investment strategies may not achieve the desired results due to implementation lag, other timing factors, portfolio management decision-making, economic or market conditions or other unanticipated factors. The views and forecasts expressed in this presentation are as of February 2007, are subject to change without notice, may not come to pass and do not represent a recommendation or offer of any particular security, strategy, or investments.*

*The information contained herein is designed to illustrate the sensitivity of returns to various factors and is not intended to predict or indicate actual results, which will differ and may differ substantially from those reflected herein.*

*Any illustrations contained herein are based on certain hypothetical assumptions specified herein. Assumptions are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the illustrations will not materialize or will vary significantly from actual results, and such variations may be material.*

*Internal Rate of Return ("IRR") as used in the Return Scenarios means the discount rate at which the present value of the future cash flows equals the cost of the investment.*

*See Important Notice at the beginning.*



citigroup
corporate and
investment banking

# Armitage ABS CDO Overview

- **Armitage ABS CDO, Ltd.** (the "Issuer" or "Armitage") is a new $[3.0] billion high grade asset-backed security ("ABS") collateralized debt obligation ("CDO") transaction investing primarily in a portfolio of cash and synthetic residential mortgage backed securities ("RMBS") and CDOs (collectively, the "Collateral Debt Securities"). The portfolio is expected to have an average rating of [Aa3/A1]. The portfolio is expected to consist of approximately [85]% floating rate securities.

  - **Investment grade credit quality:** No asset is expected to be rated less than [A3] at purchase.

  - **Diversification:** The portfolio is expected to include approximately [300] individual positions, with the average investment size expected to be approximately [0.30]% of the portfolio. Due to the expected transaction size, Armitage is expected to be more diversified across assets and is expected to have proportionally smaller upfront expenses than other deals with smaller transaction size.

- The Issuer will issue [7] classes of senior securities, the Class A-1M, Class A-1Q, Class A-2, Class A-3, Class A-4, Class B, Class C (the "Notes") and a single class of subordinate securities (the "Preferred Shares", and together with the Notes, the "Securities"). See "Subordination" under Risk Factors.

- The CDO will be managed by Vanderbilt Capital Advisors, LLC ("Vanderbilt" or the "Collateral Manager"), which is an experienced manager of CDOs.

  - Vanderbilt or an affiliate of Vanderbilt is expected to purchase [100]% of the Preferred Shares.

- The CDO is expected to close in [1Q 2007], and is expected to have acquired at least [90]% of the collateral on such date. The collateral is expected to be 100% ramped within [90] days after closing.





# Transaction Terms

**Vanderbilt Capital Advisors** → **Armitage ABS CDO, Ltd. $[3,000] MM** ← **Collateral** — Securities backed primarily by residential mortgages and ABS CDO Securities

**[LaSalle Bank NA]**

| | Rating (M/S) | Principal (mm) | Percent of Structure | Percent of Subordination | WAL (yrs) | Expected Maturity | Legal Maturity | Coupon |
|---|---|---|---|---|---|---|---|---|
| Class A-1M | [Aaa/AAA] | [1,950,000,000] | [65.0]% | [20.0]% | [7.2] | [ ] [2015] | [ ] [2047] | 1mL + [ ] bps |
| Class A-1Q | [Aaa/AAA] | [450,000,000] | [15.0]% | [20.0]% | [7.2] | [ ] [2015] | [ ] [2047] | 3mL + [ ] bps |
| Class A-2 | [Aaa/AAA] | [245,000,000] | [8.2]% | [11.8]% | [7.3] | [ ] [2015] | [ ] [2047] | 3mL + [ ] bps |
| Class A-3 | [Aaa/AAA] | [200,000,000] | [6.7]% | [5.2]% | [7.3] | [ ] [2015] | [ ] [2047] | 3mL + [ ] bps |
| Class A-4 | [Aa2/AA] | [72,000,000] | [2.4]% | [2.8]% | [7.3] | [ ] [2014] | [ ] [2046] | 3mL + [ ] bps |
| Class B | [A2/A] | [30,000,000] | [1.0]% | [1.8]% | [7.3] | [ ] [2015] | [ ] [2047] | 3mL + [ ] bps |
| Class C | [Baa2/BBB] | [27,000,000] | [0.9]% | [0.9]% | [7.3] | [ ] [2015] | [ ] [2047] | 3mL + [ ] bps |
| Pref. Shares | [NR] | [26,000,000] | [0.9]% | -- | -- | -- | [ ] [2047] | NA |

citigroup
corporate and
investment banking


VANDERBILT CAPITAL ADVISORS

# *Transaction Terms (cont.)*



| Structural Characteristics | Expected |
|---|---|
| Issuer: | **Armitage ABS CDO, Ltd.** |
| Collateral Manager: | **Vanderbilt Capital Advisors, LLC** |
| Pricing Date: | **[1Q], 2007** |
| Closing Date: | **[1Q], 2007** |
| Form of Issue/Delivery: | **Rule 144A and Regulation S eligible (Global Notes) and physical certificates; physical certificates for Class C Notes sold to US investors and Preferred Shares. Investors in Preferred Shares must be QIBS.** |
| Payment Interval: | **Quarterly (with the exception of Class A-1M which will be payable monthly)** |
| Senior Collateral Management Fee: | **[8] bps** |
| Subordinate Collateral Management Fee: | **[2] bps** |
| Reinvestment Period: | **[5] years** |
| Trading: | **[0]% discretionary trading; however, credit risk trading and other trading is allowed only if trades are made in order to maintain collateral coverage tests, collateral quality tests and eligibility criteria. The Indenture is expected to significantly limit the Collateral Manager's discretion, on behalf of the Issuer, to sell Collateral Debt Securities and purchase substitute Collateral Debt Securities with the proceeds thereof. In addition, the Issuer will be permitted to amend the Indenture if such an amendment is required to enable the Issuer to avoid registration under the Investment Company Act by relying on Rule 3a-7 thereunder. Such an amendment could add further limitations and prohibitions on the circumstances under which the Issuer may sell assets, on the type of assets that the Issuer may acquire out of the proceeds of assets that mature, are refinanced or otherwise sold, on the period during which such transactions may occur or on the level of transactions that may occur. (See Risk Factors: Investment Company Act).** |
| Non-Call Period: | **[5] years** |
| Auction Call: | **[8] years** |
| Pro Rata Amortization: | **Following the Reinvestment Period, principal proceeds will be applied to repay each Class of Notes, on a pro rata basis, until [50]% of the initial aggregate portfolio par balance remains outstanding, provided no coverage tests have ever failed, and sequentially thereafter. However, under certain conditions, if the Class B Test and Class C Test become satisfied, the deal may pay pro-rata again.** |

3



# Target Portfolio Overview[1]

## Target Collateral by Asset Type



## Target Moody's Rating Distribution

1. Note: The above is based on the expected final portfolio at the end of the ramp-up period.  Such securities may not be available and the final portfolio may be different from the one presented above and may change over time.  Percentages may not add to 100% due to rounding.



citigroup
corporate and
investment banking

VANDERBILT
CAPITAL
ADVISORS

4

# Portfolio Characteristics and Coverage Tests



| Portfolio Guidelines | Target Portfolio | Expected Constraint |
|---|---|---|
| Principal Amount | $3,000,000,000 | $3,000,000,000 |
| Weighted Average Price | [100.1]% | NA |
| Number of Positions | [300] | NA |
| Moody's WARF | [45.0] | [55.0] |
| Moody's Asset Correlation | [20]% | [22]% |
| WAL | [5.9] Years | [8.0] Years |
| % Fixed Rate Collateral Debt Securities | [15]% | [15]% |
| WA Fixed Coupon | [6.1]% | [6.0]% |
| WA Floating Rate | L + [60.7] bps | L + [55.0] bps |
| % Below A3/A- | [0.00]% | [0.00]% |
| % CDOs | [35.0]% | [35.0]% |
| % Single-A rated CDOs | [9.3]% | [10.0]% |
| % PIKable assets | [7.5]% | [7.5]% |

| Asset Guidelines | Target Assets | Expected Constraint |
|---|---|---|
| Maximum Individual Position Size: | | |
| AAA | [1.05]% | [2.50]% |
| AA | [0.85]% | [1.50]% |
| A | [0.67]% | [0.75]% |

| Coverage Tests | O/C Trigger | Initial Level | I/C Trigger | Initial Level |
|---|---|---|---|---|
| Class A | [101.5]% | [102.8]% | [101.5]% | [104.3]% |
| Class B | [101.0]% | [101.8]% | [101.0]% | [102.9]% |
| Class C | [100.5]% | [100.9]% | [100.0]% | [101.3]% |

**Note: The final portfolio may be different from the one presented above and may change over time.**

VANDERBILT CAPITAL ADVISORS

citigroup
corporate and
investment banking

# *Breakeven Default Rate Analysis*[1]

## THE TABLE SHOWS THE ANNUAL AND CUMULATIVE BREAKEVEN DEFAULT RATES ON THE UNDERLYING PORTFOLIO FOR EACH TRANCHE OF THE TRANSACTION.[2]

| Default Rate | Class A1 | | Class A2 | | Class A3 | | Class A4 | | Class B | | Class C | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Annual | Cumul. | Annual | Cumul. | Annual | Cumul. | Annual | Cumul. | Annual | Cumul. | Annual | Cumul. |
| No Loss of Yield | 12.87% | 46.19% | 6.52% | 27.12% | 3.11% | 14.19% | 1.80% | 8.67% | 0.99% | 4.98% | 0.45% | 2.87% |
| No Loss of Principal | 40.52% | 85.25% | 10.57% | 39.94% | 6.05% | 25.42% | 3.85% | 17.28% | 1.89% | 8.95% | 1.09% | 5.44% |

1. Assumes that defaults are applied monthly to the outstanding collateral balance (starting in period [4]) with immediate recoveries of [70]% upon default. Refer to Page 7 for certain additional modeling assumptions and Section 4 for certain risk factors.
2. Cumulative default is the aggregate of all defaulted securities over the life of the transaction divided by the effective date portfolio balance.





# *Modeling Assumptions*



## Assumptions Used in Scenario Analysis

**Default Rate**
Defaults are assumed to occur beginning in the [1st] quarterly Payment Date, and continue throughout the life of the transaction at the indicated per annum rates.  Default rates are applied monthly on the outstanding principal balance of the Collateral Debt Securities at the beginning of each month.

**Auction Call:**
Auction call is assumed to successfully take place at the end of year [8]. Between years [8] through [10], there is a minimum [6.0]% IRR return to the Preferred Shares. After [10] years, the IRR rate drops to [0.0]%.

**Interest Rate Swap**
The Issuer will enter into an amortizing interest rate swap where it will pay fixed and receive floating, with the initial swap notional of $[349] million.

**Recovery Rate**
The analysis assumes a recovery rate equal to [70]% of the defaulted principal balance (unless otherwise stated).

**Timing of Recoveries**
The Collateral Manager is assumed to sell any defaulted Collateral Debt Security immediately upon default and achieve the designated Recovery Rate.

**Short Term Reinvestment Rate**
1 month LIBOR – [20] bps is assumed for the intra-payment-period reinvestment rate.

**Reinvestment Period**
5 years. The deal assumes [100]% floating reinvestments.

**Reinvestment Rate**
LIBOR + [55] bps

**Prepayment Rate**
For new issuance, the pricing prepayment speed is used. For each prepayment-sensitive Collateral Debt Security, it is assumed that its prepayment rate is equal to the average prepayment.

**Other Fees and Expenses**
Breakeven rates take into account all estimated initial placement and issuance expenses as well as estimated ongoing annual operating expenses and fees.

**Liquidation**
Unless otherwise stated, it is assumed that the Trustee conducts a successful auction [8] years from closing and liquidates the remaining portfolio at par.

**LIBOR Curve**
1-month forward LIBOR curve as of [02/01/2007] is assumed.

**Liability Spreads**
An initial weighted average cost of funds of LIBOR+ [34] bps on the liabilities is assumed.

**Ramp-Up Period**
[3] months.

*Please note that this list of assumptions does not include all assumptions that may have been applied to a particular model and that the models themselves do not factor in every performance factor that can have a significant impact on the performance of the Notes and/or Preferred Shares.  Since many potential scenarios exist, it is impossible to show all of the potential circumstances that would yield similar results.  Customized scenarios with assumptions specified by you can be performed at your request. See "Important Notice".*

7



# 2. *The Collateral Manager*

*Information related to Vanderbilt, its personnel, organization, processes and historical performance information has been provided by Vanderbilt. Citigroup is not responsible for the content of the following section and has not independently verified any such information. Past performance is no assurance of future results.*



# A. Introduction to Vanderbilt Capital Advisors, LLC



# *Introduction to Vanderbilt Capital Advisors, LLC*

∨ Overview

- Vanderbilt was established in 1994, and is registered as an investment adviser under the Investment Advisers Act of 1940

  - Vanderbilt is a research-driven firm with longstanding experience in structured fixed income products and asset-backed securities

    - Vanderbilt employs 30 individuals, including 18 investment professionals
    - Vanderbilt has completed 17 ABS CDO transactions in both cash and synthetic form

- Vanderbilt is in the Top 4 on S&P's list of largest ABS CDO managers[1]

- On April 25, 2006, Vanderbilt was acquired by Pioneer Investment Management USA Inc., the North American operating subsidiary of Pioneer Global Asset Management S.p.A., a global investment management group wholly owned by UniCredito Italiano S.p.A.

