UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WOORI BANK,<br><br>                    Plaintiff,<br><br>       - against -<br><br>CITIGROUP GLOBAL MARKETS INC.<br><br>                  Defendant. | 12 Civ. 3868 (LTS)<br>ECF Case |

**CITIGROUP GLOBAL MARKETS INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS**
**<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
Brad S. Karp
Susanna M. Buergel
Jessica S. Carey
1285 Avenue of the Americas
New York, New York 10019-6064
Tel.  (212) 373-3000
Fax  (212) 757-3990

*Attorneys for Defendant Citigroup Global
Markets Inc.*

October 9, 2013

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

ARGUMENT ....................................................................................................................... 7

I.      WOORI'S CLAIMS ARE TIME-BARRED .......................................................... 7

II.     WOORI FAILS TO PLEAD JUSTIFIABLE RELIANCE ................................... 12

        A.      Woori Has Not Satisfied the Affirmative Duty to Inquire Required of
                Sophisticated Investors ............................................................................. 12

        B.      Woori's Claims of Reliance Are Foreclosed by Disclaimers in the
                Armitage Offering Materials..................................................................... 14

III.    WOORI FAILS TO ALLEGE FRAUDULENT INDUCEMENT ....................... 17

IV.     WOORI FAILS TO ALLEGE NEGLIGENT MISREPRESENTATION ............. 17

V.      WOORI FAILS TO ALLEGE UNJUST ENRICHMENT ................................... 18

VI.     THIS COURT SHOULD STRIKE WOORI'S CLAIM FOR PUNITIVE
        DAMAGES................................................................................................................ 19

CONCLUSION................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*ACA Financial Guaranty Corp.* v. *Goldman, Sachs & Co.*,
106 A.D.3d 494 (1st Dep't 2013) ................................................................ 2, 13, 14

*Ashland Inc.* v. *Morgan Stanley & Co., Inc.*,
652 F.3d 333 (2d Cir. 2011).............................................................................. 18

*Baena* v. *Woori Bank*,
No. 05 Civ. 7018, 2006 WL 2935752 (S.D.N.Y. Oct. 11, 2006) ........................... 8

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007)........................................................................................... 15

*Beth Isr. Med. Ctr.* v. *Horizon Blue Cross & Blue Shield of N.J., Inc.*,
448 F.3d 573 (2d Cir. 2006)......................................................................... 18, 19

*Bissinger* v. *City of New York*,
No. 06-CV-2325(WHP), 2007 WL 2826756 (S.D.N.Y. Sept. 24, 2007).............. 3

*CDO Plus Master Fund Ltd.* v. *Wachovia Bank, N.A.*,
No. 07 Civ. 11078 (LTS)(AJP), 2009 WL 2033048 (S.D.N.Y. July 13, 2009) ..... 14

*Centro Empresarial Cempresa S.A.* v. *América Móvil, S.A.B. de C.V.*,
17 N.Y.3d 269 (2011) ....................................................................................... 13

*Chambers* v. *Time Warner, Inc.*,
282 F.3d 147 (2d. Cir. 2002)............................................................................... 3

*Chrysler Capital Corp.* v. *Century Power Corp.*,
778 F. Supp. 1260 (S.D.N.Y. 1991)................................................................... 19

*Corsello* v. *Verizon N.Y., Inc.*,
18 N.Y.3d 777 (2012) ....................................................................................... 19

*In re Coudert Bros. LLP*,
673 F.3d 180 (2d Cir. 2012)................................................................................. 7

*Dragon Inv. Co. II LLC* v. *Shanahan*,
49 A.D.3d 403 (1st Dep't 2008) ........................................................................ 19

*Golden Archer Invs., LLC* v. *Skynet Fin. Sys.*,
No. 11 Civ. 3673(RJS), 2012 WL 123989 (S.D.N.Y. Jan. 3, 2012)...................... 17

*Goldman* v. *Metro. Life Ins. Co.*,
   5 N.Y.3d 561 (2005) ................................................................................. 18

*Gonzales* v. *Nat'l Westminster Bank PLC*,
   847 F. Supp. 2d 567 (S.D.N.Y. 2012) ........................................................ 9

*Grumman Allied Indus., Inc.* v. *Rohr Indus., Inc.*,
   748 F.2d 729 (2d Cir. 1984) ...................................................................... 14

*HSH Nordbank AG* v. *UBS AG*,
   95 A.D.3d 185 (1st Dep't 2012) ......................................................... passim

*Indep. Order of Foresters* v. *Donald, Lufkin & Jenrette, Inc.*,
   157 F.3d 933 (2d Cir. 1998) ...................................................................... 18

*Inter-Atl. Fund, L.P.* v. *Alvaro*,
   No. 0601611/2006, 2007 WL 2236595, slip op. (N.Y. Sup. Ct. Apr. 5, 2007) ........... 20

*J.A.O. Acquisition Corp.* v. *Stavitsky*,
   8 N.Y.3d 144 (2007) ................................................................................. 17

*Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*,
   478 F. App'x 679 (2d Cir. 2012) ............................................................... 17

*Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*,
   No. 12 Civ. 3723(RJS), 2013 WL 1294668 (S.D.N.Y. Mar. 28, 2013) ................. 8

*Meyercord* v. *Curry*,
   38 A.D.3d 315 (1st Dep't 2007) ................................................................ 18

*Nordwind* v. *Rowland*,
   584 F.3d 420 (2d Cir. 2009) ...................................................................... 19

*Portfolio Recovery Assocs., LLC* v. *King*,
   14 N.Y.3d 410 (2010) ................................................................................. 8

*Ross* v. *Louise Wise Servs., Inc.*,
   8 N.Y.3d 478 (2007) ................................................................................. 19

*SNS Bank, N.V.* v. *Citibank, N.A.*,
   7 A.D.3d 352 (1st Dep't 2004) .................................................................. 18

*Terra Sec. ASA Konkursbo* v. *Citigroup, Inc.*,
   450 F. App'x 32 (2d Cir. 2011) ................................................................. 14

*Wells Fargo Bank Nw., N.A.* v. *Taca Int'l Airlines, S.A.*,
   247 F. Supp. 2d 352 (S.D.N.Y. 2002) ...................................................... 19

