USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 08/05/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                          :

WOORI BANK,                  :

                        :

              Plaintiff,       :             12-cv-3868 (KBF)

                        :

           -v-           :        OPINION & ORDER

                        :

CITIGROUP GLOBAL MARKETS, INC.,  :

                        :

             Defendant.     :

                        :

------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

      On May 15, 2012, plaintiff Woori Bank filed this action against defendant

Citigroup Global Markets, Inc., asserting claims of common-law fraud, fraud in the

inducement, negligent misrepresentation, and unjust enrichment. All of plaintiff's

claims arise out of its investment in a collateralized debt obligation ("CDO")

marketed and sold by defendants. (Am. Compl. ¶¶ 93–112, A–F, ECF No. 59.)[1]

      Pending before the Court is defendant's motion to dismiss the amended

complaint, primarily on the grounds that (1) plaintiff's causes of action are barred

by the applicable statute of limitations and (2) plaintiff cannot plausibly allege

justifiable reliance, a required element of fraud claims under New York law. (Mem.

of L. in Supp. of Mot. to Dismiss ("Def.'s Mot.") 1–2, ECF No. 67.) In support of its

motion, defendant relies on Woori Bank v. Merrill Lynch, 542 F. App'x 81 (2d Cir.

---

[1] This matter was initially assigned to Judge Laura Taylor Swain. By order dated March 27, 2013, Judge Swain dismissed the plaintiff's original complaint. (ECF No. 49.) By order dated August 15, 2013, Judge Swain granted plaintiff leave to amend. (ECF No. 57.) On May 29, 2014, the case was transferred to the undersigned.

2013), a recent decision of the Second Circuit on a set of facts substantially similar to, but not identical with, those of this case.

For the reasons set forth below, defendant's motion is GRANTED.

I.   BACKGROUND

   A. Procedural History

On May 15, 2012, plaintiff initiated this action. (Compl., ECF No. 1.) On July 27, 2012, defendants moved to dismiss (ECF No. 37), and on March 27, 2013, Judge Swain granted that motion on the basis that the complaint offered insufficient examples of fraudulent misrepresentation, relied primarily on "atmospherics," and contained "vague and conclusory" allegations of wrongdoing. (ECF No. 49 at 8–9.) On April 30, 2013, plaintiff moved to amend the complaint; Judge Swain allowed the amendment. (ECF Nos. 50–51, 57.)

On August 28, 2013, plaintiff filed its amended complaint, which is that now pending before this Court. That complaint contains notable differences from the prior: it alleges fraud with respect to only a single CDO (Armitage ABS CDO Ltd., hereinafter "Armitage") rather than the five CDOs identified in the original complaint, and eliminates all of the defendants named in the original complaint except defendant Citigroup Global Markets, Inc. (See Compl. ¶¶ 111–145.) The amended complaint expands the original complaint's allegations regarding defendant's misrepresentations about Armitage. (See id. ¶¶ 94–100; Am. Compl. ¶¶ 82–92). Finally, plaintiff has attached the Armitage CDO "pitch book" and Armitage financial data as exhibits to its amended complaint. (Id. Exs. 1, 2.)

On October 9, 2013, defendant filed the instant motion to dismiss the amended complaint.  (ECF No. 66.)  The motion became fully briefed on November 27, 2013.  (ECF No. 73.)  On May 29, 2014, the case was transferred to the undersigned.  On June 9, 2014, the Court heard oral argument on the instant motion.  (Oral Arg. Tr., June 9, 2014, ECF No. 82.)[2]

B.  Factual Background

The Court assumes the truth of the facts alleged in the amended complaint and draws all inferences in plaintiff's favor.

From 2000 to 2007, defendant earned substantial profits from arranging and underwriting collateralized debt obligations ("CDOs") based on residential mortgage-backed securities ("RMBS").  (Am. Compl. ¶¶ 3, 37.)[3]  From 2005 to 2007 alone, defendant arranged nearly $110 billion in CDOs.  (Id. ¶ 37.)

---

[2] On July 15, 2014, plaintiff requested a conference with the Court to discuss the possibility of seeking leave to amend; defendant opposed that motion.  (ECF Nos. 84, 85.)  Plaintiff's letter motion is DENIED.  Plaintiff's proposed amendment, which would incorporate information from a recent settlement agreement between Citigroup Inc. and the Department of Justice, is futile and would not affect the Court's disposition of this motion.  As set forth below, plaintiff's fraud claim accrued prior to May 2009 and is therefore time-barred; its discovery of an additional factual basis for that claim within the statute of limitations—including through Citigroup's recent mortgage settlement—cannot revive such a claim.  Furthermore, this litigation has been pending for more than two years, and plaintiff has already had a prior opportunity to amend.