1.    Source:   S&P· "CDO Spotlight: 2006 Update To Sizing Collateral Manager Participation In The U.S. Cash Flow CDO Market"

8







# CDOs under Management

- **CDOs Under Management**
  - As of February 9th, 2007, Vanderbilt had 20 CDOs under management, comprising approximately $15.2 billion in assets:
    - Since 2002, Vanderbilt has completed 17 ABS CDOs and 4 synthetic investment grade corporate CDOs
    - Of the ABS CDOs, 4 are mezzanine cash deals, 5 are mezzanine synthetic, 1 is mid-grade cash, and 7 are high-grade cash deals

## CDOs Under Management Structured by VCA Structured Finance Group

| ($ in millions) | Plymouth Rock | Webster | Mayflower | Montrose Harbor | Lincoln Avenue | Diversy Harbor | Burnham Harbor |
|---|---|---|---|---|---|---|---|
| CDO Type | Syn IG Corp | Syn Mezz ABS | Mezz ABS | Mezz ABS | Mid Grade ABS | High Grade ABS | Syn Mezz ABS |
| Closing Date | December-06 | December-06 | August-06 | July-06 | July-06 | June-06 | January-06 |
| CDO Size at Closing Date | $106 | $1,000 | $1,000 | $500 | $1,250 | $2,500 | $750 |
| OC Test | N/A | N/A | N/A | PASS | PASS | PASS | N/A |

| ($ in millions) | Highgate | M-1 | Monroe Harbor | Fort Dearborn | Fort Sheridan | Dunhill | Streeterville |
|---|---|---|---|---|---|---|---|
| CDO Type | High Grade ABS | Syn IG Corp | High Grade ABS | Syn Mezz ABS | High Grade ABS | Mezz ABS | High Grade ABS |
| Closing Date | December-05 | September-05 | August-05 | August-05 | March-05 | December-04 | October-04 |
| CDO Size at Closing Date | $752 | $120 | $1,502 | $507 | $1,006 | $503 | $1,000 |
| OC Test | PASS | N/A | PASS | N/A | PASS | PASS | PASS |

| ($ in millions) | Sky River | Tudor Place | Carnegie Hill | Lakeside II | Lakeside I | Grand Central | Bristol[1] |
|---|---|---|---|---|---|---|---|
| CDO Type | Syn Mezz ABS | Syn IG Corp | Syn IG Corp | High Grade ABS | High Grade ABS | Mezz ABS | Mezz ABS |
| Closing Date | September-04 | August-04 | June-04 | March-04 | December-03 | Redeemed Dec-05 | October-02 |
| CDO Size at Closing Date | $405 | $758 | $750 | $1,502 | $801 | $304 | $300 |
| OC Test | N/A | N/A | N/A | PASS | PASS | PASS | FAIL |

**Note: Past performance is no assurance of future results.**

Note:
1) Deal was closed by previous management and inherited by the current management team.



citigroup
corporate and
investment banking

# Key Fixed Income Investment Professionals

## The CDO Team

### Vanderbilt Capital Structured Finance Group

**Patrick A. Livney**
Senior Managing Director
Structured Finance Group
21 Yrs. Investment Experience

**Stephen C. Bernhardt**
Senior Portfolio Manager
RMBS / CDOs
22 Yrs. Investment Experience

**Ali H. Haghighat**
Senior Portfolio Manager
Sub Prime MBS
8 Yrs. Investment Experience

**Edward J. O'Hara**
Senior Portfolio Manager
Prime/Alt A MBS
24 Yrs. Investment Experience

**Lawrence R. Zeno**
Senior Portfolio Manager
Sub Prime MBS/CMBS
18 Yrs. Investment Experience

**Ben Safanda**
Portfolio Manager
Quantitative Analytics
6 Yrs. Investment Experience

**Nicolas Pauwels**
Portfolio Manager
Quantitative Analytics
8 Yrs. Investment Experience

**Robert Salazar**
Senior Administrative Officer
CDOs
6 Yrs. Investment Experience

**David E. Ortiz, CFA**
Senior Portfolio Manager
Credit Research
14 Yrs. Investment Experience

**Weixiong Li, PhD**
Senior Quantitative Analyst
11 Yrs. Investment Experience

### Operations Team

**Kurt W. Florian, Jr.**
COO and Counsel
Structured Finance Group
23 Yrs. Experience



Notes:
1)

Source: Vanderbilt Capital Advisors. As of February 2007. There is no guarantee that specific individuals will continue to be employed by Vanderbilt Capital Advisors.

# ABS CDOs Under Management - Sector Distribution[1]



- ABS CDO 16.19%
- HEL 5.79%
- CMBS 2.08%
- Other 2.13%
- Residential A 24.24%
- Residential B/C 49.58%

Note:
1) Vanderbilt Capital Advisors. As of December 31, 2007.

11





# ABS CDOs Under Management - Rating Distribution[1]



Aaa 23.50%
Aa1 4.07%
Aa2 18.30%
Aa3 4.36%
A1 4.31%
A2 12.02%
A3 3.57%
Baa1 3.88%
Baa2 12.05%
Baa3 13.46%
Below Baa3 0.48%

Note:
1)   Vanderbilt Capital Advisors. As of December 31, 2007

12



VANDERBILT
CAPITAL
ADVISORS

citigroup
corporate and
investment banking

# B. Vanderbilt's Research & Credit Process



# *RMBS/ABS Analysis – Overview*

## Knowing the issuer and servicer

- Knowing the issuer and servicer
  - Regular meetings and on-site diligence
  - Origination channels
  - Underwriting philosophy and process
  - Capitalization and organization of the company
  - Staffing size and expertise
  - Growth and outlook
  - Do they retain individuals?

## Understanding Collateral and Enhancement

- Proprietary collateral and enhancement risk database
- Tailored loan stratifications
- Focus on geographic exposures
- Adjusted FICO analysis
- Understand layered risks

## Stress Runs and Cash Flow Analysis

- Generating customized default vectors
- Standard default scenarios
- Assessing available funds cap risk
- Loss coverage multiple test





*RMBS/ABS Analysis Geographic Review*

➤ Persistently High Default Rates in 63 MSAs in June 2006[1]



1. Source: Vanderbilt Loan Performance and FBR Research. MSA = Metropolitan Statistical Area.

14



citigroup
corporate and
investment banking

VANDERBILT
CAPITAL
ADVISORS

# RMBS/ABS Analysis – Cash Flow Analysis[1]



| Tranche | M-5 | Orig Face $ | FULL | Settle Date | T+3 |
| --- | --- | --- | --- | --- | --- |
| | | Cur Face $ | Current Factor | Type | 1 MEZ_FLT |
| | | 17,500,000.00 / 17,500,000.00 | | | |

Tranche Summary

## Collateral Summary

| Group Name | # Assets | Gross Coupon | Rem Amort $ | Rem Term | Asset Age |
| --- | --- | --- | --- | --- | --- |
| TOTAL | 66 | | 427 | 362 | 3 |
| 1A | 34 | | 422 | 364 | 3 |
| 1F | 32 | | 424 | 360 | 3 |
| 1H | 24 | | 6.9581 | 357 | 3 |
| 2A | 10 | | 6.4931 | 383 | 3 |
| 2B | 22 | | 7.9269 | 387 | 3 |
| 2F | 10 | | 9.2443 | 316 | 3 |

Forecast Assumptions

| Asset Stratification | Units | Solver | Detail | 1  clear # | 2  clear # | 3  clear # | 4  clear # |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Prepay Speed Ramp | | | | | | | |
| 100% of Jurisdiction Stock | | | | | | | |
| Prepay using CPR | | | | 35 | 35 | 35 | 35 |
| Prepay using CPR | | | | 35 | 35 | 35 | 35 |
| Prepay using CPR | | | | 22 | 22 | 22 | 22 |
| Prepay using CPR | | | | 35 | 35 | 35 | 35 |
| Prepay using CPR | | | | 22 | 22 | 22 | 22 |
| Exclude penalties from loan cashflows | | | Yes | | | | |
| | | | | | | | |
| No prepayment till Month greater than | | | | | | | |
| Prepay Penalty (%) | | | | | | | |
| Default Curve 'Subprime/2007 Exit this | | | | | | | |
| Target App Principal Writedown | | | | 1 | 1 | 1 | 1 |
| Loss Severity % | | | 45 | 45 | 45 | 45 | 45 |
| Recovery Lag (in months) | | | 0 | | | | |
| Servicer advance of principal (%) | | | 100 | | | | |
| Servicer advance of interest (%) | | | 100 | | | | |
| Recovery (timeframe, sum to 100 (%) | | | 0 | | | | |
| Monthly Default Rate, during initial | | | | | | | |
| liquidation lag | | | 0 | | | | |
| Severity/Recovery %, during initial | | | 40 | | | | |
| liquidation lag | | | | | | | |
| Discount | | | | 10 | 10 | 10 | 10 |
| per model; WAC; DBT | | | | | | | |
| Triggers - per model | | | | | | | |
| Credit Enhancement, per model | | | | 45 | 45 | 45 | 45 |

### Analysis Results

| Results Table | | | Yield | Spread | Disc Margin | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 99.0000 | | | 6.5416 123 83.53 | 7.0692 133 82.46 | 7.6007 133 83.90 | 8.0338 134 83.10 | | |
| 99.5000 | Price 100 | | 5.9724 112 64.82 | 6.8086 114 65.25 | 7.3999 115 65.46 | 7.9956 116 65.61 | | |
| 99.8000 | | | 5.7034 95 46.59 | 6.1635 98 46.53 | 7.2356 97 46.15 | 7.7071 98 47.86 | | |
| 99.9000 | | | 5.5454 79 32.38 | 6.5442 79 31.45 | 7.0455 80 31.02 | 7.5476 80 30.43 | | |
| 100.0000 | | | 5.3978 63 16.44 | 6.0374 62 14.86 | 6.6715 62 14.11 | 7.0702 62 13.21 | | |

| Additional Analysis | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| WAL | | | 7.XX | | 7.44 | | 7.XX | |
| WAL 1st | | | 4.03 | | 4 | | 3.30 | |
| WAL Prin | | | | | | | | |
| Prin Window | | | Jan13 Oct39 | | Jan13 Nov39 | | Dec12 Dec39 | |
| Prin Window | | | 308 | | 307 | | | |
| Principal Writedown | | | 0.00 (0.00%) | | 0.00 (0.00%) | | 1.48 (0.00%) | |
| Net Coll Loss, To Maturity | | | 126,875,397.78 (73.95%) | | 124,423,697.81 (72.54%) | | 126,042,613.24 (72.66%) | 2.36 (0.01%) |
| Net Coll Loss (%) | | | 276,611,306.11 (27.63%) | | 263,631,099.07 (26.01%) | | 290,597,804 (26.01%) | 126,809,652.24 (73.66%) |
| Net Loss Liquidation | | | | | | | | 290,659,230.07 (26.01%) |
| Pricing Severity | | | 6.020 | | 5.750 | | 5.500 | 5.520 |
| Mod Dur | | | 0.606 | | 0.561 | | 0.411 | 0.320 |
| Mod Conv | | | | | | | | |
| Accrued Int | | | | | | | | |
| Loans with overrides | | | 0 | | 0 | | 0 | 0 |

| | | | 2407.0725 (cat PER-DLNT cut core) | 2461.7501 (cat PER-DLNT cut core) | 2462.8380 (cat PER-DLNT cut core) | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | 245.84898 (cat PER-DLNT cut core) | 248.2709 (cat PER-DLNT cut core) | 246.76098 (cat PER-DLNT cut core) | | |

Note:
1)

*Source: Vanderbilt. Extract from Vanderbilt Analysis.*



# RMBS Deal Summary

## HEAT 2007-1 M5

| Bond Statistics | |
|---|---|
| CUSIP | 437101AK0 |
| Moody's Rating | A2 |
| S&P Rating | A+ |
| Fitch Rating | A+ |
| Current Credit Enhancement | 8.35% |
| Initial Credit Enhancement | 8.35% |
| Coupon | 40 |
| Coupon Type (Fixed/Floating) | FLOATING |
| Price | $100.00 |
| Price Speed | 23HEP / 100PPC |
| Maturity | May 25, 2037 |
| Par at Purchase | $7,250,000.00 |
| Yield/DM | 40 |
| Cap | AFC |
| Trade Date | January 12, 2007 |
| Settlement Date | February 1, 2007 |
| Weighted Average Life | 4.30 |
| Benchmark | 1M LIBOR |

| Collateral Statistics | |
|---|---|
| Industry Designation | RESIDENTIAL B & C |
| % Interest Only Loans | 15.20% |
| FICO | 635 |
| FICO < 550 | 8.50% |
| LTV | 81.40% |
| Cashout Refi | 45.90% |
| Mortgage Insurance(Y/N) | NO |
| Average Loan | $196,398.00 |
| Servicer/Mgr | SELECT PORTFOLIO SERVICES |
| Servicer Ratings - Moody's | SQ2 |
| Servicer Ratings - S&P | |
| Servicer Ratings - Fitch | RPS2+ |
| Breakeven CDR/CPR/SEV | 14.63%/22CPR/35CPR/45% |
| Breakeven Cumulative Loss %* | 13.33% |
| Current Cumulative Loss (%) | 0.00% |
| Current Cumulative Loss ($) | $0.00 |
| Weighted Average Maturity | |
| Weighted Average Coupon | 8.16% |
| California Exposure (%) | 29.20% |
| Fixed Rate Loans (%) | 18.10% |
| Full Documents | 56.70% |

**Comments**

1) Average HEAT collateral with above average originations. CS rep and warrants all Own loans. 635 FICO, 8.5% <550 FICO, 41.7% DTI.
2) Below 550 FICO loan 71% full doc/76% LTV, 2nd-657 FICO. Silent Seconds-662 FICO. 40% of second don't have 1st in deal, 663 FICO with first.
3) M5 class can withstand 2.4x base case losses with no coupon cap shortfalls to FL+200bp/base case losses. 2% o/c, 5.2% swap. Tight CL trigger at month 37.

Note:
1)

Source: Vanderbilt. Extract from Vanderbilt Analysis.

16

VANDERBILT CAPITAL ADVISORS


citigroup
corporate and
investment banking

17

# CDO Analysis – Overview

**Deal Parameters**
- CDO Type & Size
- Static or Reinvestment Period
- Pricing

**Manager Review**
- CDO Experience
- Organization Staffing and Stability
- Past CDO Performance
- Equity Participation
- Analytics & Technology
- CDO Administration/Compliance
- Ownership/AUM/CDO UM

**Documentation Review**
- Hedge Agreements
- Manager Removal Requirements
- Amendment Procedure

**Transaction Parties**
- Collateral Manager
- Underwriter
- Trustee
- Rating Agencies

**Collateral/Trigger Analysis**
- Senior Overcollateralization
- Subordinate Overcollateralization
- Weighted Average Rating Factor (WARF)
- Diversity Score
- Obligor and Sector Concentrations
- Coupon
- Spread

**Structure Default Analysis**
- Equity Profile (IRR/CDR/REC)
- Cash Flow Waterfall Special Features
- Clean-Up / Auction Call Mechanism
- Early Redemption

**Breakeven Default Analysis**
- Constant Default Rate
- Recovery Rate
- Cumulative Default Loss





citigroup
corporate and
investment banking

# CDO Deal Summary

## CDO Security Evaluation
### SAMPLE 2004-1

| Deal Parameters | |
|---|---|
| CDO Type & Size | $450MM ABS CDO |
| Static or Reinvestment Period | Static w/ 5yr substitution period |
| Pricing | 1x AAA 66z, AA 90 BBB 310, Equity 16.8% @ 0 CDR |

| Manager Review | |
|---|---|
| Organization Stability | Present team fully intact for 2+ years, some members together for greater than 5 years |
| Organization Staffing | 6 analysts, 2 port strategy, 2 traders plus syst. & admin |
| CDO Experience | 3rd ABS CDO, other corporate cash and CDS |

| 1st CDO | |
|---|---|
| Class B Princ Coverage Cushion | 0.00% |
| Class A Princ Coverage Cushion | 107.2 vs 103.4 |
| WARF Cushion vs Trigger | 602 vs 400 |
| Date Issued | July 25, 2002 |

| 2nd CDO | |
|---|---|
| Class B Princ Coverage Cushion | 0.00% |
| Class A Princ Coverage Cushion | 0.00% |
| WARF Cushion vs Trigger | 0 |
| Date Issued | Mar. 7, 2003 |

| 3rd CDO | |
|---|---|
| Class B Princ Coverage Cushion | 105.51 vs 102 |
| Class A Princ Coverage Cushion | Class A3 - 108.99 vs 104 |
| WARF Cushion vs Trigger | 277 vs 400 |
| Date Issued | November 2, 2003 |

| Manager Review, Cont'd | |
|---|---|
| Mer w/ Manager | On site visit and multiple conference calls |
| CDOs Under Management | 8 ABS and Several CDS |
| Assets Under Management | $6 Billion of CDOs, $8 Billion of that issued |
| Ownership | In the midst of IPO, currently funded primarily by private equity |
| CDO Administration & Compliance | State & Internal CDO Port. Evaluator |
| Analitics & Technology | Intex, Trepp, Reidpoint, ABSNet, Compustate |
| Equity Participation | Will own at least 49% of Equity |