*Whitney* v. *Citibank, N.A.*,
  782 F.2d 1106 (2d Cir. 1986).............................................................. 20

*Woori Bank* v. *Merrill Lynch*,
  923 F. Supp. 2d 491 (S.D.N.Y. 2013)...................................................... 2, 8, 12

*Woori Bank* v. *RBS Sec., Inc.*,
  910 F. Supp. 2d 697 (S.D.N.Y. 2012)...................................................... 12, 13

## STATUTES

C.P.L.R. § 202.................................................................................. 7, 12

## OTHER AUTHORITIES

Minbeob [Civil Act], Act No. 471, Feb. 22, 1958, art. 766(1) (S. Kor.).................................. 8, 9

## TABLE OF ABBREVIATIONS

**AC**:  The Amended Complaint, filed with this Court by Woori on August 28, 2013, Dkt. # 59

**Armitage**:  Armitage ABS CDO, Ltd.

**CDO**:  Collateralized debt obligation

**CGMI**:  Citigroup Global Markets Inc.

**Citigroup Defendants**:  Citigroup Inc. and Citigroup Global Markets Inc.

**Class V**:  Class V Funding III, Ltd.

**Clayton**:  Clayton Holdings

**Complaint**:  The original complaint filed with this Court by Woori on May 15, 2012, Dkt. # 1

**Def. MTD**:  Memorandum of Law in Support of Citigroup Defendants' Motion to Dismiss the Complaint, filed with this Court on July 27, 2012, Dkt. # 36.

**Lee Decl.**:  Declaration of the Honorable Don-Hui Lee, filed contemporaneously herewith

**OC**:  Offering Circular for Armitage ABS CDO, Ltd., dated March 28, 2007, attached hereto as Exhibit A to the Declaration of Marques S. Tracy

**Op.**:  The Court's opinion granting the Citigroup Defendants' motion to dismiss.  Memorandum Order, *Woori Bank* v. *Citigroup Inc.*, No. 12 Civ. 3868 (LTS), 2013 WL 1235648 (S.D.N.Y. Mar. 27, 2013), Dkt. # 49

**PB**:  Pitch book for Armitage ABS CDO, Ltd., dated February 2007, attached as Exhibit 1 to Woori's Amended Complaint

**RMBS**:  Residential mortgage-backed securities

**SEC**:  Securities and Exchange Commission

**Second Op.**:  This Court's order granting Woori's motion for leave to amend the complaint.  *See* Memorandum Order, *Woori Bank* v. *Citigroup Inc.*, No. 12 Civ. 3868 (LTS) (S.D.N.Y. Aug. 15, 2013), Dkt. # 57

**Woori**:  Woori Bank

Defendant Citigroup Global Markets Inc. ("CGMI") respectfully submits this memorandum of law in support of its motion to dismiss the Amended Complaint filed by Woori Bank ("Woori"), pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Throughout 2006 and 2007, plaintiff Woori, one of Korea's largest banks, was an enthusiastic investor in collateralized debt obligations ("CDOs") arranged by major financial institutions.  By the end of 2007, its investment in CDOs had grown to over $1 billion. Following the greatest financial crisis since the Great Depression, Woori filed numerous lawsuits against the banks that sold it CDOs, attempting to blame them for its CDO losses.  On May 15, 2012, Woori sued CGMI and other defendants, alleging that it was defrauded in connection with its $90 million investment in five CDOs.  On March 27, 2013, this Court dismissed Woori's original Complaint in its entirety, finding that it was founded on "atmospherics" and failed to meet Rule 9(b)'s heightened pleading standard.  Although the Court allowed Woori to amend the Complaint to correct those pleading deficiencies, Woori's Amended Complaint—which now concerns its $25 million investment in a single CDO—remains fatally flawed and should be dismissed for at least two reasons:

*Woori's claims are time-barred*.  Woori's claims are indisputably time-barred under the applicable three-year Korean statute of limitations.  Woori was on notice of its claims relating to the CDO at issue more than three years before May 15, 2012, when it first asserted those claims.  Extensive publicly available information, including news articles, complaints in other actions, Congressional hearings, and credit ratings downgrades—some of which Woori itself cites in the Amended Complaint—put Woori on notice of its claims well before May 15, 2009.  Indeed, another court in this District recently dismissed with prejudice a nearly identical action brought by Woori against a different bank, ruling that Woori's CDO claims were time-

barred under the Korean statute of limitations.  *Woori Bank* v. *Merrill Lynch*, 923 F. Supp. 2d 491, 494–95 (S.D.N.Y. 2013).  This Court should reach the same result.

    ***Woori fails to plead justifiable reliance***.  Even if Woori's claims were not time-barred, they should be dismissed because Woori fails to plead justifiable reliance.  As one of the largest banks in Korea, Woori is indisputably a highly sophisticated investor.  New York law is clear that sophisticated investors have an affirmative duty to inquire and to conduct due diligence, particularly in the face of specific disclosures that put them on notice of the information they claim was material to their investment decision.  *ACA Financial Guaranty Corp.* v. *Goldman, Sachs & Co.*, 106 A.D.3d 494 (1st Dep't 2013).  By 2007, Woori had invested over $1 billion in the lower rated, more risky tranches of complex CDOs in order to reap outsize returns.  Yet Woori does not allege that it conducted *any* due diligence or made *any* inquiries into information that it deemed material to its investment decision; and the representations on which Woori now claims it relied are the subject of express disclaimers and disclosures in the CDO offering documents.

    For these reasons, and for those that follow, the Amended Complaint should be dismissed with prejudice.

**STATEMENT OF FACTS**

**The Parties**

    Plaintiff Woori is the oldest and second largest commercial bank in South Korea.  By 2007, Woori had invested over $1 billion in complex CDOs, many of which were primarily backed by residential mortgage-backed securities ("RMBS").  (Ex. C (Woori Bank Annual Report 2007) at 82.)[1]  Rather than invest in the most highly-rated "senior" tranches of the CDOs,

---

[1] "Ex. _" refers to exhibits to the Declaration of Marques S. Tracy, dated October 9, 2013, filed contemporaneously herewith.  "On a motion to dismiss, the Court may consider 'documents attached to the

Woori's consistent strategy involved purchasing lower-rated "mezzanine" tranches that entailed greater risks—and provided greater returns—than the senior, "AAA" tranches.  (Amended Complaint ("AC") ¶¶ 17 (illustrations), 20, 28.)  In addition to its direct investments in CDOs, Woori had extensive experience with CDOs and RMBS through a subsidiary that originated mortgages and created structured mortgage products.  (Ex. D (WFH 2007 Form 20-F) at 49–51, 62, 64–65.)