[3] Typically, RMBS-backed CDOs aggregate payments on a group of residential mortgages; CDO investors purchase notes in exchange for a share of the homeowners' payments.  (Am. Compl. ¶¶ 15–20 & Ex. 1.)  Investors in CDOs balance the risk that some of the underlying mortgagees will default against a calculation that, because many mortgages and related securities are bundled together, the default risk is reduced.  (Id. ¶ 4 n.2.)  In this regard, an investor's risk depends on the particular class, or "tranche," of securities he purchases.  The "senior" tranches offer a lower rate of return, but are paid first from the income from the underlying mortgages; the "junior" tranches offer higher rates of return, but are paid only from the income left over after all the more senior tranches have paid out in full.  (Id. ¶ 17.)  Therefore, the junior tranches bear a higher risk of default.  (Id.)  Consequently, ratings agencies evaluate each tranche separately as to the risk it will go into default, with senior tranches generally having more favorable credit ratings than junior tranches.  (Id. ¶ 17, 20.)

In 2006, defendant began to recognize that the credit ratings on various CDO tranches did not reflect their true risk of default, in part because the underlying loans had been issued in violation of industry underwriting standards and were unreliable.  (<u>Id</u> ¶¶ 4, 39–41, 43–45.)  Plaintiff claims that defendant was aware of the discrepancies, even though CDO investors and ratings agencies were not, because it alone had access to the relevant data on the individual mortgages underlying the CDOs it offered for investment.  (<u>Id</u> ¶ 4.)[4]  To the extent that government agencies and third parties warned defendant of the risks of low-quality collateral, defendant allegedly ignored the warnings or used them to increase its margins by negotiating lower prices for the underlying loans, and did not disclose the risks to potential purchasers or ratings agencies.  (<u>Id</u> ¶¶ 49–50, 55–60.)  Plaintiff further asserts that defendant, in persuading banks and other entities to invest in CDOs, relied on historical data that it knew no longer reflected the actual likelihood that specific CDO tranches would return on investment.  (<u>Id</u> ¶¶ 4–5.)  Even as the risks began to come to light more broadly, defendant pressured ratings agencies to keep CDO credit ratings artificially inflated.  (<u>Id</u> ¶ 71–72.)

In March 2007, Citigroup or its affiliates formed Armitage ABS CDO, Ltd. and Armitage ABS CDO, Inc. (collectively, "Armitage"), for the sole purpose of issuing securities as a CDO.  (<u>Id.</u> ¶¶ 10–11.)  Plaintiff alleges that defendant arranged, underwrote, and served as a "placement agent" and direct seller for

---

[4] Citigroup itself did not originate many or any of the mortgages underlying the RMBS in its CDOs; rather, it purchased pools of mortgages originated by third-party lenders and then repackaged them into various financial instruments.  (Am. Compl. ¶ 34.)  In theory, Citigroup would investigate the quality of the loans prior to selecting them as collateral in its CDO products.  (<u>Id.</u> ¶¶ 45–46.)

Armitage.  (Id. ¶ 9.)  Armitage contained RMBS, related financial products based on residential mortgages, and shares of other CDOs, such as Class V.[5]  (Am. Compl. Ex. 1 at 1.)

Defendant included a $20 million interest in Class V Funding III ("Class V"), a CDO it arranged in late 2006, as one of the assets underlying Armitage.  (Id. ¶¶ 77, 80.)  Plaintiff alleges that, although Credit Suisse Alternative Capital, Inc., an independent portfolio manager, supposedly selected the Class V's underlying assets, defendant itself surreptitiously included assets it believed would fail.  (Id. ¶ 77.)  Then, by taking a short position[6] against Class V, defendant intended to and did profit from the CDO's default.  (Id. at ¶ 78–79.)[7]  According to plaintiff, defendant did not disclose this "collateral selection plus short" strategy in arranging the Class V CDO to potential investors in Armitage.  (Id. ¶ 80.)

In early 2007, defendant entered into discussions with plaintiff regarding a prospective investment in Armitage.  (Id. Ex. 1.)  In connection with plaintiff's prospective investment, defendant provided plaintiff with a "pitch book" that

[5] A CDO that includes interests in other CDOs among its assets is sometimes referred to as a "CDO-squared."

[6] "Short selling is a way to profit from a price drop in a company's stock. . . . To sell a stock short, you borrow shares from your broker and sell them at their current market price.  If that price falls, as you expect it to, you buy an equal number of shares at a new, lower price to return to your broker.  If the price has dropped enough to offset transaction fees and the interest you paid on the borrowed shares, you may pocket a profit."  Financial Industry Regulatory Authority, Stocks, http://www.finra.org/investors/smartinvesting/choosinginvestments/stocks/ (last visited July 30, 2014).