Note:
1)

**Source: Vanderbilt. Extract from Vanderbilt Analysis.**

18



# CDO Deal Summary (cont.)

| Collateral Composition | |
|---|---|
| Residential B&C | 46.00 |
| Residential A | 5.00 |
| HEL | 10.00 |
| Manufactured Housing | 0.00 |
| CMBS | 22.00 |
| ABS CDO | 3.00 |
| Corporate CDO | 0.00 |
| REIT | 3.00 |
| Aircraft | 0.00 |
| Tobacco Settlement | 0.00 |
| Franchise | 0.00 |
| Small Business Loan | 0.00 |
| Credit Card | 12.00 |
| Other | 0.00 |

| | |
|---|---|
| Current < Baa3 Bucket | 0.00 |
| <Baa3 Bucket Limit | 10% for migration |
| Current Weighted Average Coupon Test | 0.00 |
| Weighted Average Coupon | 5.75 |
| Current Weighted Average Spread | 0.00 |
| Weighted Average Spread Test | 2.15 |

Note:
1)

**Source: Vanderbilt. Extract from Vanderbilt Analysis.**

19





# CDO Deal Summary (cont.)

## Structural Analysis

| | |
|---|---|
| Subordination | 19.1 to 1r. AAA, 8.5 to A, 3.7 to BBB |
| Equity Profile (IRR/CDR/Rec) | 16.8%/0 CDR/60% Rec, 13.6%/.5 CDR/60% Rec, 2.8%/1.5 CDR/60% Rec |
| Turbo Features | Equity capped at 15% excess turbos Class C |
| Fees & Deal Expenses | Sr. fee of 30bps, 18bps sub fee, upfront closing expense |
| Clean Up Call/Auction Call | 2012 Auction |
| Early Redemption | 3 year non-call, callable by 66.2/3% of Pref. Shares |

## Documentation Review

| | |
|---|---|
| Cap | 0.00 |
| Swap | 0.00 |
| Manager Removal | 0.00 |
| Amendment Procedure | For cause majority of each class, no cause 2/3 of ps mgr cannot vote |

## Stress Analysis

| | |
|---|---|
| NAV Calculation & Breakup Analysis | 0.00 |
| Breakeven Default (CDR/Rec/Cum Loss) 1st $ Pmnc | A2 - 14.3 CDR/60% Rec/55.5% Cum, B - 8.6 CDR/60% Rec/38.7% Cum |
| Breakeven Default (CDR/Rec/Cum Loss) 1st $ Interest | A2 - 11.5 CDR/60% Rec/47.9% Cum, B - 6.1 CDR/60% Rec/29.4% Cum |

## Parties to the Transaction

| | |
|---|---|
| Collateral Manager | Sample |
| Underwriter | Merrill Lynch |
| Trustee | LaSalle/ABN AMRO |
| Rating Agencies | Moody's, S&P + Fitch |

## Comments

- Conservative team has ramped heavily RMBS deal
- Turbo on Baa2 class should provide significant delevering of deal
- Manager has aggressively addressed problem credits in prior deals
- Virtually no exposure to troubled asset classes

Note:
1)

**Source: Vanderbilt. Extract from Vanderbilt Analysis.**

20

# C. Surveillance



# Security Information

- The Residential Surveillance Model begins with security information from Bloomberg and our custom Access Database.

  - Surveillance is just as important as the initial asset selection and structure of the CDO

- Surveillance is critical to Vanderbilt

  - A CDO is only as strong as its weakest leg

| SECURITY DESCRIPTION | CUSIP | FIXED/FLOATING | SETTLEMENT DATE | DEAL AGE | FACTOR | ORIGINAL MOODY'S | CURRENT MOODY'S | ORIGINAL S&P | CURRENT S&P | ORIGINAL FITCH | CURRENT FITCH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ARSI 2003-W9 A5 | 04010AD21 | FLOATING | 12/9/2003 | 18 | 1.000000 | | | | | | |
| ARSI 2004-W6 AV2 | 04010AGM7 | FLOATING | 4/7/2004 | 14 | 1.000000 | AAA | AAA | | | AAA | AAA |
| BSABS 2003-1 A2 | 07384YNZ5 | FLOATING | 12/30/2003 | 17 | 0.898404 | AAA | AAA | AAA | AAA | | NO |
| BSABS 2004-HE1 2A2 | 07384YPV2 | FLOATING | 1/30/2004 | 16 | 0.344399 | AAA | AAA | AAA | AAA | | NO |
| CBASS 2003-CB6 2AV2 | 12489WGX6 | FLOATING | 12/4/2003 | 18 | 0.691759 | AAA | AAA | AAA | AAA | AAA | AAA |
| MLMI 2003-HE1 A2B | 58992 94U9 | FLOATING | 11/7/2003 | 19 | 1.000000 | AAA | AAA | AAA | AAA | AAA | AAA |
| MSAC 2004-NC1 A4 | 61744CAV8 | FLOATING | 1/29/2004 | 16 | 1.000000 | AAA | AAA | AAA | AAA | AAA | AAA |
| NCHET 2003-6 A4 | 64352VFC0 | FLOATING | 12/19/2003 | 17 | 1.000000 | AAA | AAA | AAA | AAA | | NO |
| RAMC 2003-2 A | 75996 0AW8 | FLOATING | 12/23/2003 | 23 | 0.422814 | AAA | AAA | AAA | AAA | AAA | AAA |
| RAMC 2003-4 A3 | 75996 0DR8 | FLOATING | 12/29/2003 | 17 | 1.000000 | AAA | AAA | AAA | AAA | AAA | AAA |
| RAMP 2004-SL1 AI2 | 76098 6S2G5 | FLOATING | 3/30/2004 | 14 | 1.000000 | AAA | AAA | AAA | AAA | AAA | AAA |
| SASC 2003-GEL1 A2 | 80382UAB9 | FLOATING | 11/12/2003 | 19 | 1.000000 | AAA | AAA | AAA | AAA | | NO |
| SVHE 2003-2 A2 | 83611MAG1 | FLOATING | 12/30/2003 | 17 | 1.000000 | AAA | AAA | AAA | AAA | | NO |
| TMTS 2003-8HE A | 88156ICX0 | FLOATING | 12/29/2003 | 17 | 0.374269 | AAA | AAA | AAA | AAA | AAA | NO |
| AABST 2003-2 M1 | 00764MAH0 | FLOATING | 10/6/2003 | 20 | 1.000000 | AA2 | AA2 | AA | AA | AA | AA |

Note:
1)
Source: Vanderbilt.  Extract from Vanderbilt Analysis.

21



citigroup
corporate and
investment banking



VANDERBILT
CAPITAL
ADVISORS

# Collateral Information

| SECURITY DESCRIPTION | ORIGINAL C/E | CURRENT C/E | CURRENT EXCESS INT | DELINQUENCY 60 DAYS | DELINQUENCY 90 DAYS | FORECLOSURE | REO | CURRENT LOSS | CUMULATIVE LOSS | CUMULATIVE EXPECTED LOSS |
|---|---|---|---|---|---|---|---|---|---|---|
| ARSI 2003-W9 A5 | 21.25% | 39.94% | 1,661,229.95 | 0.68 | 0.51 | 3.19 | 1.7 | 0.41 | 0.15 | 0.58 |
| ARSI 2004-W6 AV2 | 20.55% | 30.28% | 1,438,924.83 | 0.77 | 0.41 | 2.2 | 0.53 | 0.43 | 0.05 | 0.40 |
| BSABS 2003-HE1 1A2 | 21.25% | 40.76% | 552,719.04 | 1.83 | 3.12 | 2.01 | 0.7 | 0.22 | 0.23 | 0.40 |
| BSABS 2004-HE1 2A2 | 20.75% | 41.56% | 635,872.39 | 1.66 | 1.47 | 2.27 | 0.29 | 0.16 | 0.16 | 0.37 |
| CBASS 2003-CB6 2AV2 | 18.85% | 37.44% | 398,400.75 | 1.12 | 4.68 | 2.16 | 0.54 | 0.6 | 0.38 | 0.43 |
| MLMI 2003-HE1 A2B | 16.25% | 33.37% | 242,264.54 | 0.68 | 1.93 | 0.67 | 1.52 | 0.19 | 0.19 | 0.47 |
| MSAC 2004-NC1 A4 | 18.50% | 36.96% | 1,509,814.83 | 0.07 | 0.24 | 2.71 | 0.99 | 1.35 | 0.05 | 0.49 |
| NCHET 2003-6 A4 | 20.50% | 40.66% | 1,414,704.91 | 0.47 | 0.39 | 2.87 | 0.5 | 0.8 | 0.17 | 0.71 |
| RAMC 2003-2 A | 17.85% | 33.95% | 607,730.35 | 1.09 | 1.85 | 3.01 | 0.94 | 0.2 | 0.22 | 0.60 |
| RAMC 2003-4 A3 | 17.50% | 28.74% | 785,360.20 | 1.23 | 0.82 | 2.84 | 0.48 | 0.27 | 0.02 | 0.36 |
| RAMP 2004-SL1 AI2 | 15.00% | 27.09% | 302,713.76 | 1.23 | 2 | 2.91 | 0.04 | 0.05 | 0.04 | 0.53 |
| SASC 2003-GEL1 A2 | 24.75% | 65.44% | 105,806.33 | 1.75 | 4.33 | 5.33 | 5.19 | 0.05 | 0.95 | 0.83 |
| SVHE 2003-2 A2 | 14.25% | 25.85% | 260,752.07 | 0 | 0.38 | 1.89 | 0.13 | 0.27 | 0.05 | 0.36 |
| TMTS 2003-8HE A | 16.75% | 34.96% | 252,190.34 | 2.14 | 1.43 | 4.16 | 0.07 | 0.03 | 0.17 | 0.36 |
| AABST 2003-2 M1 | 10.50% | 28.86% | 501,692.97 | 0.38 | 0.49 | 6.17 | 0.78 | 1.58 | 0.70 | 0.89 |

✓ The Residential Surveillance Model populates collateral information on each RMBS position. The delinquency data is directly downloaded from Intex. The Expected Loss information is generated from our custom Loss Curve, which is continually updated and adjusted.

Note:
1)

Source: Vanderbilt. Extract from Vanderbilt Analysis.

22





# Trigger & Flag Information

| SECURITY DESCRIPTION | TRIGGERS | 2005-02 | 2005-03 | 2005-04 | LOSS FLAG | DELINQUENCY FLAG | TRIGGER FLAG | PRICE FLAG | RATING FLAG | TOTAL FLAGS |
|---|---|---|---|---|---|---|---|---|---|---|
| ARSI 2003-W9 A5 | PASS | 100.69 | 100.68 | 100.35 | 0 | 0 | 0 | 0 | 0 | 0 |
| ARSI 2004-W6 AV2 | PASS | 100.51 | 100.50 | 100.75 | 0 | 0 | 0 | 0 | 0 | 0 |
| BSABS 2003-HE1 1A2 | PASS | 100.22 | 100.22 | 100.21 | 0 | 0 | 0 | 0 | 0 | 0 |
| BSABS 2004-HE1 2A2 | PASS | 100.12 | 100.12 | 100.13 | 0 | 0 | 0 | 0 | 0 | 0 |
| CBASS 2003-CB6 2AV2 | PASS | 100.79 | 100.82 | 100.32 | 0 | 0 | 0 | 0 | 0 | 0 |
| MLMI 2003-HE1 A2B | PASS | 100.08 | 100.09 | 100.10 | 0 | 0 | 0 | 0 | 0 | 0 |
| MSAC 2004-NC1 A4 | PASS | 100.78 | 100.76 | 100.76 | 0 | 0 | 0 | 0 | 0 | 0 |
| NCHET 2003-6 A4 | PASS | 101.03 | 101.05 | 101.12 | 0 | 0 | 0 | 0 | 0 | 0 |
| RAMC 2003-2 A | PASS | 100.27 | 100.30 | 100.40 | 0 | 0 | 0 | 0 | 0 | 0 |
| RAMC 2003-4 A3 | PASS | 100.09 | 100.09 | 100.09 | 0 | 0 | 0 | 0 | 0 | 0 |
| RAMP 2004-SL1 AI2 | PASS | 100.69 | 100.67 | 100.80 | 0 | 0 | 0 | 0 | 0 | 0 |
| SASC 2003-GEL1 A2 | FAIL | 101.05 | 101.06 | 101.70 | 1 | 0 | 1 | 0 | 0 | 2 |
| SVHE 2003-2 A2 | PASS | 100.00 | 100.00 | 100.00 | 0 | 0 | 0 | 0 | 0 | 2 |
| TMTS 2003-8HE A | PASS | 100.06 | 100.06 | 100.06 | 0 | 0 | 0 | 0 | 0 | 0 |
| AABST 2003-2 M1 | PASS | 100.00 | 100.99 | 100.99 | 0 | 0 | 0 | 0 | 0 | 0 |

- A Loss Flag will appear if a security's Cumulative Loss is greater than the Expected Cumulative Loss.
- A Delinquency Flag is triggered when a security's "60+ Day" Delinquency Rate is greater than anticipated
- A Trigger Flag results from a Failure in a Deal Trigger
- A Price Flag is generated if the Current Price is at least 2% lower than the prior period
- A Rating Flag occurs if a security is downgraded or put on negative watch by any one of Moody's, S&P, or Fitch

Note:
1)

Source: Vanderbilt.  Extract from Vanderbilt Analysis.