Defendant CGMI is a New York corporation.  (AC ¶ 8.)  Woori alleges that CGMI played various roles in connection with the CDO at issue—Armitage ABS CDO, Ltd. ("Armitage")—including acting as the structurer, underwriter, placement agent, and seller.  (AC ¶ 9.)  As Woori acknowledges, Vanderbilt Capital Advisors ("Vanderbilt"), not CGMI, was the collateral manager for Armitage (the entity responsible for selecting the CDO collateral).  (AC ¶ 24; AC Ex. 1 (Armitage pitch book ("PB")) at 1.)

**Procedural Posture**

On May 15, 2012, Woori filed the original Complaint in this action against Citigroup Inc. and CGMI (together, the "Citigroup Defendants"), as well as the issuers and co-issuers of five CDOs in which Woori invested $90 million over a year-long period between March 2006 and March 2007, alleging fraud, negligent misrepresentation, and unjust enrichment.  (Complaint ¶ 1.)  The Citigroup Defendants moved to dismiss the Complaint in its entirety on July 27, 2012.

On March 27, 2013, this Court granted the Citigroup Defendants' motion to dismiss.  The Court noted that Woori's claims were "founded on . . . atmospherics," and held that

---

complaint as an exhibit or incorporated in it by reference[,] . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'"  *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d. Cir. 2002); *see also Bissinger* v. *City of New York*, No. 06-CV-2325(WHP), 2007 WL 2826756, at *2 (S.D.N.Y. Sept. 24, 2007) (holding that court may "rely on matters of public record").

Woori failed to (1) "specify alleged fraudulent statements," (2) "proffer specific factual allegations demonstrating their falsity," (3) "attribute any specific statements or conduct to either Citigroup entity," and (4) tie any allegations "specifically to any of the five CDOs in which Woori invested." (Opinion ("Op.") at 8–9.) The Court also held that "Woori's factual allegations with respect to the other elements of its fraud claim [were] similarly deficient." (*Id.* at 10 (citing the Citigroup Defendants' motion to dismiss and authorities cited therein).) The Court's dismissal of the Complaint was without prejudice to Woori filing a timely motion for leave to amend its Complaint, which it filed on April 30, 2013.

The Court granted Woori's motion for leave to amend on August 15, 2013, and Woori filed its Amended Complaint on August 28, 2013. In its Amended Complaint, Woori limits its claims to a single CDO—Armitage—and a single defendant, CGMI. (AC ¶¶ 1–2.) The core allegations in the Amended Complaint are identical to those in the original Complaint. Woori alleges that CGMI made false and misleading statements in the offering materials for Armitage in order to "off-load" mortgage products from its balance sheet that were backed by mortgages that allegedly violated underwriting standards and were likely to default. (AC ¶¶ 2– 5.) According to Woori, CGMI possessed knowledge of defective mortgage loans through CGMI's position as a mortgage originator and securitizer of RMBS. (AC ¶¶ 40–49, 50–55.) CGMI's purported scheme also involved causing the credit rating agencies to issue false credit ratings for securitizations. (AC ¶¶ 57–69.) On the basis of these allegations, Woori asserts claims for fraud and fraudulent inducement, negligent misrepresentation, and unjust enrichment.

**Woori's Investment in Armitage**

On March 29, 2007, Woori invested $25 million in the B tranche of Armitage, which was rated A/A2. (AC ¶ 7.) Armitage was a $3 billion CDO listed on the Irish Stock

Exchange.  Armitage was first downgraded on November 6, 2007.  (AC ¶ 68 (illustration).)

Woori sold its interest in Armitage on August 14, 2008.  (AC ¶ 7.)

Woori contends that its investment in Armitage was "informed" by the offering

circular and pitch book.  (AC ¶ 23.)  These documents contain extensive detail about Armitage,

including disclosures that explicitly warned the sophisticated investors (which were required to

be "qualified purchasers" under the securities laws) of the risks involved in investing in the

CDO.  For example, the offering circular and pitch book make clear that:

- Woori was obligated to conduct its own due diligence:  "[P]rior to making any investment decision in the Securities, you should determine, without reliance on Citigroup, Vanderbilt or any of their respective affiliates, the economic risks and merits, as well as the legal, tax and accounting characterizations and consequences of the transaction, and independently determine that you are able to assume these risks." (AC Ex. 1 (PB) at i; Ex. A (OC) at ii, iv.)

- Woori should consult its own advisors prior to investing:  "[B]y acceptance of these materials, you acknowledge that you have been advised that . . . (c) you should receive legal, tax and accounting advice from advisors with appropriate expertise to assess relevant risks . . . ."  (AC Ex. 1 (PB) at i; see Ex. A (OC) at i, 140.)

- Woori was not relying on CGMI in making its investment:  "The purchaser . . . in making such investment, is not relying on the advice or recommendations of [CGMI] . . . ." (Ex. A (OC) at 140.)

- Woori was cautioned about potential conflicts of interest:  Woori was informed that certain collateral underlying the CDO may have previously been underwritten or owned by Citigroup entities, and Citigroup entities may have short positions on the CDO collateral.  (AC Ex. 1 (PB) at 53 ("Potential Conflicts of Interest"); see Ex. A (OC) at 18.)

- CGMI did not represent or warrant that the information was complete or accurate:  "Neither Citigroup, Vanderbilt, nor any of their affiliates make any representation or warranty, express or implied, as to the accuracy or completeness of the Information."  (AC Ex. 1 (PB) at ii; see Ex. A (OC) at iv–v, 18.)