[7] Plaintiff bases these allegations on a lawsuit filed by the Securities and Exchange Commission against defendant in 2011.  Compl. ¶¶ 21–30, 34–35, 39–46, 50, 55, 63, SEC v. Citigroup Global Markets Inc., No. 11-cv-7387 (JSR) (S.D.N.Y. 2011), ECF No. 1 ("SEC Compl.").  In that complaint, the SEC alleges that Class V included collateral selected by defendant, that defendant intentionally concealed its involvement in such selection of those assets, and that defendant took a short position against Class V.  Id.  Although plaintiff pleads the facts surrounding Class V in a more skeletal fashion, its amended complaint incorporates the SEC complaint by reference.  (Am. Compl. ¶¶ 77–81.)  See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).

described the CDO and the potential benefits and risks of investment.  (Id. ¶ 82.)
The pitch book included a "break-even default analysis," a table purporting to show
rates at which the underlying assets could default if Armitage buyers were to break
even on their investment.  (Id. ¶ 84.)  Defendant had also previously provided
plaintiff with information on RMBS' historical rates of default, recovery of
investment, and changes in credit ratings.  (Id. ¶¶ 86–89.)  Taken together, the
information suggested that even the junior tranches of Armitage were unlikely to go
into default.  (Id.)  Plaintiff alleges that it relied on the break-even default analysis
and the historical default rates in deciding to invest in Armitage.  (Id. ¶¶ 83, 90.)

       Plaintiff alleges further that defendant, in its marketing materials, "touted
Vanderbilt Capital Advisors as experienced collateral managers that would act
independently to select Armitage CDO's collateral," while at the same time
exercising tacit control over Vanderbilt's selection of assets.  (Id. ¶ 91(B).)

       On March 29, 2007, plaintiff purchased a $25 million interest in Armitage
from defendant.  (Id. ¶ 7.)  Standard & Poor's ("S&P") had given an "A" rating to the
tranche of Armitage in which plaintiff chose to invest.  (Id. ¶ 7.)  An "A" rating
reflected S&P's assessment that the "obligor's capacity to meet its financial
commitment on the obligation [was] still strong."  (Id. ¶ 20.)  Plaintiff alleges that,
having never itself issued or underwritten a CDO, it lacked sophisticated knowledge
of CDO finance and instead relied on credit ratings to judge the safety of
prospective investments.  (Id. ¶¶ 28–29.)

Plaintiff claims that at the time of its investment in Armitage, defendant was aware of the deterioration of the market in residential mortgages, and that it knew that the breakeven default rate and historical information it provided plaintiff did not accurately represent the true risks of investing in Armitage.  (Id. ¶ 91(A).)

On November 19, 2007, Class V, a CDO included as collateral in Armitage, went into default.  (Id. ¶ 79.)  By December 4, 2007, Armitage itself was in default.  (Id. ¶ 7.)  Plaintiff sold its interest in Armitage on August 14, 2008.  (Id.)[8]  Plaintiff filed the instant lawsuit on May 15, 2012, alleging a variety of wrongdoing on the part of defendant.

Plaintiff asserts that it learned of defendant's wrongdoing from several sources that emerged subsequent to Armitage's default.

### 1.  The FCIC report

Plaintiff alleges it learned of defendant's wrongdoing in part from a report issued by the Financial Crisis Inquiry Commission ("FCIC") in January 2011.  (Id. ¶ 33.)  The FCIC was a federal investigatory body appointed to study the financial crisis.[9]  In January 2011, it issued its Financial Crisis Inquiry Report ("the Report").  (Id. ¶ 33.)  The Report contains the FCIC's findings as to the causes of the 2007–2008 financial crisis.  (Id.)  According to the Report, defendant went to great lengths to persuade customers around the globe to invest in CDOs and other structured

---

[8] The complaint does not specify the extent of plaintiff's loss on Armitage.  Of the five CDOs for which plaintiff originally asserted causes of action, Armitage is the only one for which plaintiff has not specified the extent of its loss.  Plaintiff did, however, originally describe all five as "worthless." (Compl. ¶ 7.)

[9] FCIC, History of the Commission, http://cybercemetery.unt.edu/archive/fcic/20110310173855/http://www.fcic.gov/about/history (last visited July 30, 2014).

financial products.  (Id. ¶ 38.)  The Report contained testimony by Richard M.
Bowen III, a former underwriter for Citigroup's Consumer Lending Group, in which
he stated that, as of mid-2006, the majority of loans purchased by Citigroup did not
meet the company's underwriting guidelines, and that Citigroup employees were
aware of the issues in loan quality as early as 2005.  (Id. ¶¶ 43–45.)