23

# Delinquency and Loss Information

| | |
|---|---|
| REPORTING DATE | 5/22/2006 |
| SECURITY DESCRIPTION | MSAC 2005-HE1 B3 |
| CUSIP | 617AADWV5 |
| FIXED/FLOATING | FLOATING |
| SETTLEMENT DATE | |
| DEAL AGE | 15 |
| DEAL FACTOR | 1 |
| DEAL FACTOR | 0.561228361 |

| | | | |
|---|---|---|---|
| LOSS FLAG | 0 | PRICE (T) | 0 |
| DELINQ FLAG | 0 | PRICE (T-1) | 0 |
| TRIGGER FLAG | 0 | PRICE (T-2) | 0 |
| PRICE FLAG | 0 | TRIGGERS | PASS |
| RATING FLAG | 0 | M ORIG | BAA3 |
| TOTAL FLAGS | 0 | M CURRR | BAA3 |
| | | S&P ORIG | BBB- |
| | | S&P CURR | BBB- |
| | | FITCH ORIG | BBB- |
| | | FITCH CURR | BBB- |

Data table (best-effort reading of a dense source table):

| DATE | ORIG CE | CURR CE | CURR TOTAL CS $ | CUR EXCESS INT | 60+ | 90 DAY | BK | FORECL | REO | E(DQ) | CURR LOSS | CUM LOSS | E(CUM LOSS) | CPR | CRR | CDR | 60+ TO CS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/25/2005 | 2.75% | 4.90% | 47,119,832.31 | 1,267,120.93 | 6.97% | 1.08% | 1.46% | 0.62% | | 9.37% | | 0.05% | 0.37% | 37.646253 | 36.811789 | 1.00214 | 1.39 |
| 8/25/2005 | 2.75% | 4.71% | 47,119,832.31 | 1,596,379.95 | 6.94% | 1.15% | 2.93% | 0.55% | | 8.62% | | 0.09% | 0.33% | 30.565117 | 28.635646 | 1.425571 | 1.43 |
| 9/25/2005 | 2.75% | 4.56% | 47,119,832.32 | 1,938,001.98 | 6.45% | 1.00% | 2.64% | 0.53% | | 7.65% | | 0.12% | 0.29% | 34.071886 | 34.071886 | 0 | 1.36 |
| 10/25/2005 | 2.75% | 4.24% | 47,119,832.33 | 2,113,114.13 | 5.26% | 0.40% | 2.45% | 0.41% | | 6.31% | | 0.16% | 0.33% | 49.463988 | 49.955191 | 0.928398 | 1.19 |
| 11/25/2005 | 2.75% | 4.09% | 47,119,832.31 | 1,977,848.16 | 4.37% | 0.35% | 1.89% | 0.030% | | 5.54% | | 0.18% | | 47.217537 | 47.10788 | 1.109056 | 1.05 |
| 12/25/2005 | 2.75% | 3.79% | 47,119,832.31 | 2,381,774.62 | 3.88% | 0.31% | 1.83% | 0.05% | | 4.90% | | 0.20% | | 48.120174 | 48.058826 | 0.061648 | 0.92 |
| 1/25/2006 | 2.75% | 3.59% | 47,119,832.32 | 3,098,061.93 | 3.14% | 0.67% | 1.24% | 0.16% | | 4.11% | | 0.33% | | 44.0663 | 44.0663 | 0 | 0.82 |
| 2/25/2006 | 2.75% | 3.41% | 47,119,832.32 | 2,989,111.57 | 2.46% | 0.96% | 1.29% | 0.12% | | 3.47% | | 0.29% | | 36.468904 | 36.468904 | 0 | 0.73 |
| 3/25/2006 | 2.75% | 3.29% | 47,119,832.32 | 3,498,817.04 | 2.03% | 0.23% | 0.51% | 0.000% | | 2.59% | | 0.00% | | 41.171715 | 40.816521 | 0.368392 | 0.59 |
| 4/25/2006 | 2.75% | 3.14% | 47,119,832.32 | 4,252,902.70 | 1.67% | 0.14% | 0.72% | 0.000% | | 1.98% | 0.00% | 0.00% | | 36.728618 | 36.728618 | 0 | 0.49 |

**DELINQUENCY CHART** — legend: 60+ DQ, E(60+ DQ); y-axis 0.00% – 10.00%; x-axis Jun-05 through Apr-06

**CURR LOSS CHART** — legend: CURR LOSS; y-axis 0 – 0.003; x-axis Jun-05 through Apr-06

**CUM LOSS CHART** — legend: CUM LOSS, E(CUM LOSS); y-axis 0.00% – 0.40%; x-axis Jun-05 through Apr-06

**60+ DQ TO TOTAL CE CHART** — legend: 60+ DQ TO TOTAL CE; y-axis 0 – 1.6; x-axis Jun-05 through Apr-06

24

Note:
1)

Source: Vanderbilt. Extract from Vanderbilt Analysis.



citigroup
corporate and
investment banking

VANDERBILT CAPITAL ADVISORS

# CDO Surveillance

- Vanderbilt uses its proprietary surveillance model as part of the CDO surveillance process
- CDO surveillance begins with the CDO Snapshot Model, a summary of each CDO, showing current and historical deal tests and portfolio characteristics

## Knollwood (LS II)

**Exposures:** Lakeside II $50m Class B

| | Prior | 6/30/2005 | At Closing/Target | Result | 5/31/2005 | 4/30/2005 | 4/1/2005 | 2/28/2005 |
|---|---|---|---|---|---|---|---|---|
| Class A/B Overcollateralization Test | 109.94% | 109.94% | 104.90% | PASS | 109.94% | 109.83% | 109.85% | 109.94% |
| Class C Overcollateralization Test | 104.38% | 104.38% | 101.40% | PASS | 104.38% | 104.27% | 104.21% | 104.20% |
| Class A/B Interest Coverage Tests | 160.01% | 159.15% | 113.00% | PASS | 160.01% | 159.13% | 173.35% | 173.35% |
| Class C Interest Coverage Tests | 148.74% | 148.96% | 116.00% | PASS | 148.74% | 157.05% | 157.64% | 157.64% |
| Diversity Test | 23.00 | 23.00 | 16.00 | PASS | 23.00 | 23.00 | 23.00 | 23.00 |
| Moody's WARF | 275.00 | 277.00 | 310.00 | PASS | 275.00 | 276.00 | 279.00 | 279.00 |
| W.A Spread | 2.66% | 2.66% | 2.60% | PASS | 2.66% | 2.65% | 2.64% | 2.64% |
| W.A Coupon | 5.34% | 5.35% | 5.25% | PASS | 5.34% | 5.35% | 5.34% | 5.34% |

## Liberty Harbor (MH)

**Exposures:** Monroe Harbor $3m Class B

| | Prior | 7/2/2005 | Trigger | Min/Max | Result | Initial | 5/31/2005 |
|---|---|---|---|---|---|---|---|
| Class B Overcollateralization Test | 100.86% | 100.67% | 100.50% | 0.00% | Pass | 0.00% | 100.86% |
| Maximum Principal Loss Test 5 | $0.00M | $0.00M | $0.00M | 0.00% | Pass | 0.00% | $0.00M |
| Class C Interest Coverage Test | 137.24% | 148.83% | 101.80% | 0.00% | Pass | 0.00% | 137.24% |
| Class D Interest Coverage Test | 124.16% | 134.64% | 101.00% | 0.00% | Pass | 0.00% | 124.16% |
| Diversity Test | 24.70 | 26.80 | 21.00 | 0.00 | Pass | 0.00 | 24.70 |
| Moody's WARF | 32.00 | 32.00 | 38.00 | 0.00 | Pass | 0.00 | 32.00 |
| W.A Spread | 0.74% | 0.74% | 0.65% | 0.00% | Pass | 0.00% | 0.74% |

## Longport II (FS)

**Exposures:** Fort Sheridan $3m Class A-1 / Fort Sheridan $3m Class A-2

| | Prior | 6/30/2005 | Closing | Result |
|---|---|---|---|---|
| Class C Overcollateralization Test | 111.14% | 111.14% | 111.14% | Pass |
| Class D Overcollateralization Test | 105.72% | 105.72% | 105.72% | Pass |
| Class A Interest Coverage Test | 177.44% | 129.41% | 183.83% | Pass |
| Class B Interest Coverage Tests | 163.60% | 119.31% | 173.50% | Pass |
| Diversity Test | 14.00 | 14.00 | 0.00 | Pass |
| Moody's WARF | 298.00 | 298.00 | 0.00 | Pass |
| W.A Spread | 2.14% | 2.14% | 0.00% | Pass |
| W.A Coupon | 5.78% | 5.75% | 0.00% | Pass |

Note:
1)

*Source: Vanderbilt. Extract from Vanderbilt Analysis.*

25





# CDO Surveillance (cont.)

- Vanderbilt performs review of current deal tests and characteristics and comparison with historical performances
- CDO Surveillance Model provides individual profiles on each CDO investment

| Liberty Harbor (IFS & MH) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Description | Prior 7/7/2005 | 7/7/2005 | Trigger | Result | Initial | 5/31/2005 | 4/30/2005 |
| Class D Overcollateralization Test | 100.66% | 100.67% | 100.50% | Pass | 100.66% | 100.66% | 100.66% |
| Maximum Principal Loss Test $ | $0.0MM | $0.0MM | $0.0MM | Pass | $0.0MM | $0.0MM | $0.0MM |
| Class C Interest Coverage Test | 137.24% | 148.83% | 102% | Pass | 169.36% | 137.24% | 169.36% |
| Class D Interest Coverage Test | 124.16% | 134.64% | 101% | Pass | 153.21% | 124.16% | 153.21% |
| Interest Diversion Test | 31 | 31 | 70 | Pass | 31 | 31 | 31 |
| Diversity Test | 24.7 | 26.8 | 21 | Pass | 26.8 | 24.7 | 26.8 |
| Weighted Average Rating Factor Test | 32 | 32 | 38 | Pass | 31 | 32 | 31 |
| Weighted Average Life Test | 3.74 | 2.98 | 8.00 | Pass | 3.02 | 3.74 | 3.02 |
| Eligibility Criteria | ..... | ..... | ..... | Pass | ..... | ..... | ..... |
| Weighted Average Spread Test | 0.74% | 0.74% | 0.65% | Pass | 0.74% | 0.74% | 0.74% |
| Moody's Min Wgt Avg Recovery Rate Test | 61.60% | 61.50% | 51.75% | Pass | 62.00% | 61.60% | 62.00% |
| S&P Minimum Recovery Rate Test | ..... | ..... | ..... | Pass | ..... | ..... | ..... |

26

Note:
1)

Source: Vanderbilt.  Extract from Vanderbilt Analysis.





# CDO Surveillance (cont.)

➤ Vanderbilt performs review of trading activity within each CDO

➤ Trading activity of each CDO is downloaded from the trustee reports and monitored on a monthly basis

➤ Trading activity provides insight into a particular collateral manager's reinvestment strategy, further perspective on the market, and an early look into a CDO's future performance



Liberty Harbor (FS & MH)

Trading Activity; As of 7/7/2005

| Security Description | CUSIP | Buy/Sell | Trade Date | Rating (M/S&P) | Par Amount | Price | Proceeds | $ Change in DC | Avg Purchase Price |
|---|---|---|---|---|---|---|---|---|---|
| CWALT 2005-10CB - 1A1 Libor+0.50% 05/2035 | 12667GAW3 | Buy | 6/16/2005 | Aaa/AAA | $4,950,314.50 | $99.906 | $4,945,561.099 | $4,653.20 | |
| IASPR 2005-1A - B Libor+0.588% 07/2017 | 47318XAB1 | Buy | 6/29/2005 | Aa2/AA | $12,000,000.00 | $99.420 | $11,930,480.000 | $69,600.00 | |

Trading Activity; As of 5/31/2005

| Security Description | CUSIP | Buy/Sell | Trade Date | Rating (M/S&P) | Par Amount | Price | Proceeds | $ Change in DC | Avg Purchase Price |
|---|---|---|---|---|---|---|---|---|---|
| CWALT 2005-10CB - 1A1 Libor+0.50% 05/2035 | 12667GAW3 | Buy | 5/3/2005 | Aaa/AAA | $4,184,474.12 | $99.938 | $4,181,879.946 | $2,594.17 | |
| CWALT 2005-10CB - 1A1 Libor+0.50% 05/2035 | 12667GAW3 | Buy | 5/18/2005 | Aaa/AAA | $4,981,517.06 | $99.938 | $4,978,428.519 | $3,088.54 | |
| HVMLT 2005-3 - B1 Libor-.6% | 41161PMP5 | Buy | 5/31/2005 | Aa2/AA | $10,000,000.00 | $100.00 | $10,000,000.000 | $0.00 | |

Note:
1)

**Source: Vanderbilt. Extract from Vanderbilt Analysis.**

27




citigroup
corporate and
investment banking

# D. Vanderbilt CDO Transactions Overview

NOTE: PAST PERFORMANCE IS NO ASSURANCE OF FUTURE RESULTS



citigroup
corporate and
investment banking

28

# *Webster CDO*

▼ As of October 11, 2006[1]

## Deal Summary

| | |
|---|---|
| Closing Date | August 22, 2006 |
| Substitution Period | 4 years |
| Final Maturity | September 12, 2046 |
| Total Portfolio Collateral | $991,827,554.58 |

## Assets

| | Current |
|---|---|
| Baa2 HEL | 26.25% |
| Baa3 HEL | 61.10% |
| A2 ABS CDO | 1.50% |
| A3 ABS CDO | 0.50% |
| Baa1 ABS CDO | 0.20% |
| Baa2 ABS CDO | 5.64% |

## Collateral Quality Tests

| | Test Level | Current |
|---|---|---|
| MAC Test | 21.80% | 21.45% |
| Weighted Average Moody's Rating Factor | 540 | 519 |
| Weighted Average Spread | 1.78% | 1.80% |

## Capital Structure

| | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
|---|---|---|---|
| Class X | $20.00 | AAA/Aaa | 3L + 0.36% |
| Class A-1LA | $609.00 | AAA/Aaa | 3L + 0.17% |
| Class A-1IB | $157.00 | AAA/Aaa | 3L + 0.45% |
| Class A-2L | $75.00 | AAA/Aa2 | 3L + 0.50% |
| Class A-3L | $46.00 | A/A2 | 3L + 1.40% |
| Class B-1L | $50.00 | BBB/Baa2 | 3L + 3.25% |
| Equity | $55.26 | NR/NR | Residual |
| | $1,012.26 | | |

Note:
1)

Source:  Vanderbilt Capital Advisors trustee report.  Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results



citigroup
corporate and
investment banking

VANDERBILT
CAPITAL
ADVISORS

29

# Montrose Harbor CDO

➤ As of September 22, 2006[1]

| Deal Summary | |
| --- | --- |
| Closing Date | July 31, 2006 |
| Reinvestment Period | 4 years |
| Final Maturity | December 5, 2051 |
| Total Portfolio Collateral | $499,803,917 |

| Assets | Current | Max |
| --- | --- | --- |
| CDO Securities | 8.09% | 10.00% |
| Floating Rate Securities | 84.92% | 95.00% |
| Fixed Rate Securities | 14.91% | 15.00% |

| Capital Structure | | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
| --- | --- | --- | --- | --- |
| | Class A-1 | $342.50 | AAA/Aaa | 3L + 0.30% |
| | Class A-2 | $52.50 | AAA/Aaa | 3L + 0.44% |
| | Class B-1 | $35.00 | AA/Aa2 | 3L + 0.49% |
| | Class B-2 | $13.75 | AA-/Aa3 | 3L + 0.59% |
| | Class C | $14.50 | A/A2 | 3L + 1.38% |
| | Class D | $21.25 | BBB/Baa2 | 3L + 3.25% |
| | Equity | $25.50 | NR/NR | Residual |
| | | $505.00 | | |

| Collateral Quality Tests | Test Level | Current |
| --- | --- | --- |
| MAC Test | 20.00% | 19.60% |
| Weighted Average Moody's Rating Factor | 480 | 374 |
| Weighted Average Spread | 1.700% | 1.814% |
| Weighted Average Coupon | 4.750% | 4.989% |
| Max. Weighted Average Life (in years) | 7.00 | 4.20 |

| Collateral Quality Tests | Test Level | Current |
| --- | --- | --- |
| Class A/B Overcollateralization Test | 107.7% | 112.68% |
| Class C Overcollateralization Test | 105.5% | 109.11% |

Note:
1)

Source: Vanderbilt Capital Advisors trustee report. Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results



30

# Lincoln Avenue CDO

➤ As of September 08, 2006[1]

## Deal Summary

| Deal Summary | |
|---|---|
| Closing Date | July 5, 2006 |
| Reinvestment Period | 5 years |
| Final Maturity | July 5, 2046 |
| Total Portfolio Collateral | $1,249,999,782 |

| Assets | Current | Max |
|---|---|---|
| CDO Securities | 23.54% | 25.00% |
| Floating Rates Securities | 76.02% | 75.00% |
| Fixed Rate Securities | 23.98% | 25.00% |