The offering materials also contain lengthy disclosures about the risks associated with the then-

recent deterioration in the subprime mortgage market and its potential impact on the CDO:

> Recent Development in the RMBS Market.  Recently, ***delinquencies, defaults and losses*** on residential mortgage loans have increased and may continue to increase, which may affect the performance of RMBS Securities, in particular Sub-Prime RMBS which are backed by subprime mortgage loans.  Subprime mortgage loans are generally made to borrowers with lower credit scores.  Accordingly, mortgage loans backing Sub-Prime RMBS are ***more sensitive to economic factors*** that could affect the ability of borrowers to pay their obligations under the mortgage loans backing these securities.  Market interest rates have been increasing and accordingly, with respect to adjustable rate mortgage loans and hybrid mortgage loans that have or will enter their adjustable-rate period, borrowers are likely to experience increases in their monthly payments and become ***increasingly likely to default*** on their payment obligations.  Discovery of fraudulent mortgage loan applications in connection with rising default rates with respect to subprime mortgage loans may indicate that ***the risks with respect to these mortgage loans are particularly acute at this time***.  Such risks may result in further increases in default rates by subprime borrowers as it becomes more difficult for them to obtain refinancing. . . .   These adverse changes in market conditions may ***reduce the cashflow*** which the Issuer receives from RMBS Securities and CDO Securities held by the Issuer . . . [and] ***decrease the market value*** of such RMBS Securities and CDO Securities. . . .

(Ex. A (OC) at 19–20 (emphasis added); *see* AC Ex. 1 (PB) at 52.)

In the Amended Complaint, Woori alleges for the first time that it relied on a "breakeven default rate analysis" in the Armitage pitch book, which shows breakeven default rates on each tranche of the CDO portfolio.  (AC Ex. 1 (PB) at 6.)  The pitch book contains a specific disclaimer concerning default rates:

> Default Rates of Mortgage-Backed Securities and Other Asset-Backed Securities.  The Issuer is not aware of a central source for relevant data or standardized method for measuring default rates of mortgage backed securities or other asset backed securities.  Furthermore, historical performances of these types of securities are not necessarily indicative of future market performance.  In certain circumstances, it is possible that investors in the Securities will not recover their original investment.  PROSPECTIVE PURCHASERS OF THE SECURITIES SHOULD CONSIDER AND ASSESS FOR THEMSELVES THE LIKELY LEVEL OF DEFAULTS, THE LIKELY LEVEL AND TIMING OF RECOVERIES ON THE COLLATERAL DEBT SECURITIES, AND THE LIKELY LEVELS OF INTEREST RATES DURING THE TERM  OF THE TRANSACTION.

(AC Ex. 1 (PB) at 50.)  In addition, the pitch book contains lengthy disclaimers about "forward-looking" scenario analyses, such as the breakeven default rate analysis:

> The forward-looking information is based on certain assumptions about future events or conditions and is intended only to illustrate hypothetical results under those assumptions (not all of which are specified herein).  ***Actual events or conditions are unlikely to be consistent with, and may differ materially from, those assumed***. . . .  You should understand such assumptions and evaluate whether they are appropriate for your purposes.
>
> ***No representation is made that the Securities will actually perform as described in any of the illustrative calculations presented herein.  Actual results will differ, and may differ substantially, from those illustrated in the Information***. . . .
>
> ***Neither Citigroup, Vanderbilt nor any of their affiliates makes any representation or warranty, express or implied, as to the reasonableness of any assumptions used in calculating the illustrative performance or the accuracy (mathematical or otherwise) or the validity of such information.***  You should consider whether the behavior of the Securities should be tested based on different and/or additional assumptions from those included in the Information. . . . You may contact your Citigroup sales representative for detailed explanations of any modeling techniques employed in the Information.  We undertake no obligation to provide you with any updated information reflecting changed circumstances or changed interpretations of the same circumstances.  CUSTOMIZED CALCULATIONS WITH ASSUMPTIONS SPECIFIED BY YOU CAN BE PERFORMED BY CITIGROUP AT YOUR REQUEST.

(AC Ex. 1 (PB) at ii (emphasis added).)

## ARGUMENT

## I.    WOORI'S CLAIMS ARE TIME-BARRED

When a cause of action accrues outside of New York to a non-New York resident such as Woori, New York's borrowing statute requires the action to be timely under the statute of limitations of both New York *and* the jurisdiction in which the cause of action accrued. C.P.L.R. § 202; *see In re Coudert Bros. LLP*, 673 F.3d 180, 190 (2d Cir. 2012) ("New York's borrowing statute . . . guards against forum shopping by out-of-state plaintiffs by mandating use of the *shortest* statute of limitations available.").  For purposes of C.P.L.R. § 202, the jurisdiction

in which Woori's claims accrued is Korea, its principal place of business and where it "sustained the economic impact of [its] loss." *Portfolio Recovery Assocs., LLC* v. *King*, 14 N.Y.3d 410, 416 (2010); *see Merrill Lynch*, 923 F. Supp. 2d at 494–95 (holding that Woori is a resident of Korea and that its cause of action for losses associated with its CDO investments accrued in Korea); *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, No. 12 Civ. 3723(RJS), 2013 WL 1294668, at *7 (S.D.N.Y. Mar. 28, 2013) ("The parties do not dispute that Plaintiffs are Jersey entities so their economic losses occurred in Jersey").

Under Korean law, fraud claims have a three-year limitations period under Article 766 of the Korean Civil Act.  Minbeob [Civil Act], Act No. 471, Feb. 22, 1958, art. 766(1) (S. Kor.); *see* Lee Decl. ¶ 10 (Korean statute of limitations for tort claims is three years); *see also Merrill Lynch*, 923 F. Supp. 2d at 495 (S.D.N.Y. 2013) (same); *Baena* v. *Woori Bank*, No. 05 Civ. 7018, 2006 WL 2935752, at *6 (S.D.N.Y. Oct. 11, 2006) (same).  Article 766 provides that the limitations period begins to run when the plaintiff has "practical and specific awareness" of: (i) damages that were incurred, (ii) the existence of an unlawful act or acts by the defendant; and (iii) a substantial causal relationship between the unlawful act(s) and the plaintiff's damages. Lee Decl. ¶ 11; *see also Merrill Lynch*, 923 F. Supp. 2d at 495.  The plaintiff is deemed to have such awareness based on the circumstances under which it became possible from a practical perspective to state a claim for damages, taking into account the totality of the objective evidence in the case, which may include press articles, complaints in private lawsuits, and government investigations.  Lee Decl. ¶ 12–16.  This standard is akin to the inquiry notice standard under New York law, which is triggered when the plaintiff "should have been aware of enough facts