The Report found that, from January 2006 through June 2007, an
independent due-diligence provider, Clayton Holdings LLC ("Clayton"), had
identified 42% of Citigroup's mortgage purchases as below industry underwriting
standards.  (Id. ¶ 52.)  Citigroup, however, had packaged nearly one-third of the
non-conforming loans in the sample studied by Clayton, and all of the non-
conforming loans not included in the sample, into its financial products.  (Id. ¶¶ 52–
55.)  Allegedly, Citigroup used Clayton's findings to negotiate lower prices from the
original lenders on the loans it was purchasing to repackage into CDOs.  (Id. ¶ 54.)
Testimony before the FCIC also indicated that banks rarely, if ever, provided
Clayton's warnings to potential investors or to the ratings agencies that analyzed
the CDOs' creditworthiness.  (Id. ¶¶ 57–62.)

2.  Other reports and documents

Plaintiff also alleges that it learned of defendant's wrongdoing from, inter
alia, the following reports and documents:

- A transcript of an internal meeting of the ratings agency Moody's
  documenting its internal reactions at discovering, in 2007, that banks

had not disclosed the deteriorating quality of the residential mortgage market (id. ¶¶ 63–67);[10]

- A 2011 Senate subcommittee report finding that "[s]ome investment banks applied various types of pressure to maintain the status quo, despite the fact that the newer models were considered more accurate" (id. ¶ 72); and

- A 2007 internal report prepared by defendant that summarized growing internal concerns about the stability of defendant's CDO products (id. ¶ 41).[11]

    3. The SEC lawsuit

Finally, plaintiff refers to a complaint filed by the Securities and Exchange Commission against defendant on October 19, 2011 as a source of knowledge of defendant's wrongdoing.  The SEC complaint alleges that defendant's conduct in connection with the Class V CDO constituted securities fraud.  See SEC Compl. ¶ 2.[12]  The SEC alleges that defendant itself selected assets for inclusion in Class V, and that defendant anticipated the CDO would fail, as indicated by defendant's contemporaneous decision to take a short position against Class V.  (Mem. of L. in Opp. to Citigroup Global Markets, Inc.'s Mot. to Dismiss ("Pl.'s Opp.") 7, 12, ECF No. 70; see also SEC Compl. ¶¶ 21–30, 34–35, 39–46, 50, 55, 63.)  The SEC

---

[10] The U.S. House Committee on Oversight and Government Reform published this transcript on October 22, 2008.  Committee Holds Hearing on the Credit Rating Agencies and the Financial Crisis, http://oversight-archive.waxman.house.gov/story.asp?ID=2250 (last visited July 1, 2014).

[11] Plaintiff represents that the report was released to the public after May 2009, although it admits that it is unable to identify precisely when the document was published.  (Oral Arg. Tr. 33–34.)

[12] On June 4, 2014, the Second Circuit remanded the case after finding that the district court had applied an incorrect legal standard in assessing a consent decree.  SEC v. Citigroup Global Markets, Inc., No. 11-5227-cv (L), 752 F.3d 285, 289 (2d Cir. 2014).

complaint alleges that defendant's fraud consisted, in part, in misleading investors by suggesting that an independent collateral manager had selected the assets based on their quality.  (Id.)[13]

C. Plaintiff's claims

As stated, plaintiff initially commenced this lawsuit on May 15, 2012. (Compl. ¶ 1.)  Following amendment, it asserts claims of common law fraud, fraud in the inducement, negligent misrepresentation, and unjust enrichment.  (Am. Compl. ¶¶ 93–112.)  All four claims rely on a common set of factual assertions that defendant engaged in an array of misleading or deceitful practices in structuring, marketing, and selling Armitage.  Plaintiff alleges that defendant:

(i) represented to plaintiff that CDOs were attractive investments generally, and that Armitage specifically was as safe an investment as its credit ratings suggested, even as defendant became aware that the RMBS it was packaging into CDOs and other products were deteriorating in quality and reliability (id. ¶¶ 27, 38–57, 73–76, 82–90, 91(A));

(ii) represented to plaintiff that the assets in Armitage would be selected by Vanderbilt Capital Advisors, an independent and experienced asset manager, but in fact improperly influenced Vanderbilt's selection for its own benefit (id. ¶¶ 24, 91(B));

---

[13] As discussed above, on a motion to dismiss, the Court properly takes judicial notice of documents that have been incorporated into the complaint by reference.  See Cortec, 949 F.2d at 47.

(iii) included, as one of the assets underlying Armitage, an interest in the Class V CDO, a product defendant had wrongfully designed to fail (id. ¶¶ 77–81, 91(C)); and

(iv) did not disclose information on the deterioration in loan quality to the ratings agencies that provided credit ratings for CDO products, and otherwise interfered with the credit rating process, causing those products to receive ratings that did not reflect their true risk of default (id. ¶¶ 58–72, 91(D).)