## Capital Structure

| Capital Structure | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
|---|---|---|---|
| Class A-1 | $1,094.00 | AAA/Aaa | 3L + 0.19% |
| Class A-2 | $77.00 | AAA/Aaa | 3L + 0.42% |
| Class B | $26.00 | AA/Aa2 | 3L + 0.50% |
| Class C | $21.00 | A/A2 | 3L + 1.35% |
| Class D | $19.00 | BBB/Baa2 | 3L + 3.35% |
| Equity | $13.33 | NR/NR | Residual |
| | $1,250.33 | | |

## Collateral Quality Tests

| Collateral Quality Tests | Test Level | Current |
|---|---|---|
| MAC Test | 22.00% | --- |
| Weighted Average Moody's Rating Factor | 80 | 75 |
| Weighted Average Spread | 0.760% | 0.797% |
| Weighted Average Coupon | 5.750% | 5.835% |
| Max. Weighted Average Life (in years) | 7.00 | 6.23 |

| Collateral Quality Tests | Test Level | Current |
|---|---|---|
| Class A Overcollateralization Test | 104.4% | 106.75% |
| Class B Overcollateralization Test | 102.4% | 104.43% |

Note:
1)
Source: Vanderbilt Capital Advisors trustee report. Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results





# Diversey Harbor CDO

➤ As of September 29, 2006[1]

| Deal Summary | |
|---|---|
| Closing Date | June 1, 2006 |
| Reinvestment Period | 5 years |
| Final Maturity | August 5, 2046 |
| Total Portfolio Collateral | $2,496,590,695 |

| Assets | Current | Max |
|---|---|---|
| CDO Securities | 20.32% | 25.00% |
| Floating Rate Securities | 84.92% | 90.00% |
| Fixed Rate Securities | 14.91% | 15.00% |

| Capital Structure | Amount | Ratings | |
|---|---|---|---|
| | $(MM) | (S&P/Moody's) | Coupon |
| Class A-1 M | $1,250.00 | AAA/Aaa | 3L + 0.24% |
| Class A-1 Q | $675.00 | AAA/Aaa | 3L + 0.24% |
| Class A-2 | $200.00 | AAA/Aaa | 3L + 0.37% |
| Class A-3 | $245.00 | AAA/Aaa | 3L + 0.44% |
| Class A-4 | $60.00 | AA/Aa2 | 3L + 0.52% |
| Class B | $25.00 | A/A2 | 3L + 1.30% |
| Class C | $24.00 | BBB/Baa2 | 3L + 3.25% |
| Equity | $21.00 | NR/NR | Residual |
| | $2,500.00 | | |

| Collateral Quality Tests | Test Level | Current |
|---|---|---|
| MAC Test | 23.00% | 10.57% |
| Weighted Average Moody's Rating Factor | 55 | 44.59 |
| Weighted Average Spread | 0.600% | 0.640% |
| Weighted Average Coupon | 5.400% | 5.550% |
| Max. Weighted Average Life (in years) | 8.00 | 5.34 |

| Collateral Quality Tests | Test Level | Current |
|---|---|---|
| Class A Overcollateralization Test | 101.5% | 102.91% |
| Class B Overcollateralization Test | 101.0% | 101.86% |
| Class C Overcollateralization Test | 100.4% | 100.87% |

Note:
1) Source: Vanderbilt Capital Advisor's trustee report. Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results

31



citigroup
corporate and
investment banking

# Burnham Harbor

▼ As of October 2, 2006[1]

| Deal Summary | |
|---|---|
| Closing Date | January 31, 2006 |
| Substitution Period | 4 years |
| Final Maturity | September 12, 2039 |
| Total Portfolio Collateral | $739,687,076.48 |

| Assets | Current |
|---|---|
| Aaa HEL | 13.73% |
| Baa1 HEL | 9.80% |
| Baa2 HEL | 38.41% |
| Baa3 HEL | 28.93% |
| Aa2 CMBS | 9.13% |

| Capital Structure | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
|---|---|---|---|
| Class A-1L | $470.40 | AAA/Aaa | 3L + 0.17% |
| Class A-1LB | $110.00 | AAA/Aaa | 3L + 0.56% |
| Class A-2L | $60.00 | AA/Aa2 | 3L + 0.72% |
| Class A-3L | $54.00 | A/A2 | 3L + 1.75% |
| Class B-1L | $29.00 | BBB/Baa2 | 3L + 4.00% |
| Equity | $22.60 | NR/NR | Residual |
| | $746.00 | | |

| Collateral Quality Tests | Test Level | Current |
|---|---|---|
| MAC Test | 22.50% | 21.35% |
| Weighted Average Moody's Rating Factor | 350 | 342.3 |
| Weighted Average Spread | 1.45% | 1.56% |

Note:
1) Source: Vanderbilt Capital Advisors trustee report. Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results



# Highgate CDO

- As of September 29, 2006[1]

| Deal Summary | |
|---|---|
| Closing Date | December 15, 2005 |
| Reinvestment Period | 4 years |
| Final Maturity | January 15, 2046 |
| Total Portfolio Collateral | $748,159,730 |

| Assets | Current | Max |
|---|---|---|
| CDO Securities | 13.92% | 20.00% |
| Floating Rate Securities | 84.75% | 85.00% |
| Fixed Rate Securities | 15.00% | 15.00% |

| Capital Structure | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
|---|---|---|---|
| Class A-1 | $601.20 | AAA/Aaa | 3L + 0.15% |
| Class A-2 | $71.92 | AAA/Aaa | 3L + 0.45% |
| Class B | $50.20 | AA/Aa2 | 3L + 0.55% |
| Class C | $9.02 | A/A2 | 3L + 1.45% |
| Class D | $8.00 | BBB/Baa2 | 3L + 2.85% |
| Equity | $10.52 | NR/NR | Residual |
| | $750.86 | | |

| Collateral Quality Tests | Test Level | Current |
|---|---|---|
| MAC Test | 22.00% | 18.70% |
| Weighted Average Moody's Rating Factor | 51 | 49 |
| Weighted Average Spread | 0.600% | 0.654% |
| Weighted Average Coupon | 5.500% | 5.610% |
| Max Weighted Average Life (in years) | 6.50 | 5.60 |

| Collateral Coverage Tests | Test Level | Current |
|---|---|---|
| Class A/B Overcollateralization Test | 101.61% | 103.69% |
| Class C Overcollateralization Test | 100.88% | 102.41% |

Note:
1)

Source:  Vanderbilt Capital Advisors trustee report.  Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results

VANDERBILT CAPITAL ADVISORS



citigroup
corporate and
investment banking

34

# Monroe Harbor ABS CDO

▼ As of September 29, 2006[1]

| Deal Summary | |
|---|---|
| Closing Date | August 18, 2005 |
| Reinvestment Period | 4 years |
| Final Maturity | December 5, 2040 |
| Total Portfolio Collateral | $1,491,791,874 |

| Assets | Current | Max |
|---|---|---|
| CDO Securities | 13.64% | 21.50% |
| Floating Rate Securities | 84.12% | 90.00% |
| Fixed Rate Securities | 15.36% | 20.00% |

| Capital Structure | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
|---|---|---|---|
| Class A-1 L-A | $970.00 | AAA/Aaa | 3L + 0.25% |
| Class A-1 L-B | $352.00 | AAA/Aaa | 3L + 0.25% |
| Class A-2 | $73.50 | AAA/Aaa | 3L + 0.45% |
| Class B | $29.50 | AA/Aa2 | 3L + 0.57% |
| Class C | $67.00 | -/A3 | |
| Equity | $10.00 | NR/NR | Residual |
| | $1,502.00 | | |

| Collateral Quality Tests | Test Level | Current |
|---|---|---|
| MAC Test | 21.00% | 14.04% |
| Weighted Average Moody's Rating Factor | 52 | 51 |
| Weighted Average Spread | 0.600% | 0.641% |
| Weighted Average Coupon | 5.500% | 5.577% |
| Max. Weighted Average Life (in years) | 5.90 | 4.18 |

| Collateral Coverage Tests | Test Level | Current |
|---|---|---|
| Class A/B Overcollateralization Test | 101.10% | 105.24% |
| Class C Overcollateralization Test | 75.00% | 100.51% |

Note:
1) Source: Vanderbilt Capital Advisors trustee report. Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results





# Fort Dearborn ABS CDO

➤ As of October 2, 2006[1]

## Deal Summary

| Deal Summary | |
|---|---|
| Closing Date | August 4, 2005 |
| Substitution Period | 4 years |
| Final Maturity | September 12, 2040 |
| Total Portfolio Collateral | $495,562,908 |

## Assets

| Assets | Current |
|---|---|
| A1 | 0.99% |
| A2 | 4.99% |
| A3 | 6.60% |
| Baa1 | 12.61% |
| Baa2 | 43.64% |
| Baa3 | 26.49% |
| Ba1 | 2.59% |
| Ba2 | 2.08% |

## Capital Structure

| Capital Structure | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
|---|---|---|---|
| Class A-1 L-A | $305.00 | AAA/Aaa | 0.14% |
| Class X | $14.55 | AAA/Aaa | |
| Class A-1 L-B | $82.00 | AAA/Aaa | 3L + 0.58% |
| Class A-2L | $34.00 | AA/Aa2 | 3L + 0.68% |
| Class A-3L | $22.00 | A/A2 | 3L + 1.65% |
| Class B-1L | $25.00 | BBB/Baa2 | 3L + 2.90% |
| Equity | $22.48 | NR/NR | Residual |
| | $505.0 | | |

## Collateral Quality Tests

| Collateral Quality Tests | Current |
|---|---|
| Fitch Weighted Average Rating Factor | 19.81 |
| Moody's Weighted Average Rating Factor | 422 |
| Weighted Average Spread | 1.66% |
| MAC Test | 13.66% |

Note:
1)  Source:  Vanderbilt Capital Advisors trustee report.  Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results.

35



VANDERBILT
CAPITAL
ADVISORS

citigroup
corporate and
investment banking

# *Fort Sheridan ABS CDO*

➢ As of September 29, 2006[1]

## Deal Summary

| Closing Date | March 30, 2005 |
|---|---|
| Reinvestment Period | None |
| Final Maturity | November 5, 2041 |
| Total Portfolio Collateral | $945,056,661 |

## Assets

| | Current | Max |
|---|---|---|
| CDO Securities | 21.71% | 25.00% |
| Floating Rate Securities | 78.08% | 90.00% |
| Fixed Rate Securities | 21.56% | 20.00% |

## Capital Structure

| | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
|---|---|---|---|
| Class A-1 | $833.84 | AAA/Aaa | 3L + 0.27% |
| Class A-2 | $37.90 | AAA/Aaa | 3L + 0.50% |
| Class B | $49.27 | AA/Aa2 | 3L + 0.67% |
| Class C-1 | $12.30 | BBB/Baa2 | 3L + 2.90% |
| Class C-2 | $1.89 | BBB/Baa2 | 7.337% |
| Class C-3 | $4.00 | BBB/Baa2 | 7.538% |
| Equity | $15.00 | NR/NR | Residual |
| | $954.20 | | |

## Collateral Quality Tests

| | Test Level | Current |
|---|---|---|
| Diversity | 18.0 | 22.0 |
| Weighted Average Moody's Rating Factor | 50 | 45 |
| Weighted Average Spread | 0.76% | 0.78% |
| Weighted Average Coupon | 5.42% | 5.46% |
| Max Weighted Average Life (in years) | 6.75 | 4.14 |

## Collateral Coverage Tests

| | Test Level | Current |
|---|---|---|
| Class A/B Overcollateralization Test | 101.76% | 102.99% |
| Class C Overcollateralization Test | 100.31% | 100.99% |

Note:
1) Source: Vanderbilt Capital Advisors trustee report. Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results.



# *Dunhill ABS CDO*

✓ As of September 28, 2006[1]

| Deal Summary | |
|---|---|
| Closing Date | December 16, 2004 |
| Reinvestment Period | 3 years |
| Final Maturity | January 4, 2041 |
| Total Portfolio Collateral | $478,830,676 |

| Assets | Current | Max |
|---|---|---|
| CDO Securities | 7.14% | 7.50% |
| Floating Rate Securities | 89.74% | 95.00% |
| Fixed Rate Securities | 9.22% | 10.00% |

| Collateral Quality Tests | Test Level | Current |
|---|---|---|
| Diversity | 13.0 | 14.8 |
| Weighted Average Moody's Rating Factor | 330 | 324 |
| Weighted Average Spread | 2.100% | 2.108% |
| Weighted Average Coupon | 6.000% | 6.061% |
| Max. Weighted Average Life (in years) | 5.50 | 3.50 |

| Collateral Coverage Tests | Test Level | Current |
|---|---|---|
| Class A/B Overcollateralization Test | 103.70% | 109.04% |
| Class C Overcollateralization Test | 101.45% | 104.50% |

| Capital Structure | | | |
|---|---|---|---|
| | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
| Class A-1VA | $0.23 | AAA/Aaa | 3L + 0.32% |
| Class A-1NV | $307.23 | AAA/Aaa | 3L + 0.32% |
| Class A-1VB | $18.77 | AAA/Aaa | 3L + 0.32% |
| Class A-2 | $57.50 | AAA/Aaa | 3L + 0.55% |
| Class B | $55.00 | AA/Aa2 | 3L + 0.85% |
| Class C | $18.91 | BBB/Baa2 | 3L + 3.15% |
| Equity | $21.00 | NR/NR | Residual |
| | $478.64 | | |

Source:  Vanderbilt Capital Advisors trustee report.  Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results

Note:
1)

37





# Streeterville ABS CDO

∨ As of September 29, 2006[1]

| Deal Summary | |
|---|---|
| Closing Date | October 1, 2004 |
| Substitution Period | 3 years |
| Final Maturity | November 3, 2040 |
| Total Portfolio Collateral | $860,957,428 |

| Assets | Current | Max |
|---|---|---|
| CDO Securities | 16.13% | 25.00% |
| Synthetic Securities | 0.85% | 15.00% |
| Floating Rate Securities | 69.34% | 85.00% |
| Fixed Rate Securities | 28.17% | 25.00% |

| Capital Structure | | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
|---|---|---|---|---|
| | Class A-1 | $732.61 | AAA/Aaa | 3L + 0.35% |
| | Class A-2 | $50.00 | AAA/Aaa | 3L + 0.65% |
| | Class B-1 | $30.00 | AA/Aa2 | 3L + 0.90% |
| | Class B-2 | $37.00 | AA/Aa2 | 5.52% |
| | Class C-1 | $6.00 | A/A3 | 3L + 2.25% |
| | Class C-2 | $10.00 | A/A3 | 6.645% |
| | Equity | $15.00 | NR/NR | Residual |
| | | $880.6 | | |

| Collateral Quality Tests | Test Level | Current |
|---|---|---|
| Diversity | 17.0 | 18.8 |
| Weighted Average Moody's Rating Factor | 29 | 31 |
| Weighted Average Spread | 0.790% | 0.850% |
| Weighted Average Coupon | 5.450% | 5.525% |
| Moody's Weighted Average Recovery | 50.00% | 56.00% |
| Max Weighted Average Life (in years) | 7.25 | 5.54 |

| Collateral Coverage Tests | Test Level | Current |
|---|---|---|
| Overcollateralization Test | 100.93% | 102.00% |