8

such that they could have discovered the fraud with reasonable diligence." *Gonzales* v. *Nat'l Westminster Bank PLC*, 847 F. Supp. 2d 567, 570 (S.D.N.Y. 2012).[2]

   A review of the Amended Complaint reveals that Woori knew or reasonably should have known of the information on which it bases its claims well before May 15, 2009 (three years prior to the filing of the Complaint).  Myriad news articles, lawsuits, and government inquiries prior to May 15, 2009 mirror the allegations in the Amended Complaint. (*See generally* Ex. B (compiling publicly available information).)  For instance:

   <u>CGMI's Knowledge of the Deterioration of the Housing Market</u>.  Woori alleges that in 2006 and 2007, CGMI had inside knowledge of increasing mortgage delinquencies and defaults, as well as a higher incidence of loans that failed to conform to underwriting standards. Rather than reject these "defective" loans, CGMI allegedly securitized them into RMBS, despite warnings about their poor quality from loan due diligence firm, Clayton Holdings ("Clayton") (AC ¶¶ 4, 39–47, 50–55, 61, 70, 73.)  Woori also alleges that CGMI selected collateral for Armitage that had been designed by CGMI to perform poorly, in particular Class V Funding III, Ltd. ("Class V"), a CDO that comprised less than 1% of Armitage's $3 billion in collateral.  (AC ¶¶ 77–81, 91.)

   These allegations, however, were well known to the investing public months before May 2009.  Dozens of news articles—some pre-dating Woori's investment in Armitage— put Woori on notice of increases in mortgage fraud, rising mortgage defaults, and resulting "mortgage-backed securities of lower and lower quality" (Ex. B at 10.)  Indeed, the Armitage offering circular, upon which Woori allegedly relied in making its investment, specifically

---

[2] A claim for unjust enrichment is governed by different statutory provisions under Korean law.  *See* Lee Decl. ¶¶ 17–21.  In order to assert the claim, a plaintiff must first seek rescission of the allegedly fraudulent contract within three years of the date it became aware of the fraud.  *Id.*  A plaintiff's awareness may be determined by reference to evidence that creates a reasonable presumption of awareness, similar to Article 766.  *Id.* ¶ 22.

warned of deterioration in the mortgage market in early 2007. *See supra* at 6. By early 2008, it was widely reported that several state Attorneys General and the SEC were investigating whether Wall Street banks withheld from rating agencies and investors "crucial information about the risks posed by investments linked to subprime loans [that] . . . failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms." (Ex. B at 22.) Around this time it was also reported that loan examiners hired by due diligence firm Clayton found that the subprime loans being sold to Wall Street "raised plenty of red flags about flaws so serious that mortgages should have been rejected outright—such as borrowers' incomes that seemed inflated or documents that looked fake—but the problems were glossed over, ignored or stricken from reports." (Ex. B at 26.)

Allegations that banks were offloading "toxic" collateral in CDOs were also widely reported prior to May 2009. (*See generally* Ex. B.) Indeed, numerous lawsuits had been filed by that time, including lawsuits against Citigroup, alleging that Wall Street firms heavily exposed to the mortgage market were using CDOs to rid their balance sheets of risky mortgage securities. For example, in *Epirus Capital Management, LLC* v. *Citigroup Inc.*, 09 Civ. 2594 (S.D.N.Y. filed March 20, 2009), plaintiffs allege that Citigroup undertook a "scheme to defraud investors . . . by misrepresenting and concealing that it cleaned out its warehouse of largely worthless CDO 'spare parts' and reused them in a last round of securitization and re-securitizations involved in the funding of [a particular CDO]." (Ex. B at 37–38.)

CGMI's Influence on the Rating Agencies. Woori alleges generally that information about the quality of loans underlying securitizations was withheld from the rating agencies. (AC ¶ 59.) Woori also alleges that the rating agencies and banks were aware that the

rating assumptions were inaccurate and that the ratings given to RMBS and CDOs were inflated. (AC ¶¶ 63–69, 71.)

But the accuracy of credit ratings and the influence of banks on those ratings were front-page news in 2007.  In September 2007, the U.S. Senate Banking Committee held hearings on the credit rating agencies' role in the subprime mortgage crisis, and the SEC announced that it was investigating whether the agencies improperly inflated their RMBS ratings.  (Ex. B at 9.) The reports only intensified in 2008.  For example, in April 2008 major newspapers reported on alleged manipulation of credit ratings by banks that were "gaming the system."  (Ex. B at 26.) And in October 2008, the U.S. House Oversight Committee held hearings about credit ratings, including the failure of the agencies to rate structured mortgage products accurately.  Emails of S&P employees were published in 2008 in connection with those hearings, including an email where one analyst said "'we rate every deal,' . . . 'it could be structured by cows and we would rate it.'" (Ex. B at 29.)  Indeed, the Amended Complaint cites a transcript of a Moody's "Managing Director's Town Hall Meeting"—also made public during the October 2008 hearings—to illustrate that CDO ratings were inaccurate and based on fraud.  (AC ¶¶ 63–66.) And Woori alleges that downgrades of Armitage's ratings, which occurred in late 2007, "exposed the corrupt system of CDO ratings."  (AC ¶ 69.)[3]

A court in this District recently dismissed with prejudice a very similar complaint filed by Woori involving its investment in seven CDOs arranged by Merrill Lynch.  The court applied the three-year Korean statute of limitations and concluded, based on news articles, credit rating downgrades, government investigations, and individual lawsuits, that "Woori possessed all the requisite pieces of relevant information to bring an action prior to May 18, 2009."  *See*

---

[3]    The Amended Complaint also makes clear that Woori was aware of its losses no later than August 14, 2008, when it sold its investment in Armitage.  (AC ¶ 7.)