## II.     APPLICABLE LEGAL PRINCIPLES

### A.  Motion to Dismiss

On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations, Ashcroft v. Iqbal, 556 U.S. 662, 678–80 (2009), and draws all reasonable inferences in plaintiff's favor.  Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232 (2d Cir. 2014).  To withstand dismissal, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  Thus, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Id. at 678–79.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

11

misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." Id. at 679 (internal punctuation omitted).

On a motion to dismiss, allegations of fraud must satisfy the heightened pleading standards of Rule 9(b) by stating "with particularity" the circumstances constituting the fraud.  Fed. R. Civ. P. 9(b).

> B. Legal Standards

In New York, the elements of a claim for fraud are that:

> (1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss.

Stephenson v. PricewaterhouseCoopers, LLP, 482 F. App'x 618, 622 (2d Cir. 2012), (internal punctuation omitted) (quoting Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 488 (2007)); see also Keywell Corp. v. Weinstein, 33 F.3d 159, 163 (2d Cir. 1994).

The elements of a claim for fraud in the inducement are practically identical, and include "(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by appellants; and (iv) resulting damages." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 143 (2d Cir. 2011) (citing Ross, 8 N.Y.3d at 488).

The elements of a claim for negligent misrepresentation are:

> (1) carelessness in imparting words; (2) upon which others were expected to rely; (3) and upon which they did act or failed to act; (4) to their damage.  Most relevant, the action requires that (5) the declarant must express the words directly, with knowledge or notice that they

will be acted upon, to one to whom the declarant is bound by some relation or duty of care.

Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 788 (2d Cir. 2003) (citation omitted).  In determining whether reliance on a particular statement was justified, the relevant factors are "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." Kimmell v. Schaefer, 89 N.Y.2d 257, 264 (1996).

The elements of a claim for unjust enrichment are that "(1) [defendant] was enriched, (2) at [plaintiff's] expense, and (3) that it is against equity and good conscience to permit [defendant] to retain what is sought to be recovered." Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182 (2011) (internal quotation marks omitted).

C.  Statutes of Limitations

In New York,

> [a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued . . . .

N.Y. C.P.L.R. § 202 (McKinney) (emphasis added).

New York law provides a six-year statutory period in which to bring actions based on fraud.  N.Y. C.P.L.R. § 213(8) (McKinney).  Because plaintiff purchased its interest in Armitage on March 29, 2007 and filed its original complaint on May 15, 2012, the action is timely under the New York statute of limitations.  (See Compl.;

Am. Compl. ¶ 7.)  Nevertheless, because the cause of action accrued in Korea, the plaintiff must also meet the requirements of the Korean statute of limitations.  N.Y. C.P.L.R. § 202; see also In re Coudert Bros. LLP, 673 F.3d 180, 190 (2d Cir. 2012) ("[I]f the foreign statute of limitations is shorter, then that is what controls.").[14]  The appropriate Korean statute of limitations is three years.  See Woori Bank v. Merrill Lynch, 923 F. Supp. 2d 491, 495 (S.D.N.Y. 2013) ("Merrill Lynch I"), aff'd, 542 F. App'x 81 (2d Cir. 2013) ("Merrill Lynch II").

"In borrowing the foreign statute, all the extensions and tolls applied in the foreign state must be imported with the foreign statutory period, so that the entire foreign statute of limitations applies, and not merely its period." Smith Barney, Harris Upham & Co. v. Luckie, 85 N.Y.2d 193, 207 (1995) (emphasis in original) (citation and internal punctuation omitted).  Under Korean law, a party "becomes aware of . . . damages and the identity of the tortfeasor" so as to commence the statute of limitations at the time that the party has "practical and specific awareness" of all the elements of the claim, as evaluated in light of all of the objective evidence.  (Decl. of Don-Hui Lee ("Lee Decl.") ¶¶ 10–12, ECF No. 69; see also Decl. of Hon. Suk-Soo Kim & Si-Yoon Lee ("Kim Decl.") ¶ 12, ECF No. 72.)[15] See also Merrill Lynch I, 923 F. Supp. 2d at 498 ("Korean law requires an analysis of the 'totality of the objective evidence'—including press reports, government investigations, and other lawsuits—to determine when a plaintiff can be deemed to have 'practical and specific awareness' of a claim.").

---

[14] Plaintiff is headquartered in Korea and organized under Korean law.  (Am. Compl. ¶ 1.)  The parties agree that the cause of action accrued in Korea.  (Pl.'s Opp. 1; Def.'s Mot. 7–8.)
[15] The parties do not dispute the validity of this proposition.  (See Def.'s Mot. 8; Pl.'s Opp. 5.)