Note:
1)

Source: Vanderbilt Capital Advisors trustee report. Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results





39



# Sky River CDO

▼ As of September 29, 2006[1]

| Deal Summary | |
|---|---|
| Closing Date | September 2, 2004 |
| Reinvestment Period | None |
| Final Maturity | August 20, 2009 |
| Total Portfolio Collateral | $407,480,814 |

| Assets | Current |
|---|---|
| RMBS | 100.00% |

| Capital Structure | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
|---|---|---|---|
| Class A | $20.66 | AAA/Aaa | |
| | $20.66 | | |

| Distribution of S&P Ratings | Principal Balance | % of Notional |
|---|---|---|
| A+ | $5,000,000 | 1.23% |
| A | $20,500,000 | 5.03% |
| A- | $46,133,589 | 11.32% |
| BBB+ | $78,379,586 | 19.24% |
| BBB | $161,637,744 | 39.67% |
| BBB- | $95,829,894 | 23.52% |

Note:
1)

Source: Vanderbilt Capital Advisors trustee report. Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results





# *Lakeside II CDO*

⌄ As of September 26, 2006[1]

| Deal Summary | |
| --- | --- |
| Closing Date | March 31, 2004 |
| Reinvestment Period | None |
| Final Maturity | January 2, 2040 |
| Total Portfolio Collateral | $1,217,135,798 |

| Assets | Current | Max |
| --- | --- | --- |
| CDO Securities | 26.46% | 50.00% |
| Floating Rate Securities | 73.61% | 90.00% |
| Fixed Rate Securities | 23.94% | 20.00% |

| Capital Structure | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
| --- | --- | --- | --- |
| Class A-1 | $884.19 | AAA/Aaa | 3L + 0.38% |
| Class A-2 | $279.90 | NR/Aaa | 3L + 1.03% |
| Class B | $15.00 | A-/A3 | 3L + 1.65% |
| Class C | $14.55 | BBB/Baa2 | 3L + 3.25% |
| Equity | $21.60 | NR/NR | Residual |
| | $1,215.25 | | |

| Collateral Quality Tests [2] | Test Level | Current |
| --- | --- | --- |
| Diversity | 20.0 | 19.0 |
| Weighted Average Moody's Rating Factor | 27 | 26 |
| Weighted Average Spread | 0.79% | 0.87% |
| Weighted Average Coupon | 5.10% | 5.27% |
| Moody's Weighted Average Recovery | 50.00% | 58.53% |
| Max Weighted Average Life (in years) | 7.50 | 6.55 |

| Collateral Coverage Tests | Test Level | Current |
| --- | --- | --- |
| Overcollateralization Test | 100.25% | 101.92% |

Note:
1)
Source: Vanderbilt Capital Advisors trustee report. Parameters on the Armilage CDO transaction may be different from above and past performance is no guarantee of future results

40





# Lakeside I CDO

- As of September 7, 2006[1]

## Deal Summary

| | |
|---|---|
| Closing Date | December 11, 2003 |
| Reinvestment Period | None |
| Final Maturity | December 7, 2039 |
| Total Portfolio Collateral | $596,402,885 |

## Assets

| | Current | Max |
|---|---|---|
| CDO Securities | 43.72% | 50.00% |
| Floating Rate Securities | 75.09% | 90.00% |
| Fixed Rate Securities | 21.17% | 20.00% |

## Capital Structure

| | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
|---|---|---|---|
| Class A-1 | $419.78 | AAA/Aaa | CP |
| Class A-2 | $152.00 | NR/Aaa | AMPS |
| Class B | $8.52 | NR/Baa2 | 3L + 3.25% |
| Equity | $15.00 | NR/NR | Residual |
| | $595.30 | | |

## Collateral Quality Tests [2]

| | Test Level | Current |
|---|---|---|
| Diversity | 20.0 | 30.0 |
| Weighted Average Moody's Rating Factor | 18 | 11 |
| Weighted Average Spread | 0.80% | 0.88% |
| Weighted Average Coupon | 5.35% | 5.50% |
| Moody's Weighted Average Recovery | 55.00% | 62.00% |
| Max Weighted Average Life (in years) | 8.00 | 4.22 |

## Collateral Coverage Tests

| | Test Level | Current |
|---|---|---|
| Overcollateralization Test | 100.25% | 102.64% |

Note:
1)

Source: Vanderbilt Capital Advisors trustee report. Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results

41





42

# Grand Central CDO

∨   Redeemed in December 2005[1]

| Deal Summary | |
|---|---|
| Closing Date | July 30, 2003 |
| Reinvestment Period | None |
| Final Maturity | September 10, 2038 |
| Total Portfolio Collateral | $239,491,979 |

| Assets | At Redemption | Requirement |
|---|---|---|
| Asset Backed Securities | 100.00% | 100.00% |
| Floating Rate Securities | 49.20% | |
| Fixed Rate Securities | 48.50% | |

| Capital Structure at Redemption | | | |
|---|---|---|---|
| | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
| Class A-1 | $138.60 | A-1/Aaa | 3L + 0.15% |
| Class A-1L A | $32.30 | AAA/Aaa | 3L + 0.55% |
| Class A-1L B | $25.00 | AAA/Aaa | 3L + 0.90% |
| Class A-2 | $25.00 | AA+/Aa1 | 3L + 1.50% |
| Class B-1L | $13.30 | A-/Baa1 | 3L + 3.25% |
| Equity | $15.00 | NR/NR | Residual |
| | $249.20 | | |

| Collateral Quality Tests [2] | At Redemption |
|---|---|
| Diversity | 32.4 |
| Weighted Average Moody's Rating Factor | 211.6 |
| Weighted Average Spread | 2.17% |
| Weighted Average Coupon | 5.20% |
| Moody's Weighted Average Recovery | 43.73% |
| Max Weighted Average Life (in years) | 4.10 |

| Collateral Coverage Tests | Test Level | At Redemption |
|---|---|---|
| Class A/B Overcollateralization Test | 104.00% | 110.90% |
| Class C Overcollateralization Test | 101.50% | 104.70% |

Note:
1)

Source:  Vanderbilt Capital Advisors trustee report.  Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results



VANDERBILT CAPITAL ADVISORS

citigroup
corporate and
investment banking

43

# *Bristol CDO I*

- As of October 1, 2006[1]

| Deal Summary | |
|---|---|
| Closing Date | October 11, 2002 |
| Reinvestment Period | None |
| Final Maturity | October 11, 2037 |
| Total Portfolio Collateral | $141,944,404 |

| Assets | Current |
|---|---|
| CDO Securities | 14.09% |
| Floating Rate Securities | 52.88% |
| Fixed Rate Securities | 47.12% |

| Capital Structure | Amount $(MM) | Ratings (S&P/Moody's) | Coupon |
|---|---|---|---|
| Class A-1 | $88.07 | AAA/Aaa | 3L + 0.60% |
| Class A-2 | $8.08 | AAA/Aaa | 3L + 1.04% |
| Class B | $30.00 | A/A2 | 3L + 3.25% |
| Class C | $13.24 | CCC+/Caa3 | 3L + 3.25% |
| Equity | $15.00 | NR/NR | Residual |
| | $154.38 | | |

| Collateral Quality Tests [2] | Current |
|---|---|
| Diversity | 30.0 |
| Weighted Average Moody's Rating Factor | 1,392 |
| Weighted Average Spread | 1.30% |
| Weighted Average Coupon | 7.17% |
| Moody's Weighted Average Recovery | 45.60% |
| Max Weighted Average Life (in years) | 3.60 |

| Collateral Coverage Tests | Test Level | Current |
|---|---|---|
| Class A/B Overcollateralization Test | 104.50% | 103.29% |
| Class C Overcollateralization Test | 102.00% | 93.29% |

Note:
1)
Source: Vanderbilt Capital Advisors trustee report. Deal was closed by previous management and inherited by the current management team. Bristol is a static transaction with no ongoing collateral reinvestment eligibility tests. Parameters on the Armitage CDO transaction may be different from above and past performance is no guarantee of future results

VANDERBILT CAPITAL ADVISORS

citigroup
corporate and
investment banking

# E. Biographies of Key Investment Professionals



# Biographical Information



**Patrick A. Livney**
Senior Managing Director

Mr. Livney is a Senior Managing Director and the Head of the Structured Finance Group of Vanderbilt Capital Advisors, LLC, a position he has held since June 2003. In addition, Mr. Livney is the Chief Executive Officer and a Director of Vanderbilt Financial, LLC. Previously, Mr. Livney was a founding Partner of Meritus Asset Management, where he worked from March 2002 to May 2003. From March 2000 to February 2002, he was a Partner at Asset Allocation & Management Company, responsible for the CDO platform and marketing. Prior to that, from 1986 through 2000, Mr. Livney worked in institutional fixed income sales on Wall Street where he specialized in structured finance products. Mr. Livney serves on the Board of Directors of the Ascendant Structured Credit Opportunity Master Fund, Ltd., on the Board of Directors of the CMTA, and on the Steering Committee of the American Securitization Forum CDO Collateral Managers Subforum. He is a frequent speaker at industry conferences. Mr. Livney holds a B.S. in Industrial Engineering from Roosevelt University, Chicago. He has twenty-one years of investment experience.

**Kurt W. Florian**
Chief Operating Officer and Counsel

Mr. Florian is the Chief Operating Officer and Counsel of the Structured Finance Group of Vanderbilt Capital Advisors, LLC. In addition, he is the Chief Operating Officer and Counsel of Vanderbilt Financial, LLC. Previously, from 1998 to 2005, Mr. Florian was a partner at the law firm of Katten Muchin Rosenman LLP in Chicago, where he was co-chair of the securitization practice and focused on securitization and other corporate transactions. From 1995 to 1998, Mr. Florian was a partner at the law firm of Lord Bissell & Brook, where he was an Associate from 1984 to 1995. He is also an Adjunct Professor at the Chicago-Kent College of Law of the Illinois Institute of Technology. In addition, Mr. Florian is a member of the Board of Directors of the Ascendant Structured Credit Opportunity Master Fund, Ltd., and the Epilepsy Foundation of Greater Chicago. He holds a B.A. from the University of Chicago, and a J.D. from Duke University School of Law. He has twenty-three years of experience.

44



citigroup
corporate and
investment banking

# Biographical Information

**Stephen C. Bernhardt**
Senior Portfolio Manager

Mr. Bernhardt is a Senior Portfolio Manager at Vanderbilt Capital Advisors, LLC. He is also the Senior Vice President – Head of Investor Relations of Vanderbilt Financial, LLC. Mr. Bernhardt focuses on the CDO and ABS sectors with an emphasis on the structured finance CDO market. Mr. Bernhardt was employed by Meritus Asset Management from August 2002 to June 2003. Previously, Mr. Bernhardt traded mortgage backed and asset backed securities at Prudential Securities, Smith Barney, Asset Allocation & Management Company, and Dean Witter Reynolds. Mr. Bernhardt holds a B.A. from Brown University. He has twenty-two years of investment experience.

**Ali Haghighat**
Senior Portfolio Manager

Mr. Haghighat is a Senior Portfolio Manager at Vanderbilt Capital Advisors, LLC. Mr. Haghighat focuses on the mortgage market with an emphasis on the Sub-Prime Residential sector of the ABS/MBS market. He joined the Investment Manager from Standish Mellon Asset Management where he managed ABS and RMBS securities, developed the RMBS credit platform, and was a senior member of the structured finance CDO group. Prior to that, he was a structured debt research analyst at Banc One Capital Markets and a credit manager within the bank's securitization conduit. Mr. Haghighat has an M.B.A. from Loyola University and a B.S. from the University of Wisconsin-Madison. He has eight years of investment experience.

**Edward J. O'Hara**
Senior Portfolio Manager

Mr. O'Hara is a Senior Portfolio Manager and head of the ABS CDO Group within the Structured Finance Group of Vanderbilt Capital Advisors, LLC. He is also the Chief Investment Officer of Vanderbilt Financial, LLC. Mr. O'Hara focuses on the mortgage sector with an emphasis on the Residential A and Alt A sector of the ABS/MBS market. He was previously a Managing Director at INVESCO where he specialized in Mortgage-backed and Asset-backed securities. Prior to that, he was a Senior Portfolio Manager at Ark Asset Management serving in a similar capacity. Mr. O'Hara holds a B.S. in accounting from the University of Bridgeport. He has twenty-four years of investment experience.

**Lawrence R. Zeno**
Senior Portfolio Manager

Mr. Zeno is a Senior Portfolio Manager at Vanderbilt Capital Advisors, LLC. Mr. Zeno focuses on the sub-prime and second lien residential ABS market, as well as the CMBS sector. Previously, he held the position of Senior Manager of trading and was a partner at Asset Allocation & Management Company, where he also managed the ABS/CMBS Structured Finance portfolio, including the CDOs under management. Mr. Zeno holds a B.A. from Northwestern University. He has eighteen years of investment experience.