*Merrill Lynch*, 923 F. Supp. 2d at 497–98.  So, too, here.  Woori was on notice and had the practical ability to bring its claims well before May 15, 2009.  Accordingly, its claims are easily time-barred as a matter of Korean law.  *See* Lee Decl. at ¶ 23; *See Merrill Lynch*, 923 F. Supp. 2d at 495.  The Amended Complaint therefore should be dismissed as untimely.  C.P.L.R. § 202.[4]

## II.    WOORI FAILS TO PLEAD JUSTIFIABLE RELIANCE

Woori fails to plead justifiable reliance for two reasons.  *First*, the representations in the Armitage offering circular and pitch book upon which Woori claims it relied are contradicted by the express disclosures and disclaimers in those documents.  *Second*, Woori does not allege that it conducted any due diligence or inquired into any information that it deemed material to its investment, as it is required to do under New York law.

### A.    Woori Has Not Satisfied the Affirmative Duty to Inquire Required of Sophisticated Investors

Woori is unquestionably a sophisticated investor.  *See Woori Bank* v. *RBS Sec., Inc.*, 910 F. Supp. 2d 697, 706 (S.D.N.Y. 2012) ("Woori and RBS are sophisticated parties.").  New York law imposes an affirmative duty on sophisticated investors to inquire and to conduct due diligence rather than blindly trust the representations of counterparties.  "'[A]s a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it.'"  *HSH Nordbank AG* v. *UBS AG*, 95 A.D.3d 185, 194–

---

[4]    In a similar action against Merrill Lynch, Woori asserted that the Korean limitations period may only be triggered by conclusive evidence, such as a criminal verdict or regulatory findings.  The court rejected that argument, stating "there is nothing in the Korean law cited by [Woori], the law of this Court, or common sense that would require an official determination of wrongdoing before a civil lawsuit relating to that conduct may be brought."  *Merrill Lynch*, 923 F. Supp. 2d at 498.  In his declaration, the Honorable Don-Hui Lee cites several actions where the limitations period was triggered by news articles or lawsuits filed in other matters.  Lee Decl. ¶¶ 15–16.

95 (1st Dep't 2012) (quoting *Ventur Grp., LLC* v. *Finnerty*, 68 A.D.3d 638, 639 (1st Dep't 2009)); *see also Centro Empresarial Cempresa S.A.* v. *América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 279 (2011).[5]

In *ACA Financial Guaranty Corp.* v. *Goldman, Sachs & Co.*, 106 A.D.3d 494 (1st Dep't 2013), decided on the same day CGMI filed its opposition to Woori's motion for leave to amend its Complaint, the First Department held that, as a matter of law, a plaintiff cannot plead justifiable reliance if it "fails to plead that it exercised due diligence by inquiring about the nonpublic information . . . or that it inserted the appropriate prophylactic provision to ensure against the possibility of misrepresentation." 106 A.D.3d at 494. "[B]ecause parties can seldom be certain that the representations made by other contracting parties are indeed true, they *must*— lest their cause of action for fraud be barred—insert the requisite prophylactic provision to ensure against the possibility of misrepresentation." *Id*. at 496 (emphasis added).

The Amended Complaint is devoid of any allegation that Woori attempted to satisfy its obligation to inquire into the matters it now alleges were misrepresented. Woori does not allege that it performed any due diligence on the Armitage CDO apart from reviewing the offering circular and pitch book, which, as discussed below, contained explicit disclosures and disclaimers that warned of the risks associated with the CDO and instructed investors to perform their own analyses. (*See* AC ¶ 23; *see infra* at 14–16.) Instead, Woori pleads that it relied on CGMI's "reputation" and "track record" and took the credit ratings at "face value." (AC ¶ 27–29.) Woori's explanation for its failure to analyze the "public information available," is that it

---

[5]  Woori's attempt to claim that it is "not a 'sophisticated investor' with respect to CDOs backed by RMBS" (AC ¶ 29), is belied by its numerous CDO investments prior to investing in Armitage (*see* Complaint ¶¶ 8–11), and is unavailing in any event. *See RBS Sec.*, 910 F. Supp. 2d at 706 ("The expertise at issue here is in financial transactions and risk assessment, it matters little that this was a new area of investment for Woori."); *HSH*, 95 A.D.3d at 196 ("[A] relative lack of expertise in transactions of this kind would not have given HSH any right to expect UBS to act as its advisor in the deal or to bring to HSH's attention relevant information that HSH could have obtained through its own efforts.")

would have taken more than "minimal diligence" to do so.  (*Id.* ¶ 30.)  In short, Woori was "so lax in protecting [itself] that [it] cannot fairly ask for the law's protection."  *HSH*, 95 A.D.3d at 197 (quoting *Centro Empresarial*, 17 N.Y.3d at 279); *see also Terra Sec. ASA Konkursbo* v. *Citigroup, Inc.*, 450 F. App'x 32, 34 (2d Cir. 2011) (affirming dismissal of fraud claim where plaintiffs "have not alleged that they conducted any independent investigation prior to making their investments").

**B.      Woori's Claims of Reliance Are Foreclosed by Disclaimers in the Armitage Offering Materials**

As a "highly sophisticated commercial entity," Woori cannot plead reasonable reliance when the alleged misrepresentations "were specifically contradicted by the offering circular's disclosure."  *ACA*, 106 A.D.3d at 497.  There need not even be a "precise identity" between the disclosures and alleged misrepresentations; rather, reliance is precluded as long as the "substance of the disclaimer provision tracks the substance of the alleged misrepresentations."  *Grumman Allied Indus., Inc.* v. *Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984); *see also CDO Plus Master Fund Ltd.* v. *Wachovia Bank, N.A.*, No. 07 Civ. 11078 (LTS)(AJP), 2009 WL 2033048, at *4 (S.D.N.Y. July 13, 2009).  Here, the disclosures in the Armitage offering circular and pitch book flatly contradict Woori's claimed reliance and foreclose its fraud claims.

*First*, contrary to Woori's claim that it "relied on CGMI to explain to it fully and truthfully the risks associated with the Armitage CDO" (AC ¶ 29), when it invested in the CDO Woori specifically represented that it was *not* relying on CGMI in making its investment, and warranted that it was able to conduct its own independent investigation of the investment and to assess the risks.  *See supra* at 5.