D. <u>Claim Accrual</u>

Statutes of limitations exist with respect to claims.  If a plaintiff knew or should have known of a claim, the statute begins to run.  This is a distinct concept from the dates of particular facts upon which a claim may be based.  Thus, once a claim has "accrued"—that is, once it has "come into existence as an enforceable claim or right," <u>Black's Law Dictionary</u> (9th ed. 2009)—the statute begins to run.  <u>See</u> <u>Gabelli v. SEC</u>, 133 S. Ct. 1216, 1220 (2013) ("[A] right accrues when it comes into existence . . . . [A] claim accrues when the plaintiff has a complete and present cause of action." (citation and internal quotation marks omitted)); <u>Cruden v. Bank of N.Y.</u>, 957 F.2d 961, 974 (2d Cir. 1992) (explaining that a fraud claim accrues "when a plaintiff with assumed knowledge of the fraudulent wrong may assert a claim for relief"); <u>Ely-Cruikshank Co. v. Bank of Montreal</u>, 81 N.Y.2d 399, 402 (1993) ("Generally, any Statute of Limitations begins to run when a cause of action accrues.") (citation omitted).

Whether additional facts—dated or discovered later in time—come to light does not restart an already-accrued claim.  Put simply, once Woori's <u>claim</u> based on Citibank's conduct with respect to the Armitage CDO had accrued, the statute started to run.  That Woori discovered facts several years later making such a claim all the stronger (in particular, alleged facts relating to Class V) does not alter the original commencement of the limitations period.

A threshold question in this case, given how plaintiff has argued its position, is when plaintiff Woori's claim first accrued.  Did the claim first accrue with the host of information publicly available before May 2009, or did it accrue later?

15

While plaintiff argues that its claim accrued only later—as of the FCIC report and the SEC complaint—each of plaintiff's claims relies on the same set of operative facts. Those facts by and large relate to Citibank's alleged conduct prior to May 2009. As discussed below, all but certain facts relating to one piece of collateral—the Class V CDO—were or should have been known to plaintiff prior to May 2009. Because plaintiff could have stated its claim based on facts of which it had practical and specific awareness prior to May 2009, its claim accrued prior to May 2009. Later-learned, additional facts perhaps strengthened that accrued claim but could not restart the clock. Plaintiff has not argued—nor could it—that its claims accrued at different times.[16]

III.   DISCUSSION

   A. The Statute of Limitations

For its claims to be timely under Korean law, plaintiff must have developed the awareness necessary to assert a claim no earlier than May 15, 2009, three years prior to its filing of the original complaint.

   1. Plaintiff's awareness of its claims

Plaintiff's claims are time-barred to the extent that they relate to defendant's alleged misrepresentations to ratings agencies, defendant's alleged misrepresentations about the state of the RMBS market, and defendant's general practices in structuring and selling CDOs (Am. Compl. ¶¶ 27, 38–76, 82–90, 91(A),

---

[16] To be clear, it is not the mere presence of <u>some</u> fact prior to May 2009 that triggered the start of the statute of limitations. Rather, the statute of limitations was triggered when plaintiff knew or should have known of <u>any and all</u> facts sufficient to state a fraud claim. That occurred before May 2009.

91(D)) because plaintiff had or should have had the necessary practical and specific awareness of these grounds for its causes of action prior to May 15, 2009.[17]  See Merrill Lynch II, 542 F. App'x at 82.

Plaintiff argues that it did not develop practical and specific awareness of its claims until the publication of several sources of information that became available only after May 2009, including the information on Clayton's findings included in the FCIC Report, the Bowen testimony, the internal Citigroup report, and the SEC complaint.  (See, e.g., Am. Compl. ¶¶ 43–45; Pl.'s Opp. 7; Oral Arg. Tr. 31–34.)  With one notable exception (discussed below), the Court does not agree that these sources provided any new information.  Rather, they restated what had already been well-publicized.

Defendant has provided excerpts of 69 news articles, legal complaints, and other public sources that demonstrate a high degree of public awareness about defendants' allegedly wrongful conduct (Decl. of Marques S. Tracy in Supp. of Mot. to Dismiss ("Tracy Decl."), Ex. B, ECF No. 68.)[18]  These public documents gave notice, inter alia, of deterioration in the housing market; of the possibility that banks had used mortgage collateral that violated underwriting standards; that Clayton's clients were ignoring its warnings; that banks had moved "toxic"

---

[17] Korean law does not explicitly incorporate a doctrine of constructive notice.  However, the parties do not dispute that plaintiff need not have had actual awareness of its cause of action to commence the statute of limitations.  (Lee Decl. ¶ 13 ("Press reports, commencement of regulatory investigations, and prior lawsuits based on the same or similar facts are possible triggers for the injured party's practical and specific awareness."); Kim Decl. ¶ 10 (evaluating the quality of public materials, not plaintiff's actual awareness, to determine the commencement of the statutory period).)