45


citigroup
corporate and
investment banking

# Biographical Information



| | |
|---|---|
| **Ben Safanda**<br>Portfolio Manager | Mr. Safanda is a Portfolio Manager at Vanderbilt Capital Advisors, LLC. Mr. Safanda focuses on quantitative analysis across all of the market sectors. He assists in the monitoring of secondary CDO positions, and tracking transaction cash flows. Mr. Safanda was employed by Meritus Asset Management from August 2002 to June 2003. Previously, he supported the CDO platform at Asset Allocation & Management Company. He holds a B.A. from Haverford College. He has six years of investment experience. |
| **Nicolas N.M. Pauwels**<br>Portfolio Manager | Mr. Pauwels is a Portfolio Manager at Vanderbilt Capital Advisors, LLC. He focuses on ABS CDO quantitative risk management methodology and RMBS surveillance analytics. He is also responsible for the development and implementation of proprietary programs and databases across the ABS CDO platform as well as the modeling of cash flows. Previously, Mr. Pauwels was a trader at KBC Bank where he traded Eurobonds and emerging markets forwards. He holds an M.B.A. in analytic finance from the University of Chicago, a MS in Tax Management from Solvay Business School, Belgium, and a MS in Applied Economics from the Katholieke Universiteit Leuven, Belgium. He has eight years of investment experience. |
| **Robert Salazar**<br>Senior Administrative Officer - CDOs | Mr. Salazar is a Senior Administrative Officer at Vanderbilt Capital Advisors, LLC. Before joining Vanderbilt, he was a Vice President at LaSalle Bank N.A., where he worked on the closings and modeling of new transactions, while providing oversight on a portfolio of ABS CDOs and Synthetic CDOs. He holds an MBA from DePaul University and a B.S. in Finance from the University of Illinois-Champaign. Mr. Salazar has successfully completed the CFA Level III exam and has six years of investment experience. |

46



# *Biographical Information*

| | |
|---|---|
| **Weixiong Li, Ph.D.**<br>Senior Quantitative Analyst | Dr. Li is a Senior Quantitative Analyst at Vanderbilt Capital Advisors, LLC. Dr. Li focuses on credit market analytics, risk management methodology and implementation, as well as investment ideas, research, and testing. Dr. Li joined Vanderbilt Capital Advisors from Bank One/JPMorgan, where he was Director of Portfolio Analytics in the Credit Portfolio Management Group. Prior to that, he was Vice President of Enterprise Risk Management at ABN AMRO North America, Research Programmer/Trader at Klee Research and Trading, Industry Analyst at First Chicago Corporation, and Postdoctoral Research Fellow at the Materials Science and Engineering Department of the University of Pittsburgh. He holds a B.S. from Fudan University in China, and an M.S. and Ph.D. from the Carnegie Mellon University, all majoring in theoretical physics. Dr. Li has been a speaker at various conferences and has published research papers in Risk Magazine and other journals. He has eleven years of investment experience. |
| **David E. Ortiz, CFA**<br>Senior Portfolio Manager | Mr. Ortiz is a Senior Portfolio Manager at Vanderbilt Capital Advisors, LLC. Mr. Ortiz manages the Investment Manager's corporate CDO platform and focuses on structured credit products research and trading. He has broad experience in quantitative credit research and has worked closely with CreditSights, Inc. in the portfolio management application of the BondScore model and UBS CreditDelta portfolio optimization module. Previously, he held the position of Partner at Asset Allocation & Management Company responsible for private placement portfolio management and cyclical public corporate credit research and trading. Prior to that, he worked as a corporate credit research analyst for Prudential Capital's Private Placement Group. Mr. Ortiz holds an M.B.A. in finance from the University of Chicago and a B.S. in finance from Miami University of Ohio. He has fourteen years of investment experience. |





47

# 3. Risk Factors







# *Risk Factors*

***Prospective investors in the Notes and the Preferred Shares should consider, among other things, the following factors in connection with the purchase of the securities. A more detailed description of the risks associated with an investment in the Notes and the Preferred Shares is available in the Offering Memorandum pursuant to which the Securities will be offered.***

➢Limited Recourse Obligations. The Issuer is a recently formed entity with no prior operating history or business, and, as a special purpose company will have no significant assets other than the Collateral Debt Securities and its interest in its hedge agreements. Except for the Issuer, no person or entity will be obligated to make any payments on the Securities. Consequently, the holders of the Securities must rely solely on distributions on the Issuer's assets for payment. If distributions from the portfolio of Collateral Debt Securities (the "Portfolio") are insufficient to make payments on the Securities, no other assets of the Issuer or any other person or entity will be available for payment of the deficiency. The Securities will not represent interests in or obligations of Citigroup, the Collateral Manager or any of their respective subsidiaries or affiliates.

➢Subordination. Payments on the Securities are subject to the priority of payments provisions (the "Priority of Payments") in the final Offering Memorandum. Under such provisions, the Preferred Shares are subordinated to the Notes and to the payment of certain fees and expenses. In addition, the most senior class of Notes outstanding at any time may be entitled to determine the remedies to be exercised by the trustee, which may be adverse to the holders of the Preferred Shares and the subordinate classes of Notes. If any collateral coverage test is not met at any time, certain amounts that otherwise would have been paid to the holders of the Preferred Shares and the subordinate classes of Notes and certain other amounts will instead be used to redeem, generally first, the most senior class of Notes then outstanding to the extent necessary to restore the applicable test to the minimum required level. Losses on credit impaired Collateral Debt Securities in the Portfolio are allocated first to the Preference Shareholders.

The Preferred Shares will be treated as equity in the Issuer and are not secured by the Collateral Debt Securities. Pursuant to the Priority of Payments, the holders of the Preferred Shares will rank behind all of the creditors of the Issuer, including, without limitation, the holders of the Notes, the Collateral Manager, the hedge counterparty and any judgment creditors. Except with respect to the obligations of the Issuer to make payments pursuant to the Priority of Payments, the Issuer does not expect to have any other creditors. The holders of Preferred Shares are not entitled to a stated return on their investment.

# Risk Factors (cont.)

▾ Nature of the Collateral Pledged to Secure the Notes; Credit and Liquidity Risk. The Collateral Debt Securities are expected to be comprised primarily of mortgage-backed securities and other asset backed securities. Factors affecting the performance of the Collateral will include, but not be limited to, the general economic conditions in the area the property is located, the financial circumstances of the borrower, liquidity risks, changes in interest rates, market risks, operations risks, risks associated with the structure of underlying securities, political events, prepayment volatility, and industry trends. Any Collateral Debt Security rated below investment grade will have greater credit risk than higher rated Collateral Debt Securities. The lower rating of securities reflects a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the issuer to make payments of principal and interest. In addition to credit risk, any Collateral Debt Securities rated below investment grade will have greater liquidity risk and volatility than higher rated Collateral Debt Securities. The credit risk associated with the Collateral Debt Securities will be heightened to the extent the Collateral Debt Securities are concentrated in particular issuers, industries, countries or regions that are adversely affected by the factors above.

▾ Risks Associated with RMBS securities. The loans underlying RMBS securities generally do not restrict prepayments or require the payment of prepayment penalties. As a result, prepayments are likely to increase in lower interest rate environments, which may result in a reduction in yield to maturity for holders of RMBS securities. The origination and servicing of the mortgage loans may be subject to various federal and state laws and regulations with respect to interest rates and other charges, or may require certain disclosures, require licensing of originators, prohibit discriminatory lending practices, regulate the use of consumer credit information and debt collection practices and may limit the servicer's ability to collect all or part of the principal of or interest on a residential mortgage loan, entitle the borrower to a refund of amounts previously paid by it or subject the servicer to damages and sanctions.

▾ Risks Associated with CMBS securities. Commercial mortgage loans underlying CMBS securities are subject to particular risks, including lack of standardized terms, shorter maturities than residential mortgage loans and payment of all or substantially all of the principal only at maturity rather than regular amortization of principal. Additional risks may be presented by the type and use of a particular commercial property. Special risks are presented by hospitals, nursing homes, hospitality properties and certain other property types. Furthermore, the net operating income from and value of any commercial property is subject to various risks, including changes in general or local economic conditions and/or specific industry segments; declines in real estate values; declines in rental or occupancy rates; increases in interest rates; real estate tax rates and other operating expenses; changes in governmental rules; regulations and fiscal policies; acts of God; terrorist threats and attacks; and social unrest and civil disturbances.





49

# Risk Factors (cont.)

- Risks Associated with REIT debt securities. Risks of REIT debt securities may include (among others): (i) limited liquidity and limited secondary market support, (ii) substantial market price volatility resulting from changes in prevailing interest rates, (iii) subordination to the prior claims of banks and other senior lenders, (iv) the operation of optional redemption or sinking fund provisions during periods of declining interest rates, (v) the possibility that income of the issuer of the REIT debt security may be insufficient to meet its debt service and (vi) the declining creditworthiness and potential for insolvency of the issuer of the REIT debt security during periods of rising interest rates and economic downturn.

- Default Rates of Mortgage-Backed Securities and Other Asset-Backed Securities. The Issuer is not aware of a central source for relevant data or standardized method for measuring default rates of mortgage backed securities or other asset backed securities. Furthermore, historical performances of these types of securities are not necessarily indicative of future market performance. In certain circumstances, it is possible that investors in the Securities will not recover their original investment. PROSPECTIVE PURCHASERS OF THE SECURITIES SHOULD CONSIDER AND ASSESS FOR THEMSELVES THE LIKELY LEVEL OF DEFAULTS, THE LIKELY LEVEL AND TIMING OF RECOVERIES ON THE COLLATERAL DEBT SECURITIES, AND THE LIKELY LEVELS OF INTEREST RATES DURING THE TERM OF THE TRANSACTION.

- Unforeseen Economic Scenarios Specific to Real Estate Related Securities. Rating agencies' assumptions for real estate related securities and for structures such as the Issuer have not been tested in all conceivable credit environments. If the assumptions prove to be incorrect over a period of time, the Issuer's performance and hence the performance of the securities could be negatively affected. Moreover, real estate related securities generally have significantly more variability in the principal cash flow timing than other fixed income assets such as corporate bonds. Cash flow timing is sensitive to many factors including changes in interest rates, banks' willingness to extend or renew credit, the creditworthiness of consumers, strength of the real estate market, existence of prepayment penalties, etc. Variation in the principal cash flow timing may negatively impact the returns on the Securities.





51

# Risk Factors (cont.)

∨ Synthetic Securities. A portion of the Collateral Debt Securities included in the Collateral may consist of synthetic securities the reference obligations of which are asset-backed securities. Investments in such types of assets through the purchase of synthetic securities present risks in addition to those resulting from direct purchases of such Collateral Debt Securities. With respect to synthetic securities, the Issuer will usually have a contractual relationship only with the counterparty of such synthetic security, and not the reference obligor on any related reference obligation. The Issuer generally will have no right directly to enforce compliance by the reference obligor with the terms of either the reference obligation or any rights of set-off against the reference obligor, nor will the Issuer generally have any voting or other consensual rights of ownership with respect to any related reference obligation. The Issuer will not benefit from any collateral supporting any related reference obligation and will not have the benefit of the remedies that would normally be available to a holder of such reference obligation. In addition, in the event of the insolvency of the counterparty, the Issuer will be treated as a general creditor of such counterparty, and will not have any claim of title with respect to the reference obligation. Consequently, the Issuer will be subject to the credit risk of the counterparty as well as that of the reference obligor. As a result, concentrations of synthetic securities entered into with any one counterparty will subject the Securities to an additional degree of risk with respect to defaults by such counterparty as well as by the reference obligor.

∨ Limited Liquidity; Restrictions on Transfer. There is no market for the Securities and it is highly unlikely that an active secondary market for the Securities will develop. As a result, a purchaser must be prepared to hold the Securities for an indefinite period of time or until the maturity of the Notes. The Securities have not been and will not be registered under the United States Securities Act of 1933, as amended, or state securities laws. Blue Sky laws or the securities laws of any other jurisdiction and there are restrictions on the transfer thereof.

∨ Concentration Risk. Concentration with respect to any particular obligor, servicer, region or industry will be limited as set forth in the reinvestment criteria including the Portfolio percentage limitations in the final Offering Circular. However, there can be no assurance that the reinvestment criteria will be adequate to protect investors from risk with respect to any one industry, region or collateral type or any particular obligor or servicer. In addition, the reinvestment criteria only apply on the date of purchase of Collateral Debt Securities and therefore, may not provide adequate protection against concentration in any particular obligor, servicer, region or industry after such purchase.





# Risk Factors (cont.)

▾ Hedge Counterparty Risk. The Issuer will enter into hedging contracts with counterparties. Pursuant to such contracts, the hedge counterparties agree to make payments to the Issuer as described therein and the Issuer will be exposed to credit risk of the hedge counterparties with respect to such payments. Unless the hedge counterparty has been required to post collateral to the Issuer and has actually done so, the Issuer will be treated as a general unsecured creditor in the event of the insolvency of the hedge counterparty.

▾ Redemption of Securities; Auction Call Redemptions; Potential Illiquidity and Volatility of Collateral Market Value. An optional redemption, withholding tax redemption or an auction call redemption would result in a liquidation and sale of the collateral into the then-existing markets. The market value of the collateral will generally fluctuate. A decrease in the market value of the Collateral would adversely affect the sale proceeds and therefore the distribution to the Preferred Shares. Because the collateral will generally be illiquid, the par value of the assets may not reflect the actual market value of the assets.

▾ Underwriting Standards and Conditions in the Sub-Prime Mortgage Market. Certain Collateral Debt Securities will be backed by sub-prime mortgages originated using underwriting standards that are less restrictive than the underwriting standards for agency programs such as Fannie Mae. Applying less restrictive underwriting standards creates additional risks of losses on the Collateral Debt Securities, which would be allocated first to the Preferred Shares. This redirection of cash flows will negatively affect the returns to the Preferred Shares and, to a lesser extent the subordinate classes of Notes. Recent increases in the default rates by sub-prime borrowers and the discovery of fraudulent mortgage applications in connection with such defaults may imply that the risks with respect to sub-prime loans are particularly acute at this time and such risks may result in further increases in default rates by sub-prime borrowers as it becomes more difficult for sub-prime borrowers to obtain refinancing.

▾ Fixed/Floating Interest Rate Mismatch Risk. Although it is expected that the Issuer will enter into an interest rate hedge agreement, which will be used to exchange fixed rate payments for a LIBOR based floating rate payment to provide a source of funding for the floating rate interest payments on the Notes, under certain circumstances a fixed/floating interest rate mismatch will exist between the Notes and the underlying Collateral Debt Securities. Such mismatch may adversely affect the Issuer's ability to pay amounts due on the Notes or to be paid to the Preferred Shares.




53

# Risk Factors (cont.)

**Collateral Coverage Tests.** If any collateral coverage tests are not met at any time, certain amounts that otherwise would have been paid to the holders of the Preferred Shares and the subordinate classes of Notes and certain other amounts will instead be used to redeem, generally first, the most senior class of Notes then outstanding to the extent necessary to restore the applicable test to the minimum required level. This redirection of cash flow will negatively affect the returns to the Preferred Shares and, to a lesser extent the subordinate classes of Notes. This may result in a temporary or permanent reduction of payments to the holders of the Securities. In the event of a cash flow diversion, the holders of the Securities may incur taxes on "phantom income".

**Potential Conflicts of Interest.** Prior to closing, Citigroup and its affiliates will have warehoused the initial Collateral Debt Securities prior to their purchase by the Issuer and will transfer the initial Collateral Debt Securities to the Issuer (on the closing date) at the original accumulation price. Certain Collateral Debt Securities may be securities of issuers for which Citigroup, Vanderbilt or their respective affiliates have acted as underwriter, agent, placement agent or principal or for which Citigroup or its affiliates is an equity owner. In connection with the original issuance of the Collateral Debt Securities, Citigroup may have placed or underwritten some Collateral Debt Securities purchased by the Issuer on the Closing Date and Citibank N.A. may serve as counterparty under the synthetic securities. In addition, the Collateral Manager and its affiliates may have equity and other investments in, and have other ongoing relationships with issuers of the Collateral Debt Securities. The Collateral Manager also serves as investment advisor to other collateralized debt obligation issuers that may seek to invest in securities similar to the Collateral Debt Securities and affiliates of the Collateral Manager are expected to act as servicer for the underlying issuers of certain Collateral Debt Securities. Consequently, the Collateral Manager and Citigroup may have conflicts of interest in allocating between the investments of the Issuer and of Citigroup, the Collateral Manager and their respective principals, officers, employees and affiliates. In addition, it is expected that the Collateral Manager or related parties will purchase for its own account up to [100]% of the Preferred Shares on the Closing Date and may from time to time own other classes of the Securities and may invest in securities issued by the issuers of the Collateral Debt Securities that are senior or subordinate to such Collateral Debt Securities. As a holder of certain classes of Securities or securities senior or subordinate to Collateral Debt Securities, the Collateral Manager may have interests adverse to the holders of the Securities or certain classes of Securities. Certain affiliates of Citigroup (such as The Citigroup Private Bank) may also receive referral fees for referring investors to Citigroup in Citigroup's capacity as placement agent. These affiliates in some instances may receive higher compensation from Citigroup for selling or referring investment products structured and placed by Citigroup or for the account of affiliates than if they sold a similar product that was not structured and placed by Citigroup.