*Second*, Woori alleges that it relied on the Armitage pitch book's breakeven

default rate analysis.  (AC ¶¶ 4–5 & n.2, 42, 53 n.5, 83–92.)  The pitch book, however, contained

a specific disclaimer concerning the default rate table:  "PROSPECTIVE PURCHASERS OF

THE SECURITIES SHOULD CONSIDER AND ASSESS FOR THEMSELVES THE LIKELY

LEVEL OF DEFAULTS, THE LIKELY LEVEL AND TIMING OF RECOVERIES ON THE

COLLATERAL DEBT SECURITIES, AND THE LIKELY LEVELS OF INTEREST RATES

DURING THE TERM  OF THE TRANSACTION."  *See supra* at 6.  In addition, the pitch book

contained a lengthy risk disclosure about forward-looking scenario analyses, warning that they

could differ significantly from reality and advising investors to perform their own analyses.  *See*

*supra* at 7.  The pitch book also disclosed that the CDO collateral "*will* be backed by subprime

mortgages originated using underwriting standards that are *less restrictive* than the underwriting

standards for agency programs such as Fannie Mae."  (AC Ex. 1 (PB) at 52 (emphasis added).)

The Armitage offering circular went further, disclosing that RMBS delinquencies had "*increased*

and may *continue to increase*," that the risks of subprime loans were "*particularly acute at this*

*time*," that there was a "downward trend" to which the performance of RMBS would be

"sensitive," and that originators and servicers were going bankrupt and being investigated.

(Ex. A (OC) at 19–20 (emphasis added).)  In light of these disclosures—specifically warning that

default rates were *increasing* and advising Woori to conduct its own default rate analysis—

Woori was unreasonable to base its investment decision on an assumption that historic default

rates would remain *constant*.[6]

      *Third*, Woori alleges that it relied on the CDO credit ratings.  (AC ¶¶ 4–5, 20, 23,

25–26, 28–29, 31–32.)  But, the offering circular disclosed that the ratings "are not a guarantee

---

[6]    In evaluating a Rule 12(b)(6) motion, a court need not accept bald assertions or unwarranted inferences.  *See*
*Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007).

of quality" and "may not fully reflect the true risks of an investment." (Ex. A (OC) at 21.) And, the pitch book disclosed that, for the mortgage-related collateral specifically, the "[r]ating agencies' assumptions . . . have not been tested in all conceivable credit environments." (AC Ex. 1 (PB) at 50.) Even without these disclosures, allegations that a defendant "marketed" an investment "on the basis of ratings agency models" do not establish the reasonableness of relying on ratings. *HSH*, 95 A.D.3d at 202. Woori "could have discovered the infirmity of those ratings in the relevant security classes had it examined the market pricing of rated securities." *Id*. at 201. It is "common knowledge" among even ordinary investors that the market values of securities frequently do not correspond to their credit ratings. *Id*. at 193. In short, a sophisticated investor cannot satisfy its affirmative duty to conduct due diligence by taking credit ratings at "face value." (*See* AC ¶ 29.)

      *Finally*, Woori alleges that it relied upon the absence of a conflict of interest involving CGMI and Vanderbilt, the collateral manager, in selecting the collateral. (AC ¶¶ 24, 91.) If it had known the allegedly "substantial influence" that CGMI exercised over Vanderbilt—a wholly conclusory and unsupported allegation—Woori claims it would not have invested in Armitage. (*Id*. at ¶ 91.) In fact, however, the offering circular and pitch book disclosed potential conflicts of interests of both CGMI and Vanderbilt, including that Citigroup and its affiliates may issue and underwrite some of the CDO collateral, and might enter into transactions to "short" the collateral. (Ex. A (OC) at 22–26; *see also* AC Ex. 1 (PB) at 53.)[7]

---

[7] Woori's complaint that it lacked access to CGMI's "internal analyses" is irrelevant. (AC ¶ 32.) Woori does not allege that it ever requested access to CGMI's internal analyses. In New York, it is black letter law that "[i]n the context of arm's length dealing between sophisticated parties . . . [CGMI] had no obligation to disclose internal analyses for which [Woori] made no request." *HSH*, 95 A.D.3d at 197–98. Nor is a seller "obligated to disclose to the buyer its internal valuation of the item sold." *Id*. at 202. CGMI "after all, was acting as a *salesman*, not as [Woori's] advisor." *Id*. at 197 (emphasis in original).

As the First Department recently held, a sophisticated investor "should be charged with knowledge of the offering circular's risk disclosures and warning to examine for itself the extent of those risks." *HSH*, 95 A.D.3d at 201. The disclosures at issue here independently preclude Woori's claimed reasonable reliance on the allegedly false or misleading statements.

## III.   WOORI FAILS TO ALLEGE FRAUDULENT INDUCEMENT

In the Amended Complaint, Woori adds a new claim for "fraud in the inducement" to the first cause of action. Under New York law, the elements of fraudulent inducement are substantially the same as those for common law fraud. *Wells Fargo Bank Nw., N.A.* v. *Taca Int'l Airlines, S.A.*, 247 F. Supp. 2d 352, 364 (S.D.N.Y. 2002). A plaintiff must demonstrate: "(1) representation of a material fact[,] (2) falsity[,] (3) scienter[,] (4) reasonable reliance[,] and (5) injury." *Id.* Like common law fraud claims, fraudulent inducement claims must meet the heightened pleading standard of Rule 9(b). *Golden Archer Invs., LLC* v. *Skynet Fin. Sys.*, No. 11 Civ. 3673(RJS), 2012 WL 123989, at *7–8 (S.D.N.Y. Jan. 3, 2012) (dismissing claim for fraudulent inducement for failure to plead with particularity required by Rule 9(b)). For the same reasons the Amended Complaint fails to plead a common law fraud claim, it also fails to plead a fraudulent inducement claim.