[18] On a motion to dismiss, the Court may take judicial notice of publicly available news articles and of public complaints in other proceedings.  GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd., 580 F. Supp. 2d 321, 330 (S.D.N.Y. 2008); In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 251 n.5 (S.D.N.Y. 2003).

collateral into CDO products; and that ratings agencies had come under scrutiny for giving unjustifiably optimistic credit ratings to CDOs.

These documents provided or should have provided plaintiff with "practical and specific awareness" of its claims and commenced the statute of limitations prior to May 2009.  See Merrill Lynch I, 923 F. Supp. 2d at 497.  Merrill Lynch I involved nearly (but not entirely) identical allegations by this plaintiff against another U.S. bank with regard to plaintiff's investment in its CDOs.  There, as here, the Korean statute of limitations was directly at issue.  In that case, and confronted with similar arguments to those raised here, Judge Victor Marrero found that plaintiff had the practical ability to sue in 2009, before the publication of the FCIC Report in 2011, because news reports, civil complaints, and other public sources of information had "publicize[d] general problems with mortgages issued by subprime lenders."  923 F. Supp. 2d at 496.  While the FCIC Report "provide[d] further elaborations" on the public record, it "provide[d] little additional information specifically applicable to Woori's claims" such as would be necessary to provide the requisite degree of practical and specific awareness under Korean law.  Id. at 498. The Second Circuit affirmed Judge Marrero's analysis on appeal.  Merrill Lynch II, 542 F. App'x at 82.

In the case before this Court, plaintiff again alleges—as it did in Merrill Lynch I—that it lacked the necessary "practical and specific awareness" of its claims until the publication of the FCIC Report.  According to plaintiff, the public documents cited by defendant (Tracy Decl. Ex. B) did not independently make it

aware of defendant's alleged wrongdoing with regard to Armitage because only two of the 69 documents referenced in that exhibit mention Class V, and none refers to Armitage itself.  (Pl.'s Opp. 6.)  Plaintiff further asserts that references to problems in the CDO market or of lawsuits brought against Citigroup were so general that it could not have adequately supported allegations of fraud until the FCIC report. (Id.)  Plaintiff claims that the publication of the FCIC Report incorporating the Clayton analysis as well as the revelation of internal Citigroup warnings provided it with a specific basis for its fraud claims.[19]

Plaintiff's argument here does not differ in any material way from that which it asserted in Merrill Lynch.  See Compl. ¶¶ 66–67, 74–78, Woori Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc. et al., No. 12-cv-3993 (VM) (S.D.N.Y. 2012), ECF No. 1 ("Merrill Lynch Compl.").  That is, plaintiff argues that the Clayton analysis and the internal Citigroup warnings alone were insufficient to provide it with the type of specific factual basis necessary to sustain a claim of fraud.  Merrill Lynch I, 923 F. Supp. 2d at 498, aff'd, Merrill Lynch II.  This Court agrees that, as in Merrill Lynch, the FCIC Report's inclusion of Clayton findings provided, at most, an overview of the low quality of Citigroup's RMBS products as a whole.  (See Am. Compl. ¶ 52 (citing All Clayton Trending Reports: 1st Quarter 2006 – 2nd Quarter 2007, Financial Crisis Inquiry Commission (Sept. 23, 2010), available at

---

[19] Notably, arguing that the FCIC Report provided it with a specific basis for its fraud claims forecloses plaintiff from arguing that only the facts relating to Class V in the SEC complaint pushed its fraud claim into the realm of viability.  This is important because, if plaintiff's claim accrued based on material in the FCIC report (but of which it had practical and specific awareness prior to the Report's publication), its claim is untimely.  However, if its claim only first became viable when plaintiff learned of the SEC complaint, accrual would not have occurred until the date upon which that complaint was filed, and its claims here would have been timely.  Plaintiff, however, fundamentally relies on the materials in the FCIC report for viability, and so does this Court.

http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-T rending-Report.pdf).)  The publication of Clayton's analysis added little to the preexisting documentation of defendant's practices in the global media and in numerous U.S. lawsuits prior to May 2009.  See Merrill Lynch I, 923 F. Supp. 2d at 498 (explaining that the FCIC relied on "the large body of publicly available pre-existing literature").[20]  Similarly, Citigroup's internal warnings indicate only what was already widely known before 2009: that the banks had been, at very least, wilfully blind to the possibility of financial collapse as early as 2005 or 2006, and did not warn their clients and partners.

Finally, plaintiff argues that, since the documents to which defendant now refers were in English and published in the United States or listed on court dockets in the United States, under Korean law they "do not have the same aura of credibility and specificity concerning unlawful and fraudulent conduct that was reported by the FCIC."  (Kim Decl. ¶ 27.)  Like Judge Marrero, this Court does not agree with this argument.  See Merrill Lynch I, 923 F. Supp. 2d at 496 n.3 (finding it "curious" and implausible that Woori would digest the 500-page FCIC Report and yet overlook "years of business publications regularly and explicitly covering matters directly pertinent to Woori's investment").  The documents were not published in obscure places, but were rather largely in major publications with wide international distribution, such as The Wall Street Journal, The New York Times, The Economist.  (See Tracy Decl. Ex. B.)