# Risk Factors (cont.)

- **Sale of Collateral Upon Default.** The market value of the Collateral Debt Securities will generally fluctuate with, among other things, changes in market rates of interest, general economic conditions, world political events, developments or trends in any particular industry, the conditions of financial markets and the financial condition of the issuers of securities similar to the Preferred Shares and the Notes. If an event of default occurs with respect to the Notes, there can be no assurance that the proceeds of any sale by the trustee of Collateral Debt Securities will be sufficient to pay in full any amounts payable to the trustee, the Collateral Manager, any hedge counterparty and the expenses of the Issuer and the principal of and interest on the Notes (all of which amounts are payable prior to payments in respect of the Preferred Shares). Any such shortfall would adversely affect the Issuer's ability to make distributions on the Preferred Shares.

- **Reinvestment Risk/Uninvested Cash Balances.** Although it is expected that the Issuer will invest primarily in real estate related securities, the Issuer may find that, as a practical matter, these investment opportunities are not available to it for a variety of reasons. For instance, at any time there may be a limited universe of investments that would satisfy the reinvestment criteria given the Collateral Debt Securities then held by the Issuer. As a result, the Issuer may at times find it difficult to purchase suitable investments to replace prepaid or sold securities. In general, if cash balances remain uninvested, the adverse impact on portfolio income increases concomitantly with increases in the amount of such balances and the length of time uninvested, which will reduce amounts available for payment on the Notes and the Preferred Shares. The extent to which cash balances remain uninvested will be subject to a variety of factors, including future market conditions, and is difficult to predict.

- **Servicer Risk.** Real estate related securities (RMBS and commercial mortgaged backed securities) typically have a "servicer" who is responsible for collecting payments on the underlying loans and pursuing delinquencies. If the servicer experiences financial or administrative problems, there could be a disruption to cash flows on the real estate related securities.





# Risk Factors (cont.)

**Non-Voting by Holders Treated as Affirmative Vote on Certain Matters.** In certain circumstances in which holders of Securities are permitted to vote, a failure to cast a vote, including an abstention, will be treated as a vote in favor of the underlying proposal. Each holder of Securities should pay particular attention to any request for a vote on any matter that may affect its interests.

**Long Term Investment – Stated Maturity Date, Average Life and Prepayment Considerations.** The stated maturity date of each class of Notes and the Preferred Shares is a payment date occurring 40 years from the Closing Date (2047). The average lives of each class of Notes are expected to be shorter than the number of years until their respective stated maturity dates, and such average lives may vary due to various factors affecting the early retirement of Collateral Debt Securities, any sales of such Collateral Debt Securities and the occurrence of principal prepayments. Generally, a higher level of prepayments would be expected in a decreasing rate environment. This should be viewed as a long-term investment. On a payment date [8] years from the Closing Date, the trustee will conduct an auction and liquidate the Portfolio provided certain conditions are met. Liquidation proceeds will be used to pay outstanding expenses, hedging costs, retire any outstanding Notes and any excess will be paid to the Preferred Shares. If certain conditions are not met, the auction will be delayed and re-attempted on the following monthly or quarterly payment date. The timing of the liquidation and the proceeds thereof will affect the returns on the Preferred Shares.

**Purchase of Collateral Debt Securities on or Prior to the Closing Date.** The Collateral Manager has entered into a warehouse facility (the "Warehouse Facility") with Citigroup or one of its affiliates, pursuant to which Citigroup will acquire Collateral Debt Securities and enter into hedging arrangements for the benefit of the Issuer. The Issuer will be required to purchase eligible Collateral Debt Securities in the Warehouse Facility for inclusion in the Collateral on the Closing Date. The purchase price payable by the Issuer for such Collateral Debt Securities will be based on the purchase price paid when such Collateral Debt Securities were acquired under the Warehouse Facility, accrued and unpaid interest on such Collateral Debt Securities as of the Closing Date and gains or losses incurred in connection with the related hedging arrangements. The Issuer will bear the risk of market changes subsequent to the acquisition of Collateral Debt Securities and hedging arrangements as if it acquired such assets directly prior to the Closing Date. Accordingly, the Issuer may be obligated to pay a higher purchase price for eligible Collateral Debt Securities than it would have had it purchased such assets in the market on the Closing Date.





55

56

# Risk Factors (cont.)

▾ Insolvency Considerations with Respect to Issuers of Collateral Debt Securities. Various laws enacted for the protection of creditors may apply to the Collateral Debt Securities included in the Collateral. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an issuer of any such Collateral Debt Security, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting such Collateral Debt Security and, after giving effect to such indebtedness, the issuer (i) was insolvent, (ii) was engaged in a business for which the remaining assets of such issuer constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, subordinate such indebtedness to existing or future creditors of the issuer or recover amounts previously paid by the issuer in satisfaction of such indebtedness. There can be no assurance as to what standard a court would apply in order to determine whether the issuer was insolvent after giving effect to the incurrence of the indebtedness constituting such Collateral Debt Security or that, regardless of the method of valuation, a court would not determine that the issuer was insolvent upon giving effect to such incurrence. In addition, in the event of the insolvency of an issuer of a Collateral Debt Security included in the Collateral, payments made on such Collateral Debt Security could be subject to avoidance as a preference if made within a certain period of time (which may be as long as one year and one day) before bankruptcy.

In general, if payments on a Collateral Debt Security are avoidable, whether as fraudulent conveyances or as preferences, such payments can be recaptured either from the initial recipient (such as the Issuer) or from subsequent transferees of such payments (such as the holders of the Securities). To the extent that any such payments are recaptured from the Issuer, the resulting loss will be borne by the holders of the Preferred Shares and the Notes in the reverse order of seniority. However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a holder of Securities only to the extent that such court has jurisdiction over such holder or its assets.

▾ Withholding on the Notes. The Issuer expects that payments of principal and interest on the Securities will ordinarily not be subject to withholding tax in the Cayman Islands, the United States or any other jurisdiction. In the event that tax must be withheld or deducted from payments of principal or interest, the Issuer shall not be obligated to make any additional payments to the holders of any Securities on account of such withholding or deduction.





# Risk Factors (cont.)

- **U.S. Taxes on the Issuer.** The Issuer expects to conduct its affairs so that its income generally will not be subject to tax on a net income basis in the United States or any other jurisdiction. The Issuer also expects that payments received under the Collateral Debt Securities generally will not be subject to withholding tax imposed by the United States or other countries that may be treated as the source of the payments. The Issuer's income might become subject to net income or withholding taxes in the United States or other jurisdictions, however, due to unanticipated circumstances, change in law or contrary positions of relevant tax authorities or other causes. The imposition of unanticipated net income or withholding taxes on the Issuer could materially impair the Issuer's ability to make payments on the Notes and Preferred Shares.

- **Tax Treatment of Notes.** Holders of Notes will be required to treat the Notes as debt for U.S. federal income tax purposes. It is possible that the treatment of the Notes, particularly the Class B Notes and the Class C Notes, as debt of the Issuer could be challenged by the U.S. Internal Revenue Service. If such a challenge were successful, the affected Notes would be treated as equity securities of the Issuer, and the U.S. federal income tax consequences of investing in those Notes would be similar to the consequences of investing in the Preferred Shares without electing to treat the Issuer as a qualified electing fund.

- **Tax Considerations.** The tax aspects of an investment in Armitage ABS CDO Ltd. are complicated and each investor should have them reviewed by professional advisers familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and Armitage ABS CDO Ltd. Armitage ABS CDO Ltd. does not intend and should not be expected to provide any tax shelter.

- **Possibility of Taxation of Income without Corresponding Distribution.** Armitage ABS CDO Ltd. may derive income from their investments that is not matched by corresponding distributions of cash. Because the Issuer will be a passive foreign investment company, a U.S. person holding Preferred Shares may be subject to additional taxes unless it elects to treat the Issuer as a qualified electing fund and to recognize currently its proportionate share of the Issuer's income. The Issuer also may be a controlled foreign corporation, in which case U.S. persons holding Preference Shares could be subjected to different tax treatments. As a result, an investor's U.S federal and other income tax liabilities with respect to its allocable share of Armitage ABS CDO Ltd's income in a particular tax year could exceed the cash distributions to such investor for such year





57

# *Risk Factors (cont.)*

- Annual Tax Information. It is expected that annual tax information from the Armitage ABS CDO Ltd. may not be received in sufficient time to permit investors to incorporate such information into their annual tax information prior to April 15 of each year. As a result, investors in Preferred Shares may be required to obtain extensions for filing U.S federal, state and local income tax returns each year.

  **The above statements about U.S. federal tax issues are made to support marketing of the Notes. No taxpayer can rely on them to avoid U.S. federal tax penalties. Each prospective purchaser should seek advice from an independent tax advisor about the tax consequences under its own particular circumstances of investing in Notes under the laws of the Cayman Islands, the United States and its constituent jurisdictions and any other jurisdiction where the taxpayer may be subject to tax.**

  Please see the section entitled "Income Tax Considerations" in the final Offering Circular for more details.

- Investment Company Act. Although the Issuer expects to be able to rely upon the exemption provided by Section 3(c)(7) under the Investment Company Act, one or more owners of the Preferred Shares may seek to rely on an exception from the definition of "investment company" and the requirement to register under the Investment Company Act that in turn depends, in part, upon the Issuer not being an investment company required to register under the Investment Company Act by reason of Rule 3a-7 thereunder. It is expected that in the near future the SEC may consider the applicability of Rule 3a-7 to entities such as the Issuer. If it were determined that the Issuer cannot rely on Rule 3a-7, the Issuer may amend the Indenture without the consent of the holders of the Notes (unless they would be materially and adversely affected thereby) and without the consent of the holders of the Preferred Shares (whether or not they would be materially and adversely affected thereby) to enable the Issuer to rely on Rule 3a-7. These amendments could require additional limitations and prohibitions on the circumstances under which the Issuer may sell assets, on the type of assets that the Issuer may acquire out of the proceeds of assets that mature, are refinanced or otherwise sold, on the period during which such transactions may occur, on the level of transactions that may occur or on other provisions of the Indenture and could adversely affect the earnings of the Issuer and its ability to make payments on the Notes and Preferred Shares.

# Risk Factors (cont.)

∨ Risks Related to use of Leverage in Structure of the Transaction. Due to the existence of the high leverage (anticipated to be approximately (115:1 at closing), changes in the market value of the Preferred Shares and, to a lesser extent, the subordinate classes of Notes could be greater than the changes in the value of the underlying Portfolio, which itself is subject to, among other things, credit and liquidity risk. Purchasers of the Preferred Shares and to a lesser extent, the subordinate classes of Notes must consider with particular care the risks of leverage because, although the use of leverage creates opportunity for substantial returns on the Preferred Shares and to a lesser extent, the subordinate classes of Notes, it increases substantially the likelihood that the holders of Preferred Shares and to a lesser extent, the subordinate classes of Notes could lose their entire investment if the Issuer is adversely affected by the removal of certain assets upon the occurrence of credit events or otherwise. Leverage can magnify both gains and losses.

∨ Forward Looking Statements. Estimates of the weighted average lives of the Notes and the duration of the Preferred Shares, together with any projections, forecasts and estimates provided to prospective purchasers of the Securities, are forward looking statements. Projections are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results. Actual results may vary from the projections and the variations may be material.





59

# EXHIBIT 2

**Armitrage ABS CDO, Ltd.**

| Sep 2007 Monthly Report | RMBS Structurer and Lead Underwriter | Collateral Type | Dollar Amount |
|---|---|---|---|
| ADMSQ 2007-2A A3 | CGMI | CDO | 20,000,000.00 |
| CWALT 2006-28CB A16 | CGMI | RMBS | 18,456,000.00 |
| CWALT 2007-6 A4 | CGMI | RMBS | 41,000,000.00 |
| CWALT 2007-5CB 1A4 | CGMI | RMBS | 30,000,000.00 |
| BAYC 2006-3A A2 | CGMI | RMBS | 1,581,070.18 |
| BAYC 2006-3A M1 | CGMI | RMBS | 4,623,012.26 |
| BAYC 2006-3A M2 | CGMI | RMBS | 5,085,313.48 |
| BAYC 2006-3A M3 | CGMI | RMBS | 4,623,012.26 |
| BAYC 2006-3A M4 | CGMI | RMBS | 1,849,204.89 |
| BONF 2007-1A A4 | CGMI | CDO | 5,000,000.00 |
| CMALT 2007-A1 1A8 | CGMI | RMBS | 22,976,299.39 |
| CARR 2006-NC4 M3 | CGMI | RMBS | 5,568,000.00 |
| CARR 2006-NC4 M5 | CGMI | RMBS | 6,000,000.00 |
| CETUS 2006-1A A2 | CGMI | CDO | 10,000,000.00 |
| CETUS 2006-1A B | CGMI | CDO | 10,000,000.00 |
| CETUS 2006-4A A2 | CGMI | CDO | 10,000,000.00 |
| CMLTI 2006-WFH3 M3 | CGMI | RMBS | 10,000,000.00 |
| CMLTI 2006-SHL1 M1 | CGMI | RMBS | 4,532,000.00 |
| CMSI 2006-6 A4 | CGMI | RMBS | 13,000,000.00 |
| CMLTI 2007-AHL2 M4 | CGMI | RMBS | 3,500,000.00 |
| CMLTI 2007-AHL2 M5 | CGMI | RMBS | 2,000,000.00 |
| CLSVF 2007-3A A3 | CGMI | CDO | 20,000,000.00 |
| DIHAR 2006-1A A2 | CGMI | CDO | 10,400,000.00 |
| EIGHT 2007-1A A2 | CGMI | CDO | 15,000,000.00 |
| FAB 2006-1A A4 | CGMI | CDO | 6,500,000.00 |
| FAB 2006-1A B | CGMI | CDO | 4,500,000.00 |
| KLIO 2005-3A A2 | CGMI | CDO,ABS | 5,000,000.00 |
| KLIO 2004-2A A1 | CGMI | CDO,ABS | 9,221,000.00 |
| LSECA 2007-1A A4 | CGMI | CDO | 20,000,000.00 |
| LSECA 2007-1A B | CGMI | CDO | 5,000,000.00 |
| MCKIN 2005-2A A2 | CGMI | CDO | 6,000,000.00 |
| OCTON 2007-1A A3 | CGMI | CDO | 26,000,000.00 |
| OCTON 2007-1A B | CGMI | CDO | 8,000,000.00 |
| OOMLT 2007-6 M5 | CGMI | RMBS | 2,000,000.00 |
| OOMLT 2007-6 M6 | CGMI | RMBS | 1,000,000.00 |
| RALI 2007-QS1 1A4 | CGMI | RMBS | 25,000,000.00 |
| RAFF 2006-2A A4 | CGMI | CDO | 9,985,503.88 |
| RDGW 2007-2A A5 | CGMI | CDO | 12,000,000.00 |
| JACKS 2006-2A B | CGMI | CDO | 5,000,000.00 |
| JACKS 2006-3A C | CGMI | CDO | 2,000,000.00 |
| JACKS 2006-4A D | CGMI | CDO | 8,000,000.00 |
| WFMBS 2007-2 1A7 | CGMI | RMBS | 8,740,000.00 |
| TOPG 2005-1A B | CGMI | CDO | 15,000,000.00 |
| RDGW 2006-1A B | CGMI | CDO | 20,000,000.00 |
| | | | **474,140,416.34** |