## IV.   WOORI FAILS TO ALLEGE NEGLIGENT MISREPRESENTATION

Woori's claim for negligent misrepresentation should be dismissed for the same reasons its fraud claim fails. To plead a claim of negligent misrepresentation, Woori must allege: (1) the existence of a special relationship imposing a duty on CGMI to impart correct information; (2) that CGMI imparted information that was incorrect; and (3) that Woori reasonably relied on the information. *See J.A.O. Acquisition Corp.* v. *Stavitsky*, 8 N.Y.3d 144, 148 (2007). First, there is nothing "special" about the arm's-length, commercial relationship between CGMI and Woori. *See Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*, 478

F. App'x 679, 682 (2d Cir. 2012) (affirming dismissal of negligent misrepresentation claim by

CDO investor against arranging bank because "[t]he relationship between [the investor] and the

defendants was that of buyer and seller in a standard, arm's length transaction; and by its own

representations [the investor] possessed sufficient expertise to evaluate the risks of its

investment"); *see also HSH*, 95 A.D.3d at 208–09.  Indeed, as a condition of purchasing the

Armitage notes, Woori expressly disclaimed any such relationship with CGMI.  *See* Def. MTD

at 7–8, 20–21.  And second, the Amended Complaint does not plead that Woori reasonably relied

on any alleged misstatement by CGMI (*supra* at 12–17).  *See Meyercord* v. *Curry*, 38 A.D.3d

315, 316 (1st Dep't 2007) (dismissing negligent misrepresentation claim where plaintiff failed to

plead reasonable reliance); *Ashland Inc.* v. *Morgan Stanley & Co., Inc.*, 652 F.3d 333, 339 (2d

Cir. 2011) (same).

## V.      WOORI FAILS TO ALLEGE UNJUST ENRICHMENT

Woori's unjust enrichment claim likewise should be dismissed.  Under New York

law, the existence of a "valid and enforceable contract governing a particular subject matter,

whether that contract is written, oral, or implied-in-fact" precludes recovery in quasi-contract for

events arising out of the same subject matter.  *Beth Isr. Med. Ctr.* v. *Horizon Blue Cross & Blue

Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (citing *Clark-Fitzpatrick, Inc.* v. *Long

Island R.R. Co.*, 70 N.Y.2d 382, 388–89 (1987)); *Goldman* v. *Metro. Life Ins. Co.*, 5 N.Y.3d 561,

572 (2005).  Here, the Armitage offering circular constituted a written contract of sale that bars

Woori's claim for unjust enrichment (*see* AC ¶ 14).  *See Indep. Order of Foresters* v. *Donald,

Lufkin & Jenrette, Inc.*, 157 F.3d 933, 939–40 (2d Cir. 1998) (affirming dismissal of quasi-

contract claim because offering circulars and prospectuses were an offer and the trade settlement

was an acceptance creating a valid contract); *SNS Bank, N.V.* v. *Citibank, N.A.*, 7 A.D.3d 352,

356 (1st Dep't 2004) (dismissing unjust enrichment claim based on offering memorandum).

Even if Woori's investment in Armitage had not been governed by a sales

contract, Woori has failed to plead the elements of an unjust enrichment claim: "(1) that the

defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience

require restitution." *Nordwind* v. *Rowland*, 584 F.3d 420, 434 (2d Cir. 2009); *Beth Isr. Med.*

*Ctr.*, 448 F.3d at 586–87 (elaborating on the standard and dismissing unjust enrichment claims

because of existence of contracts). The Amended Complaint includes no allegations that

CGMI—rather than the issuer of the CDO notes—was enriched at Woori's expense. Further, as

this Court previously recognized, Woori's failure to "plead a valid fraud claim is . . . fatal to its

claim for unjust enrichment." (Op. at 11); *Chrysler Capital Corp.* v. *Century Power Corp.*, 778

F. Supp. 1260, 1272 (S.D.N.Y. 1991) ("[I]f the fraud allegations are dismissed or determined to

be without merit, then unjust enrichment is not a valid theory of recovery."); *Corsello* v. *Verizon*

*N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) ("[U]njust enrichment is not a catchall cause of action to

be used when others fail.").[8]

## VI.     THIS COURT SHOULD STRIKE WOORI'S CLAIM FOR PUNITIVE
##           DAMAGES

Woori's claim for punitive damages is inappropriate because the Amended

Complaint fails to allege the type of wrongful conduct aimed at the public generally that

"evinces a high degree of moral turpitude and demonstrates such wanton dishonesty as to imply

a criminal indifference to civil obligations." *See Ross* v. *Louise Wise Servs., Inc.*, 8 N.Y.3d 478,

489 (2007) (alterations omitted); *see also Whitney* v. *Citibank, N.A.*, 782 F.2d 1106, 1118 (2d

Cir. 1986) ("Under New York law, . . . punitive or exemplary damages may be awarded where a

---

[8]     The Amended Complaint also fails to adequately state a claim for unjust enrichment because Woori alone is
responsible for the consequences of its decision not to conduct any due diligence prior to investing in the CDOs.
*See Dragon Inv. Co. II LLC* v. *Shanahan*, 49 A.D.3d 403, 405 (1st Dep't 2008) (holding that an unjust
enrichment claim does not "relieve a party of the consequences of the party's own failure to exercise caution
with respect to a business transaction." (alteration and internal quotation marks omitted)).

defendant's conduct amounts to such gross, wanton or willful fraud, dishonesty, or malicious wrongdoing as to involve a high degree of moral culpability, making it appropriate to deter the defendants from engaging in similar conduct in the future and to induce the victim to take action against the wrongdoer."); *HSH*, 95 A.D.3d at 208–09 (denying punitive damages because alleged fraud in the sale of CDO did not involve "egregious conduct" aimed at public generally).  Absent such conduct, punitive damages are unavailable where, as here, a dispute centers on a commercial transaction between sophisticated parties.  *See Inter-Atl. Fund, L.P.* v. *Alvaro*, No. 0601611/2006, 2007 WL 2236595, slip op. at 10 (N.Y. Sup. Ct. Apr. 5, 2007) (noting a "garden-variety commercial dispute over a failed investment between sophisticated private parties does not implicate egregious tortious conduct directed at the general public").  Accordingly, Woori's demand for punitive damages should be stricken.

## CONCLUSION

For these reasons, CGMI respectfully requests that the Court dismiss the Amended Complaint in its entirety, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,

Dated:   New York, New York           PAUL, WEISS, RIFKIND, WHARTON &
         October 9, 2013               GARRISON LLP


                                           /s/Jessica S. Carey

                                       Brad S. Karp
                                       Susanna M. Buergel
                                       Jessica S. Carey
                                       1285 Avenue of the Americas
                                       New York, New York 10019-6064
                                       Tel.  (212) 373-3000
                                       Fax  (212) 757-3990
                                       bkarp@paulweiss.com
                                       sbuergel@paulweiss.com
                                       jcarey@paulweiss.com

                                       *Attorneys for Defendant Citigroup Global
                                       Markets Inc.*