---

[20] Nearly identical allegations based on the Clayton data were before Judge Marrero in Merrill Lynch I.  See Merrill Lynch Compl. ¶¶ 74–86.

Thus, since plaintiff's claims are premised, <u>inter alia</u>, on the Clayton findings, Bowen testimony, internal Citigroup memorandum, and other information underlying the FCIC Report but available prior to May 2009 (Am. Compl. ¶¶ 27, 38–76, 82–90, 91(A), 91(D)), they are time-barred.  These documents provided plaintiff with the "practical and specific awareness" of its claims prior to May 15, 2009.

        2.  <u>The Class V CDO</u>

The Court notes that separate issues relating to the Class V CDO (collateral contained within Armitage) merit additional discussion.  In the complaint before this Court, plaintiff's claims are based largely on facts known prior to May 2009. However, plaintiff also alleges certain additional conduct with regard to the Class V CDO (Am. Compl. ¶¶ 77–81, 91(C)).  As the Class V CDO was included as collateral in Armitage, it was, in effect, a CDO collateralizing a CDO.  In particular, plaintiff alleges that Citigroup surreptitiously selected assets for Class V it knew were likely to default and that Citigroup shorted Class V.  (Am. Compl. ¶¶ 77–81.)  These allegations are based on the SEC complaint first filed in October 2011.  No allegations relating to the Class V CDO were present in the complaint before Judge Marrero in <u>Merrill Lynch I</u>.  <u>See generally</u> <u>Merrill Lynch</u> Compl.

The specific factual allegations relating to the Class V CDO collateral raise the following issue: do they represent a separate claim or are they part of the same claims plaintiffs allege based on facts known prior to May 2009?  The answer to this question has obvious implications for the statute of limitations.  If the facts relating

to Class V are simply additional facts supporting the claims that accrued before

May 2009, then the mere presence of those facts cannot revive a claim as to which

the statute of limitations has run; nor would such facts restart an already-running

statute of limitations.  Put bluntly, facts suggestive of an even stronger fraud claim

and which happen only to have been discovered more recently cannot revive that

which was already moribund.  See Gabelli, 133 S. Ct. at 1220; Cruden, 957 F.2d at

974; Ely-Cruikshank, 81 N.Y.2d at 402.

Defendant argues that plaintiff could have learned materially similar

information from the complaint filed in Epirus Capital Management, LLC, et al. v.

Citigroup Inc., et al., No. 09-cv-2594 (SHS), ECF No. 1 ("Epirus Compl.") (alleging

that Citigroup had engaged in fraudulent and deceptive business practices in

arranging and marketing another CDO product that included Class V shares).

(Def.'s Mot. 10; Tracy Decl. Ex. B.)  That is largely true.  The complaint in Epirus

mentioned that Citigroup repackaged "unwanted assets," including Class V, into

new CDO products.  While the Epirus complaint did not specify that Citigroup also

shorted Class V, the overall disclaimers relating to Armitage mention shorting as a

general possibility.

Nevertheless, the Court agrees with plaintiff that, standing alone, the Epirus

complaint could not give plaintiff practical and specific awareness of its claims.  It is

only one piece of a "totality" of evidence available to plaintiff.  Merrill Lynch I, 923

F. Supp. 2d at 498.  It is also true that the SEC complaint put the pieces together

regarding Class V—asserting not only that defendant played a role in the selection

of the Class V assets but also taking a short position against the assets within Class V.  The allegations relating to Class V do not, however, provide a basis for plaintiffs' claims, which accrued by May 2009, to be timely.  Plaintiff has not pled a separate fraud claim (or any type of claim) with respect to Citibank's conduct in connection with Class V.  The Court will not parse collected facts into independent claims.  Instead, the Class V factual allegations are taken in the manner in which they are pled: as additional evidence supportive of plaintiff's claims.  It is simply one piece of evidence—a factual allegation—supporting a broader claim.

Accordingly, the later-discovered Class V allegations cannot save a previously accrued claim from being time-barred.  Defendant's motion to dismiss is GRANTED.

V.     CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the complaint is GRANTED on the basis that its claims are time-barred.  Accordingly, the Court need not and does not reach the other bases asserted for dismissal.

The Clerk of Court is directed to close the motions at ECF Nos. 66 and 84 and to terminate this action.

SO ORDERED.

Dated:     New York, New York
           August 5, 2014

_____
     KATHERINE B. FORREST
     United States District Judge

23